UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

_____

MEL MARIN,

                                        Plaintiff,


v.                                                          6:24-cv-1009
                                                            (DNH/TWD)


WALTER T. MOSLEY et al.,

                                        Defendants.

_____

APPEARANCES:                                    OF COUNSEL:

MEL MARIN
*Plaintiff, pro se*
Box 80715
San Diego, CA 92138

**THÉRÈSE WILEY DANCKS**, United States Magistrate Judge

## REPORT-RECOMMENDATION AND ORDER

## I.    INTRODUCTION

The Clerk has sent to the Court for review a complaint and amended complaint submitted by *pro se* plaintiff Mel Marin ("Plaintiff").  Dkt. Nos. 1, 7.  Plaintiff has not paid the statutory filing fee, seeks leave to proceed *in forma pauperis* ("IFP"), and has moved to seal his IFP application.  Dkt. Nos. 2, 3.  For the reasons stated below, the undersigned recommends Plaintiff's complaint be dismissed.

## II.    IFP APPLICATION

"28 U.S.C. § 1915 permits an indigent litigant to commence an action in a federal court without prepayment of the filing fee that would ordinarily be charged."  *Cash v. Bernstein*, No. 1:09-CV-1922, 2010 WL 5185047, at *1 (S.D.N.Y. Oct. 26, 2010).  Upon review, Plaintiff's IFP

application demonstrates economic need, *see generally*, Dkt. No. 2, therefore, he is granted permission to proceed IFP.

Under both the common law and the First Amendment, there is a general presumption in favor of public access to judicial documents. *See Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 119 (2d Cir. 2006). Documents submitted to the Court to influence its decision on a motion or application are judicial documents to which the presumption of public access attaches. *See id*. at 121. Such judicial documents generally "'may be sealed if specific, on the record findings are made demonstrating that closure is essential to preserve higher values and is narrowly tailored to serve that interest.'" *Id*. at 120 (quoting *Matter of New York Times Co.*, 828 F.2d 110, 116 (2d Cir. 1987). "With respect to IFP applications, general concerns over disclosure of financial status have been held insufficient to overcome the presumption of public access." *Wimberly v. Experian Info. Sols.*, No. 1:18-CV-06058, 2021 WL 1146277, at *1 (S.D.N.Y. Mar. 24, 2021) (denying the plaintiff's application to seal affidavit submitted in connection with application for IFP status).

Here, Plaintiff argues his "IFP Application includes confidential banking information, as well as each expenditure and debt which he asserts is confidential," therefore, his application to proceed IFP "should be sealed." Dkt. No. 3 at 6. [1, 2] However, Plaintiff's assertion that such

---

[1] Citations to Plaintiff's submissions will refer to the pagination generated by CM/ECF, the Court's electronic filing system. Unless otherwise indicated, excerpts from the record are reproduced exactly as they appear in the original and errors in spelling, punctuation, and grammar have not been corrected.

[2] Plaintiff also states "[a] California court has already sealed at least 3 times this plaintiff's financial records that he now provides on this court's IFP application," as "[t]he California Constitution and statutes automatically seal such financial records . . . ." Dkt. No. 3 at 3-4. Accordingly, Plaintiff contends "[t]hat right to have the California decision sealing these same financial numbers honored here, is a fundamental federal right because it is based on Article IV . . . . Therefore, plaintiff is entitled to the sealing of the IFP application here." *Id*. at 4. However,

information is "confidential" is insufficient to overcome the presumption of public access. *See id.* at 2. Moreover,

> [i]f personal financial information were held *per se* grounds for sealing, all . . . [documents] submitted with requests for *in forma pauperis* status under 28 U.S.C. § 1915 would automatically be sealed. Such is not the case. Financial affidavits, like other judicial documents, are presumptively open to public access and sealed only upon demonstration of compelling grounds.

*Sardarian v. Fed. Emergency Mgmt. Agency*, No. 3:19-CV-0910, 2019 WL 8331444, at *3 n.3 (D. Conn. Sept. 16, 2019).

The Court further notes there is nothing in Plaintiff's application or accompanying motion indicating he is differently situated from any other litigant seeking IFP status. *See*, *e.g.*, *Marin v. Chancellor, Univ. of Oxford*, No. 1:22-CV-2839, 2022 WL 3328154, at *1 (S.D.N.Y. July 18, 2022) (denying the plaintiff's "request to seal his IFP application" noting the plaintiff "assert[ed] no other facts suggesting that he is differently situated from other litigants seeking IFP status who submit the form without a sealing order."), *motion to certify appeal denied*, 2022 WL 4780823 (S.D.N.Y. Oct. 3, 2022). Accordingly, Plaintiff's motion to seal his IFP application is denied.

## III.     BACKGROUND

### A.  Plaintiff's Complaint

Plaintiff's amended complaint lists the following defendants: (1) "WALTER T. MOSLEY, SECRETARY OF STATE OF THE STATE OF NEW YORK," (2) "THE HONORABLE CHRISTINA RYBA," (3) "HENRY T. BERGER, PETER S. KOSINSKI,

---

he acknowledges his "sealing requests for the IFP application have been commonly denied in most of the federal courts to which he applied because all of those courts applied the federal common law rule . . . ." *Id.* at 5. To the extent Plaintiff seeks to have his IFP application submitted to this Court sealed pursuant to California law, any such request is denied.

ESSMA BAGNUOLA, [and] ANTHONY K. CASALE, IN THEIR PERSONAL AND

OFFICIAL CAPACITIES," and (4) "THE NEW YORK STATE BOARD OF ELECTIONS"

("NYSBOE").  Dkt. No. 7 at 1.[3]  He asserts "[t]his court has jurisdiction under 28 U.S.C. § 1331

from Article II, § 1, Article VI, cl. 2, and the 1st and 14th Amendments to the Constitution of the

United States, and 42 U.S.C. § 1983 . . . ."  *Id*. at 2.

Plaintiff "is a supporter of Robert F. Kennedy, Jr., and has a right to see Mr. Kennedy's

name on the ballot in Oneida County as the Independent Candidate for President of the United

States, and to vote for Mr. Kennedy in the General Election . . . ."  *Id*. at 3.[4]  "Plaintiff was being

processed for paid employment as a telefundraiser in the Kennedy Campaign . . . and he

understood . . . that once he reached a certain level of calls he would be paid as staff because

they were desperate for callers . . . ."  *Id*. at 4.

> The likelihood that [Plaintiff] would have reached the required
> number of calls to start being paid was high because he was a stock
> and commodity broker for Merrill Lynch in 1980, and rose to the
> top 1% in the nation in opening new accounts because of his phone
> skills on "cold calling"; His intent was to call into New York where
> the campaign demand was high . . . . Therefore, the elimination of
> Mr. Kennedy from the New York race interfered with [Plaintiff]'s
> employment between August to November 2024 . . . .

*Id*. at 5.

---

[3] Plaintiff's complaint, Dkt. No. 1, was filed on August 16, 2024, and his amended complaint, Dkt. No. 7, was filed on August 19, 2024.  "It is well established that an amended complaint ordinarily supersedes the original and renders it of no legal effect."  *Int'l Controls Corp. v. Vesco*, 556 F.2d 665, 668 (2d Cir. 1977) (citations omitted).  Accordingly, the undersigned will solely assess the merits of the amended complaint.

[4] The undersigned notes, while Plaintiff states he: (1) "is a domiciliary of New York," (2) "is the trustee of his family's residence" located within the state "despite the county's attempt to seize that residence," (3) "holds a NY license, has filed NY tax returns," (4) "registered for classes at the University of Albany and HVCC in the past four years," (5) "had a law office at the Empire State Building before retiring from law practice," (6) "holds two NY bank accounts, and intends to return to New York," and (7) "*has been* registered to vote in New York for 26 years," Dkt. No. 7 at 3 (emphasis added), he does not explicitly state he is a *resident* of the State of New York.

Plaintiff further argues his "professional career within the Kennedy Team and in the government was also hurt by the removal of RFK Jr. because [Plaintiff] had financial training that gave him a unique understanding of the root economic causes afflicting this nation . . . ." *Id.* at 6.  In support of this contention, Plaintiff states he "was an Intern to the President in the Carter White House a year after he was an Intern to Senator Edward M. Kennedy" and "drafted a policy paper for the Kennedy team in June and July based on this training in money management that showed how what he calls the Suicide Economy, our uncontrolled pattern of rampant inflation followed by crippling recession, is breaking the nation apart . . . ." *Id.* at 7.  Plaintiff "also learned from driving an ambulance for years that the polls are useless, because Reagan Democrats put presidents in office and take them out." *Id.*  Plaintiff contends:

> A reasonable jury from this is able to find that if [Plaintiff] raised funds in New York for Mr. Kennedy, [Plaintiff] would likely have been paid before the end of the campaign, and would likely have taken a position in the Kennedy White House to help heal the economic problems and to get paid for that too, because he had first class training in a prior White House and practical training as a broker with Merrill Lynch, and was stopped early by these defendants' unconstitutional acts.

*Id.* at 9.

With respect to his first cause of action, "FOR DELCARATORY JUDGMENT AND INJUNCTION," Plaintiff seeks for the attached ruling of Judge Ryba [5] to

> be declared to be void and this court must enjoin the Secretary of State of New York and the commissioners of the New York Elections from honoring it, and must stay the deadline for printing the names of *all* candidates on the NY ballot until Mr. Kennedy's name is included therein, and to direct the Secretary to place Mr. Kennedy's name on all original ballots ahead of the names other

---

[5] The Court notes Plaintiff submitted a copy of the August 12, 2024, decision of New York Supreme Court, Albany County, in *Cartwright v. Kennedy* as an exhibit to his original petition. *See* Dkt. No. 1-1.  The undersigned assumes Plaintiff is referencing such decision when referring to the "attached ruling" in his amended complaint.

> presidential candidates to compensate in equity for the unequal
> protection of the laws visited upon Kennedy and his candidacy by
> the ruling of Judge RYBA.

*Id*. at 13-14 (emphasis in original).  Plaintiff avers Judge Ryba's order violates "Article II, § 1,

clause 5" because the U.S. Constitution does not "require integrity, nor residency in any

particular state" to be president.  *Id*. at 14.  He further contends the order violates "Article VI, cl.

2" as "adding the New York state residency law to the Federal Constitution is not consistent with

federal law."  *Id*. at 15.  Next, Plaintiff argues "[t]he ruling violates the 1st Amendment because

dishonest and fraudulent speech . . . is legal expression under the 1st Amendment."  *Id*. at 16.  He

also claims a violation of the "14th Amendment," stating:

> The due process clause was violated because the process due was
> the one that places Kennedy's name on the ballot because he meets
> the qualifications set forth by the Constitution . . . .  The equal
> protection clause was violated  because the judge did not remove
> Trump's name from the ballot, although he has a long history of
> courts finding dishonesty years before this election.

*Id*. at 16-17.  Plaintiff also references "The Civil Rights Act," *id*. at 21, claiming "[t]his state

judge demonstrated voter fraud under color of state law."  *Id*. at 23.

Next, Plaintiff's second cause of action "FOR DAMAGES AGAINST MS. RYBA"

alleges he "spent countless hours supporting Mr. Kennedy in this race . . . [and] would have

made between $10,000 to $30,000 on telefundraising calls into New York but for the removal

order of Mr. Kennedy from the race."  *Id*. at 24-25.  He avers "[t]he unconstitutional conduct of

the judge was the actual, proximate and substantial cause of the loss of that value of [Plaintiff]

past time and anticipated salary."  *Id*. at 25.  Plaintiff contends "Judge RYBA has no judicial

immunity" with respect to this cause of action "because she purported to change the Federal

Constitution" and "acted in the clear absence of jurisdiction . . . ."  *Id*. at 25-26 (internal

quotations omitted).  He "seeks and is entitled to nominal damages against the Judge in her

personal capacity, of $1" and "is entitled to punitive damages against the same citizen purporting

to act as a judge because the parameters of constitutional law and the Supremacy Clause barring

the judge's conduct have been very clear . . . so the test of punitive damages is met." *Id.* at 29.

### B. *Team Kennedy v. Berger*

In addition to the facts contained in Plaintiff's pleadings, the undersigned takes judicial

notice of an Order from the U.S. District Court for the Southern District of New York in *Team

Kennedy v. Berger*. *See generally*, No. 1:24-CV-3897, 2024 WL 4144057, at *1 (S.D.N.Y. Sept.

10, 2024).[6] Team Kennedy, America Values 2024, and Jeffrey Rose commenced said action

with an emergency request for preliminary injunction in the Southern District asking the court to

enjoin the NYSBOE's enforcement of the State's Court's decision in *Cartwright v. Kennedy* and

order the NYSBOE to keep Kennedy on the ballot.[7] *See id.* As the Southern District explained:

> "[T]o obtain a preliminary injunction against governmental action
> taken pursuant to a statute, the movant has to demonstrate (1)
> irreparable harm absent injunctive relief, (2) a likelihood of success
> on the merits, and (3) public interest weighing in favor of granting
> the injunction. The movant also must show that the balance of
> equities tips in his or her favor." *Yang v. Kosinski*, 960 F.3d 119,
> 127 (2d Cir. 2020) (internal quotation marks, footnote, and
> alteration omitted). A district court may enter a prohibitory
> preliminary injunction staying "government action taken in the
> public interest pursuant to a statutory or regulatory scheme" only
> when the moving party has demonstrated that (1) absent injunctive
> relief, he will suffer "irreparable injury," and (2) there is "a
> likelihood that he will succeed on the merits of his claim."
> *Mastrovincenzo v. City of New York*, 435 F.3d 78, 89 (2d Cir. 2006)
> (internal citations omitted).

---

[6] *See also*, *e.g.*, *Kurtz v. New York*, No. 9:24-CV-0073 (AMN/DJS), 2024 WL 3488408, at *2
(N.D.N.Y. July 19, 2024) (explaining, "[p]ursuant to Fed. R. Evid. 201, a court may at any stage
of a proceeding take judicial notice of 'a fact that is not subject to reasonable dispute because it
(1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and
readily determined from sources whose accuracy cannot reasonably be questioned.'").
[7] No. 906349-24, 2024 WL 3894605, at *1 (N.Y. Sup. Ct. Aug. 13, 2024), *aff'd*, 230 A.D.3d 969
(N.Y. App. Div. 2024), *appeal dismissed, leave to appeal denied*, 42 N.Y.3d 943 (2024).

*Id*. at *4 (quoting *Mastrovincenzo v. City of New York*, 435 F.3d 78, 89 (2d Cir. 2006)).

Ultimately, the Court in *Team Kennedy* determined: (1) "Plaintiffs have failed to show they are

likely to succeed on the merits of their U.S. constitutional claims," (2) "[b]ecause Plaintiffs have

not demonstrated a likelihood of success on the merits, the Court finds that they have not

established irreparable harm," and (3) "[e]ven if Plaintiffs could establish a likelihood of

prevailing on the merits, the public interests of the State outweigh those of the Plaintiffs."  *Id*. at

*17 (citation and footnote omitted).  Accordingly, the plaintiffs' emergency request for a

preliminary injunction was denied.  *See id*. at 18.

The plaintiffs in *Team Kennedy* subsequently moved for an emergency injunction

pending appeal in the U.S. Court of Appeals for the Second Circuit.  *See Kennedy v. Berger*, No.

24- 2385, 2024 WL 4274191 (2d Cir. Sept. 18, 2024).  On September 18, 2024, the Second

Circuit denied the plaintiffs' motion.  *See id*.  Thereafter, the plaintiffs submitted an application

for a writ of injunction to the U.S. Supreme Court, which was denied on September 27, 2024.

*See Team Kennedy v. Berger*, No. 24A285, 2024 WL 4312515 (Sept. 27, 2024).

## IV.    LEGAL STANDARD

Section 1915 of Title 28 requires a district court to dismiss an *in forma pauperis*

complaint if the action is frivolous or malicious, fails to state a claim upon which relief may be

granted, or seeks monetary relief against a defendant who is immune from such relief.  *See* 28

U.S.C. § 1915(e)(2)(B)(i)-(iii); *Livingston v. Adirondack Beverage Co.*, 141 F.3d 434, 437 (2d

Cir. 1998).  The Court must also dismiss a complaint, or portion thereof, when the Court lacks

subject matter jurisdiction.  *See* Fed. R. Civ. P. 12(h)(3) ("If the court determines at any time that

it lacks subject-matter jurisdiction, the court must dismiss the action.").

While the law mandates dismissal on any of these grounds, the Court is obliged to construe *pro se* pleadings liberally, *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009), and interpret them to raise the "strongest arguments that they *suggest*." *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474-75 (2d Cir. 2006) (internal quotation marks and citation omitted, emphasis in original). A claim is frivolous when it "lacks an arguable basis either in law or in fact." *Neitzke v. Williams*, 490 U.S. 319, 325 (1989), *abrogated on other grounds Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007); *see also Denton v. Hernandez*, 504 U.S. 25, 33 (1992) ("[A] finding of factual frivolousness is appropriate when the facts alleged rise to the level of the irrational or the wholly incredible"); *Livingston*, 141 F.3d at 437 ("[A]n action is 'frivolous' when either: (1) the factual contentions are clearly baseless . . . or (2) the claim is based on an indisputably meritless legal theory.").

In determining whether a complaint states a claim upon which relief may be granted, "the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor." *Hernandez v. Coughlin*, 18 F.3d 133, 136 (2d Cir. 1994) (citations omitted). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id*.

Moreover, a court should not dismiss a *pro se* complaint "without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Gomez v. USAA Fed. Sav. Bank*, 171 F.3d 794, 795 (2d Cir. 1999) (citation and internal quotation marks omitted). However, an opportunity to amend is not

required where "the problem with [the plaintiff's] causes of action is substantive" such that

"better pleading will not cure it." *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000).

## V.    ANALYSIS

Concerning the first cause of action, seeking injunctive and declaratory relief, Plaintiff

asserts the aforementioned ruling of New York State Supreme Court, Albany County, found:

> Mr. Kennedy misrepresented his residency for his petition to be
> placed on the ballot in all the New York counties and, apparently on
> the implication that he is a liar, a cheat, a perpetrator of fraud, and a
> scoundrel, has no right to be on the ballot with honest and upright
> persons . . . .

Dkt. No. 7 at 13.  As an initial matter, this claim by Plaintiff misrepresents the state court's

ruling.

As Albany County Supreme Court explained, New York "Election Law § 6-140 (1)

requires that each page of an independent nominating petition set forth the address of the

candidate's 'place of residence' . . . [and] the failure to strictly comply with the Election Law

requirements as to matters of content is fatal to a nominating petition . . . ." *Cartwright*, 2024

WL 3894605, at *11 (citations omitted).  The state court determined it had been "demonstrated

by clear and convincing evidence that the 84 Croton Lake Road address listed on the nominating

petition was not Kennedy's bona fide residence within the meaning of the Election Law." *Id*. at

13.  Therefore, Judge Ryba ordered "that the nominating petition filed with . . . [the] New York

State Board of Elections purporting to designate . . . Candidate, Robert F. Kennedy, Jr., as a

candidate of the We The People Independent Body for Public Office of President of the United

States . . . is invalidated . . . ." *Id*. at 16.  In other words, contrary to Plaintiff's claim, the order

invalidating the nominating petition at issue here was not grounded on some "implication that

[Kennedy] is a liar, a cheat, a perpetuator of fraud, and a scoundrel," and as such, had "no right to be on the ballot," Dkt. No. 7 at 13, but rather on compliance with the state's election laws.

In any event, injunctive relief is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (citing *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997)). Plaintiff's failure to demonstrate a likelihood of success on the merits precludes such extraordinary relief.

As explained by the U.S. District Court for the Southern District of New York in *Team Kennedy*, "[t]he purpose of inclusion of the residence address of the candidate" as required by New York Election Law "is not only to facilitate the processing of his petition by the Board of Elections and to ease the task of one checking his qualification to run, but perhaps most important to assure that the signers of his petition are aware of the identity of their candidate." *Team Kennedy*, 2024 WL 4144057, at *15 (citing *Ferris v. Sadowski*, 45 N.Y.2d 815, 817, 381 N.E.2d 339, 341 (1978)). Further, the undersigned agrees with that court's conclusion that New York "State's purported regulatory interests in guarding against voter confusion justify the *de minimis* burden of requiring candidates to comply with the residence requirement." *Id.* at *17. Therefore, Plaintiff in the instant matter is unable to demonstrate he is likely to succeed on the merits of his U.S. Constitutional claims for the same reasons articulated by the Southern District of New York, and his cause of action for declaratory and injunctive relief should be dismissed.

Turning to Plaintiff's second cause of action, for damages against Judge Ryba, "[a]bsolute immunity for judges is 'firmly established' for acts 'committed within their judicial jurisdiction.'" *Peoples v. Leon*, 63 F.4th 132, 138 (2d Cir. 2023) (quoting *Cleavinger v. Saxner*, 474 U.S. 193, 199 (1985)). "Such judicial immunity is conferred in order to insure 'that a

judicial officer, in exercising the authority vested in him, shall be free to act upon his own convictions, without apprehension of personal consequences to himself.'" *Bliven v. Hunt*, 579 F.3d 204, 209 (2d Cir. 2009) (quoting *Bradley v. Fisher*, 80 U.S. (13 Wall.) 335, 347 (1871)). Therefore, "even allegations of bad faith or malice cannot overcome judicial immunity." *Id*. (citing *Pierson v. Ray*, 386 U.S. 547, 554 (1967); *Tucker v. Outwater*, 118 F.3d 930, 932 (2d Cir. 1997), *cert. denied*, 522 U.S. 997 (1997)).  However, "a judge is not immune from liability for nonjudicial actions, *i.e.*, actions not taken in the judge's judicial capacity . . . [or] for actions, though judicial in nature, taken in the complete absence of all jurisdiction." *Mireles v. Waco*, 502 U.S. 9, 11-12 (1991) (citing *Forrester v. White*, 484 U.S. 219, 227-29 (1988); *Stump v. Sparkman*, 435 U.S. 349, 360 (1978)).

Here, Plaintiff's claim for damages against Judge Ryba, a New York State Supreme Court Justice, arise out of her decision granting a petition in New York Supreme Court. Therefore, Judge Ryba is entitled to judicial immunity.  *See, e.g., Strong v. New York*, No. 1:19-CV-0063 (MAD/CFH), 2019 WL 2723372, at *3 (N.D.N.Y. July 1, 2019) (explaining the defendant, "a New York State Supreme Court Judge, enjoys judicial immunity" and dismissing the plaintiff's § 1983 claims against him) (citing *Green v. Maraio*, 722 F.2d 1013, 1016 (2d Cir. 1983)) (additional citations omitted).  Moreover, Plaintiff's conclusory allegations that Judge Ryba acted without jurisdiction are insufficient to overcome such absolute immunity.  *See, e.g., Dees v. Zurlo*, No. 1:24-CV-0001 (MAD/DJS), 2024 WL 2291701, at *8 (N.D.N.Y. May 21, 2024) ("Plaintiffs have not presented more than conclusory allegations to establish that the judicial Defendants were acting absent all jurisdiction. They are, therefore, entitled to absolute immunity for that conduct.").  Accordingly, Plaintiff's claim against Judge Ryba for damages must be dismissed.

In sum, Plaintiff has failed to state a claim upon which relief may be granted.  Therefore, the undersigned recommends the amended complaint be dismissed pursuant to 28 U.S.C. § 1915.

## VI.    CONCLUSION

**WHEREFORE**, it is hereby

**ORDERED** that Plaintiff's motion to proceed *in forma pauperis* (Dkt. No. 2) is **GRANTED**, and it is further

**ORDERED** that Plaintiff's motion to seal (Dkt. No. 3) is **DENIED**, and the Clerk is directed to remove the docket restriction at Dkt. No. 2, and it is further

**RECOMMENDED** that Plaintiff's amended complaint (Dkt. No. 7) is **DISMISSED**, and it is further

**ORDERED** that the Clerk provide to Plaintiff a copy of this Report-Recommendation and Order, along with copies of the unpublished decisions cited herein in accordance with the Second Circuit decision in *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam). Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) days within which to file written objections to the foregoing report.[8]  Such objections shall be filed with the Clerk of the Court.  **<u>FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW</u>**.  *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.

---

[8] If you are proceeding *pro se* and are served with this Report-Recommendation and Order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Report-Recommendation and Order was mailed to you to serve and file objections.  Fed. R. Civ. P. 6(d).  If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday.  Fed. R. Civ. P. 6(a)(1)(C).

**IT IS SO ORDERED.**

Dated: November 8, 2024
        Syracuse, New York

Thérèse Wiley Dancks
United States Magistrate Judge

2010 WL 5185047
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

David J. CASH, Plaintiff,

v.

BERNSTEIN, MD, Defendant.

No. 09 Civ.1922(BSJ)(HBP).
|
Oct. 26, 2010.

*REPORT AND RECOMMENDATION*[1]

[1] At the time the action was originally filed, the Honorable Leonard B. Sand, United States District Judge, granted plaintiff's application for *in forma pauperis* status based on plaintiff's *ex parte* submission (Docket Item 1). Although the present application seeking to revoke plaintiff's *in forma pauperis* status is non-dispositive, I address it by way of a report and recommendation to eliminate any appearance of a conflict between the decision of a district judge and that of a magistrate judge.

PITMAN, United States Magistrate Judge.

**\*1** TO THE HONORABLE BARBARA S. JONES, United States District Judge,

I. *Introduction*

By notice of motion dated March 4, 2010 (Docket Item 11), defendant moves pursuant to 28 U.S.C. § 1915(g) to revoke plaintiff's *in forma pauperis* ("IFP") status on the ground that plaintiff has previously had at least three Section 1983 actions dismissed as frivolous, malicious or failing to state a claim upon which relief could be granted, and has not shown that he is in imminent danger of serious physical injury. Defendant further seeks an order directing that the action be dismissed unless plaintiff pays the full filing fee within thirty (30) days. For the reasons set forth below, I respectfully recommend that defendant's motion be granted.

II. *Facts*

Plaintiff, a sentenced inmate in the custody of the New York State Department of Correctional Services, commenced this action on or about January 12, 2009 by submitting his complaint to the Court's Pro Se office. Plaintiff alleges, in pertinent part, that he has "a non-healing ulcer that is gane green [*sic* ]" and that defendant Bernstein "did not want to treat the ulcer right" (Complaint, dated March 3, 3009 (Docket Item 2) ("Compl."), at 3).

The action was originally commenced against two defendants—Dr. Bernstein and Dr. Finkelstein. The action was dismissed as to Dr. Finkelstein because the complaint contained no allegations whatsoever concerning Dr. Finkelstein (Order dated February 18, 2010 (Docket Item 9)).

On March 4, 2010, the sole remaining defendant—Dr. Bernstein—filed the current motion. Plaintiff failed to submit a response. Accordingly, on August 20, 2010, I issued an Order advising plaintiff that if he wished to oppose the motion, he must submit

his opposition by September 15, 2010 and that after that date I would consider the motion fully submitted and ripe for decision (Order dated August 20, 2010 (Docket Item 15)). The only submission plaintiff has made in response to my Order is a multi-part form issued by the New York State Department of Correctional Services entitled "Disbursement or Refund Request." [2] By this form, plaintiff appears to request that the New York State Department of Correctional Services pay the filing fee for this action. The form is marked "Denied."

[2]    Plaintiff sent this form directly to my chambers, and it has not been docketed by the Clerk of the Court. The form will be docketed at the time this Report and Recommendation is issued.

### III. *Analysis*

28 U.S.C. § 1915 permits an indigent litigant to commence an action in a federal court without prepayment of the filing fee that would ordinarily be charged. Although an indigent, incarcerated individual need not prepay the filing fee at the time at the time of filing, he must subsequently pay the fee, to the extent he is able to do so, through periodic withdrawals from his inmate accounts. 28 U.S.C. § 1915(b); *Harris v. City of New York,* 607 F.3d 18, 21 (2d Cir.2010). To prevent abuse of the judicial system by inmates, paragraph (g) of this provision denies incarcerated individuals the right to proceed without prepayment of the filing fee if they have repeatedly filed meritless actions, unless such an individual shows that he or she is in imminent danger of serious physical injury. *See Ortiz v. McBride,* 380 F.3d 649, 658 (2d Cir.2004) ("[T]he purpose of the PLRA ... was plainly to curtail what Congress perceived to be inmate abuses of the judicial process."); *Nicholas v. Tucker,* 114 F.3d 17, 19 (2d Cir.1997). Specifically, paragraph (g) provides:

> **\*2** In no event shall a prisoner bring a civil action or appeal a judgment in a civil action or proceeding under this section if the prisoner has, on 3 or more prior occasions, while incarcerated or detained in any facility, brought an action or appeal in a court of the United States that was dismissed on the grounds that it is frivolous, malicious, or fails to state a claim upon which relief may be granted, unless the prisoner is under imminent danger of serious physical injury.

28 U.S.C. § 1915(g).

If an inmate plaintiff seeks to avoid prepayment of the filing fee by alleging imminent danger of serious physical injury, there must be a nexus between the serious physical injury asserted and the claims alleged. *Pettus v. Morgenthau,* 554 F.3d 293, 298 (2d Cir.2009).

Section 1915(g) clearly prevents plaintiff from proceeding in this action without prepayment of the filing fee. The memorandum submitted by defendant establishes that plaintiff has had his IFP status revoked on at least four prior occasions as a result of his repeatedly filing meritless actions.

• In 2005, plaintiff commenced an action in the United States District Court for the Northern District of New York seeking to have his infected leg amputated. *Nelson [3] v. Lee,* No. 9:05–CV–1096 (NAM)(DEP), 2007 WL 4333776 (N.D.N.Y. Dec. 5, 2007). In that matter, the Honorable Norman A. Mordue, Chief United States District Judge, accepted and adopted the Report and Recommendation of the Honorable David E. Peebles, United States Magistrate Judge, that plaintiff had brought three or more prior actions that had been dismissed for failure to state a claim and that plaintiff's IFP status should, therefore, be revoked. 2007 WL 4333776 at \*1–\*2.

[3]    It appears that plaintiff uses the names David J. Cash and Dennis Nelson interchangeably. In his complaint in this matter, plaintiff states that the Departmental Identification Number, or DIN, assigned to him by the New York State Department of Correctional Services ("DOCS") is 94–B–0694 (Compl. at 7). DOCS inmate account records submitted by plaintiff

2010 WL 5185047

in connection with his application for IFP status indicate that DIN 94–B–0694 is assigned to Dennis Nelson. In addition, the DOCS form described in footnote two bears the docket number of this action, but is signed in the name of Dennis Nelson and was sent in an envelope identifying the sender as Dennis Nelson. A subsequent action has been filed in this Court in which the plaintiff identifies himself as Dennis Nelson but lists his DIN as 94–B–0694, the same DIN used by plaintiff here. Finally, plaintiff has submitted nothing to controvert the assertion in defendant's papers that David Cash and Dennis Nelson are the same person. In light of all these facts, I conclude that David Cash and Dennis Nelson are both names used by plaintiff.

- In *Nelson v. Nesmith,* No. 9:06–CV–1177 (TJM)(DEP), 2008 WL 3836387 (N.D.N.Y. Aug. 13, 2008), plaintiff again filed an action concerning the medical care he was receiving for his left leg. The Honorable Thomas J. McAvoy, United States District Judge, accepted the Report and Recommendation of Magistrate Judge Peebles, and revoked plaintiff's IFP status and dismissed the action on the ground that plaintiff had previously commenced at least three actions that had been dismissed on the merits. 2008 WL 3836387 at *1, *7.

  - In *Nelson v. Spitzer,* No. 9:07–CV–1241 (TJM)(RFT), 2008 WL 268215 (N.D.N.Y. Jan. 29, 2008), Judge McAvoy again revoked plaintiff's IFP status on the ground that plaintiff had commenced three or more actions that constituted "strikes" under Section 1915(g) and had not shown an imminent threat of serious physical injury. 2008 WL 268215 at *1–*2.

  - Finally, in *Nelson v. Chang,* No. 08–CV–1261 (KAM)(LB), 2009 WL 367576 (E.D.N.Y. Feb. 10, 2009), the Honorable Kiyo A. Matsumoto, United States District Judge, also found, based on the cases discussed above, that plaintiff had exhausted the three strikes permitted by Section 1915(g) and could not proceed IFP in the absence of a demonstration of an imminent threat of serious physical injury. 2009 WL 367576 at *2–*3.

 **\*3** As defendant candidly admits, there is one case in which plaintiff's leg infection was found to support a finding of an imminent threat of serious physical injury sufficient to come within the exception to Section 1915(g). *Nelson v. Scoggy,* No. 9:06–CV–1146 (NAM)(DRH), 2008 WL 4401874 at *2 (N.D.N.Y. Sept. 24, 2008). Nevertheless, summary judgment was subsequently granted for defendants in that case, and the complaint was dismissed. Judge Mordue concluded that there was no genuine issue of fact that plaintiff had received adequate medical care for his leg wound and that the failure of the leg to heal was the result of plaintiff's own acts of self-mutilation and interference with the treatment provided. *Nelson v. Scoggy,* No. 9:06–CV–1146 (NAM)(DRH), 2009 WL 5216955 at *3–*4 (N.D.N.Y. Dec. 30, 2009). [4]

[4]
 Although the form complaint utilized by plaintiff expressly asks about prior actions involving the same facts, plaintiff disclosed only the *Scoggy* action and expressly denied the existence of any other actions relating to his imprisonment (Compl. at 6).

In light of the foregoing, there can be no reasonable dispute that plaintiff has exceeded the three "strikes" allowed by Section 1915(g) and that he cannot, therefore, proceed here without prepaying the filing fee unless he demonstrates an imminent threat of serious physical injury. Plaintiff has declined to attempt to make this showing in response to defendant's motion, and the only suggestion in the record of serious physical injury is the bare statement in the complaint that plaintiff "need[s] to go back to a wound speci [a]list before the gane green [*sic* ] kills [him]" (Compl. at 5). "However, unsupported, vague, self-serving, conclusory speculation is not sufficient to show that Plaintiff is, in fact, in imminent danger of serious physical harm." *Merriweather v. Reynolds,* 586 F.Supp.2d 548, 552 (D.S.C.2008), *citing Ciarpaglini v. Saini,* 352 F.3d 328, 330 (7th Cir.2003) *and White v. Colorado,* 157 F.3d 1226, 1231–32 (10th Cir.1998); *see also Martin v. Shelton,* 319 F.3d 1048, 1050 (8th Cir.2003) (imminent danger exception to Section 1915(g) requires "specific fact allegations of ongoing serious physical injury, or of a pattern of misconduct evidencing the likelihood of imminent serious physical injury"). Given the plaintiff's history, as set forth in the cases described above, I conclude that this vague statement is insufficient to support a finding that plaintiff is in imminent danger of serious physical injury. [5]

5    Plaintiff has sent me several letters describing his wound and its symptoms in detail, and I have no doubt that the wound is serious. However, in granting summary judgment dismissing an action last year based on the same allegations, Judge Mordue of the Northern District found that there was no genuine issue of fact that plaintiff's own conduct was responsible for the ineffectiveness of the treatment he was provided:

> Furthermore, to the extent that Nelson's medical treatment was delayed, much of the delay was due to his own refusal to cooperate with medical staff and his self-mutilations. Nelson's actions to thwart the medical treatment of his wound cannot be construed as interference or indifference by anyone else.... [T]he medical treatment Nelson received complied with constitutional guarantees as it was appropriate, timely, and delayed only by Nelson's own actions.

> *Nelson v. Scoggy, supra,* 2009 WL 5216955 at *4.

Given plaintiff's total failure to respond to the pending motion and his failure to even deny that he is actively thwarting treatment of his wound, it would be sheer speculation for me to conclude that he is in imminent danger of a serious injury as a result of defendant's conduct.

### IV. *Conclusion*

Accordingly, for all the foregoing reasons, I find that plaintiff has had three or more prior actions dismissed as being frivolous, malicious or failing to state a claim and that plaintiff's *in forma pauperis* status should, therfore, be revoked. If your Honor accepts this recommendation, I further recommend that the action be dismissed unless plaintiff pays the filing fee in full within thirty (30) days of your Honor's final resolution of this motion.

### V. *OBJECTIONS*

Pursuant to 28 U.S.C. § 636(b)(1)(C) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from receipt of this Report to file written objections. *See also* Fed.R.Civ.P. 6(a). Such objections (and responses thereto) shall be filed with the Clerk of the Court, with courtesy copies delivered to the Chambers of the Honorable Barbara S. Jones, United States District Judge, 500 Pearl Street, Room 1920, and to the Chambers of the undersigned, 500 Pearl Street, Room 750, New York, New York 10007. Any requests for an extension of time for filing objections must be directed to Judge Jones. FAILURE TO OBJECT WITHIN FOURTEEN (14) DAYS **WILL** RESULT IN A WAIVER OF OBJECTIONS AND **WILL** PRECLUDE APPELLATE REVIEW. *Thomas v. Arn,* 474 U.S. 140, 155 (1985); *United States v. Male Juvenile,* 121 F.3d 34, 38 (2d Cir.1997); *IUE AFL–CIO Pension Fund v. Herrmann,* 9 F.3d 1049, 1054 (2d Cir.1993); *Frank v. Johnson,* 968 F.2d 298, 300 (2d Cir.1992); *Wesolek v. Canadair Ltd.,* 838 F.2d 55, 57–59 (2d Cir.1988); *McCarthy v. Manson,* 714 F.2d 234, 237–38 (2d Cir.1983).

### All Citations

Not Reported in F.Supp.2d, 2010 WL 5185047

---

**End of Document**                                        © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Wimberly v. Experian Information Solutions, Not Reported in Fed. Supp. (2021)

2021 WL 1146277

2021 WL 1146277
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Jason WIMBERLY, Plaintiff,

v.

EXPERIAN INFORMATION SOLUTIONS, Defendant.

1:18-cv-06058-MKV
|
Signed 03/24/2021

**Attorneys and Law Firms**

Jason Wimberly, New York, NY, pro se.

Diana Lee Calla, Jones Day, San Francisco, CA, for Defendant.

ORDER

MARY KAY VYSKOCIL, United States District Judge:

 **\*1** On February 1, 2021, the Court issued an opinion and order denying Plaintiff, who is *pro se*, leave to file a second amended complaint. [ECF No. 91.] Plaintiff filed a notice of appeal two days later. [ECF No. 92.] On March 22, 2021, Plaintiff notified the Court that he intends to move for *in forma pauperis* ("IFP") status for purposes of his appeal. Plaintiff filed under seal a motion for leave to seal his affidavit in connection with his application for IFP status. The Court DENIES Plaintiff's motion.

Under both the common law and the First Amendment, a strong presumption of public access attaches to judicial documents. *See Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 119–20 (2d Cir. 2006). Documents submitted to the Court to influence its decision on a motion or application are judicial documents to which the presumption of public access attaches. *See id.* at 121; *Julian v. Metro. Life Ins. Co.*, No. 17-CV-957 (AJN) (BCM), 2020 WL 5913739, at \*3 (S.D.N.Y. Oct. 6, 2020) (collecting cases); *Valassis Commc'ns, Inc. v. News Corp.*, No. 17-cv-7378 (PKC), 2020 WL 2190708, at \*2 (S.D.N.Y. May 5, 2020).

Generally, judicial documents may be sealed "if specific, on the record findings are made demonstrating that closure is essential to preserve higher values and is narrowly tailored to serve that interest." *Lugosch*, 435 F.3d at 120 (quoting *In re N.Y. Times Co.*, 828 F.2d 110, 113 (2d Cir. 1987)). The Second Circuit has explained that generally "[f]inancial records of a wholly owned business, family affairs, illnesses, embarrassing conduct with no public ramifications, and similar matters will weigh more heavily against access than conduct affecting a substantial portion of the public." *United States v. Amodeo*, 71 F.3d 1044, 1051 (2d Cir. 1995).

With respect to IFP applications, general concerns over disclosure of financial status have been held insufficient to overcome the presumption of public access. For example, in *Komatsu v. City of New York*, 1:20-CV-6510 (LLS), 2020 WL 8641272, at \*1 (S.D.N.Y. Sept. 2, 2020), the court denied a motion to seal an IFP application, finding that "the contents of Plaintiff's IFP applications, including Plaintiff's references to his receipt of public benefits, employment history and current unemployment, and his state and federal litigation history, are not sufficiently extraordinary to outweigh the presumption in favor of public access." In *Sardarian v. Federal Emergency Management Agency*, No. 3:19-cv-910 (CSH), 2019 WL 8331444, at \*3–4 (D. Conn. Sept. 16, 2019), the court, in connection with an application for appointment of counsel, denied a motion to seal "information [that] bore on the issue of whether Plaintiff was indigent [and] lacking sufficient funds to obtain his own counsel."

2021 WL 1146277

In explaining that the plaintiff's discomfort knowing that his finances would be publicly disclosed was insufficient to overcome the presumption of public access, the court persuasively noted:

> If personal financial information were held *per se* grounds for sealing, all prisoner affidavits submitted with requests for *in forma pauperis* status under 28 U.S.C. § 1915 would automatically be sealed. Such is not the case. Financial affidavits, like other judicial documents, are presumptively open to public access and sealed only upon demonstration of compelling grounds.

**\*2**  Id. at \*3 n.3.

Here, Plaintiff provides no specific justification to seal his supporting affidavit other than that it "contains detailed financial information and therefore should not be made public." This does not overcome the presumption of public access. *See Komatsu,* 2020 WL 8641272, at \*1; *see also Lugosch,* 435 F.3d at 120 (noting that sealing requires more than "[b]road and general findings" (quoting *N.Y. Times,* 828 F.2d at 113)). Accordingly, Plaintiff's motion to file his affidavit in support of his IFP application under seal is DENIED.

IT IS HEREBY ORDERED that on or before March 31, 2021, Plaintiff shall file his IFP application, including his supporting affidavit, on the public docket in order for the Court to rule on his application.

**SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2021 WL 1146277

---

**End of Document**                                                                 © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Case 6:24-cv-01009-DNH-TWD     Document 8     Filed 11/08/24     Page 21 of 89

Sardarian v. Federal Emergency Management Agency, Not Reported in Fed. Supp. (2019)

2019 WL 8331444

2019 WL 8331444
Only the Westlaw citation is currently available.
United States District Court, D. Connecticut.

Arkady SARDARIAN, Plaintiff,

v.

FEDERAL EMERGENCY MANAGEMENT AGENCY; Dean J. Savramis, in his official capacity; and Department
of Emergency Services & Public Protection, Division of Connecticut Emergency Management & Homeland Security;
William J. Hackett, Gemma Fabris, and Ken Dumais, in their official capacity; and Town of Westport, Connecticut;
Jim Marpe, Robert E. Yost, Andrew Kingsbury, and Michele Onofrio, in their official capacity, Defendants.

Civil Action No. 3:19-cv-910 (CSH)
|
Signed 09/16/2019

**Attorneys and Law Firms**

Arkady Sardarian, Westport, CT, pro se.

Eric Benjamin Miller, Department of Justice, New Haven, CT, for Defendants Federal Emergency Management Agency, Dean
J. Savramis.

Terrence M. O'Neill, Attorney General's Office, Hartford, CT, for Defendants Department of Emergency Services and Public
Protection, William J. Hackett, Gemma Fabris, Ken Dumais.

Richard C. Buturla, Ryan P. Driscoll, Berchem Moses P.C., Milford, CT, for Defendants Town of Westport, Jim Marpe, Robert
E. Yost, Andrew Kingsbury, Michele Onofrio.

## RULING ON PLAINTIFF'S MOTION FOR REDACTION OF PERSONAL INFORMATION

Haight, Senior District Judge:

### I. INTRODUCTION

**\*1** *Pro se* plaintiff Arkady Sardarian commenced this action "pursuant to the Stafford Act, 42 U.S.C. §§ 5133[,] *et seq.*, 42
U.S.C. §§ 4321[,] *et seq.*, and the Administrative Procedure Act ("APA"), 42 U.S. Code § 1983 (civil action for deprivation of
rights), 5 U.S.C. §§ 701[,] *et seq.*, to void the decision of the Federal Emergency Management Agency ('FEMA') in July 2018 to
terminate previously awarded Hazard Mitigation Grant Program ('HMGP') grant funding for the elevation of the lowest living
area of the Plaintiff's raised-ranch slab-on-grade residence located in Westport, Connecticut." Doc. 1, ¶ 1. Defendants in the
action include FEMA, the Department of Emergency Services and Public Protection ("A Division of Connecticut, Emergency
Management and Homeland Security"), the Town of Westport, and a list of individual defendants who are governmental officials
in the aforementioned and other agencies (in their official capacities).

Pending before the Court is Plaintiff's motion to redact "personal/financial data" he previously filed in support of a motion
for appointment of counsel [Doc. 7]. The Court denied Plaintiff's request for appointed counsel on June 19, 2019, because
based on the financial facts presented (income, savings, properties), Plaintiff is not indigent – "unable to afford counsel" –
under 28 U.S.C. § 1915(e)(1). *See* Doc. 12, at 9-10. Plaintiff now moves the Court to redact personal information set forth in
particular paragraphs of that failed motion: paragraphs 3-10 and 15. Paragraphs 3 to 7 set forth financial information regarding

2019 WL 8331444

Plaintiff's salary as a project engineer, earned income, taxes, interest, dividends, rents, investments, savings, property, and loans. Doc. 19-1, at 1-2. Paragraphs 8 and 9 list family members who rely on Plaintiff's support and the fact that no member of his household over age 18 is presently employed. *Id.*, at 2. Paragraph 10 describes Plaintiff's projections for his financial status in future years and the reasons he has attempted to secure counsel on a contingency basis. *Id.*, at 2-3. Paragraph 15 summarizes the circumstances which Plaintiff believes supported his application for appointment of counsel, including, *inter alia*, his need for a suitable attorney who is familiar with court rules and procedure and his belief that his work overseas will prevent him from attending to court-related matters on a timely basis. *Id.*, at 5-6. As to these designated paragraphs, Plaintiff characterizes the information as "personal" in the title of his motion. However, he fails to provide the Court with a basis for redaction or sealing in a supporting memorandum of law. He simply appends the motion for appointment of counsel [Doc. 7] to his present motion [Doc. 19]. For the reasons discussed below, Plaintiff's motion to redact this information will be denied.

## II. DISCUSSION

### A. Standard to Seal

In requesting redaction of designated paragraphs in his motion for appointment of counsel, Plaintiff moves to seal specific information from public disclosure. Under both the common law and the First Amendment, there is a strong, long-established presumption of public access to judicial documents, those documents that are "relevant to the performance of the judicial function and useful in the judicial process." [1] *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 119 (2d Cir. 2006). *See also Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 597-98 (1978); *Matter of New York Times Co.*, 828 F.2d 110, 114 (2d Cir. 1987), *cert. denied*, 485 U.S. 977 (1988). Put simply, "[j]udicial records presumptively are subject to public inspection." *Cedar Swamp Holdings, Inc. v. Zaman*, 476 F. Supp. 2d 303, 304 (S.D.N.Y. 2007) (citing *United States v. Amodeo*, 71 F.3d 1044, 1047 (2d Cir. 1995) ("*Amodeo II*") and collecting cases). Additionally, "the presumption is at its strongest when the document in question ... has been submitted as a basis for judicial decision making." *Greater Miami Baseball Club Ltd. P'ship v. Selig*, 955 F. Supp. 37, 39 (S.D.N.Y. 1997). "Only where countervailing considerations overcome the presumption may the public be denied access to such documents." *Cedar Swamp Holdings*, 476 F. Supp. 2d at 304 (citing *Amodeo II*, 71 F.3d at 1050-53; *Greater Miami Baseball*, 955 F.Supp. at 39).

[1]      See also *United States v. Amodeo*, 44 F.3d 141, 145 (2d Cir. 1995) ("*Amodeo I*") ("The Second Circuit defined a judicial document as an item which is "relevant to the performance of the judicial function and useful in the judicial process.").

**\*2** Nevertheless, the public's right of access to court documents is not absolute. That right may be surmounted by a party's showing that sealing the document in question will further other substantial interests, for example, a criminal defendant's right to a fair trial or a third party's privacy interests. *New York Times Co.*, 828 F.2d at 114-16. Therefore, in limited cases and upon a showing of compelling circumstances, the court may order documents to be sealed. *Lugosch*, 435 F.3d at 123; *Hartford Courant Co. v. Pellegrino*, 380 F.3d 83, 96 (2d Cir. 2004).

In particular, a federal court may seal a document if "specific, on the record findings are made demonstrating that 'closure is essential to preserve higher values and is narrowly tailored to serve that interest.' " *Press-Enterprise Co. v. Superior Court*, 478 U.S. 1, 13-14 (1986) ("*Press Enterprise II*") (quoting *Press-Enterprise Co. v. Superior Court*, 464 U.S. 501, 510 (1984) ("*Press–Enterprise I*")). *Accord New York Times Co.*, 828 F.2d at 116; *see also Hartford Courant Co.*, 380 F.3d at 95-96 (judicial records may be sealed only when and to the extent necessary to preserve higher values). Thus, "a judge must carefully and skeptically review sealing requests to insure that there really is an extraordinary circumstance or compelling need." *In re Orion Pictures Corp.*, 21 F.3d 24, 27 (2d Cir. 1994). *See also Sec. & Exch. Comm'n v. The Street.com*, 273 F.3d 222, 232 (2d Cir. 2001). Additionally, the Supreme Court has clarified that "the decision as to access [to judicial records] is one best left to the sound discretion of the trial court, a discretion to be exercised in light of the relevant facts and circumstances of the particular case." *Nixon*, 435 U.S. at 599 (citations omitted).

Case 6:24-cv-01009-DNH-TWD    Document 8    Filed 11/08/24    Page 23 of 89

Sardarian v. Federal Emergency Management Agency, Not Reported in Fed. Supp. (2019)

2019 WL 8331444

The party who requests sealing bears the burden of demonstrating the grounds to seal. *See, e.g., DiRussa v. Dean Witter Reynolds Inc.*, 121 F.3d 818, 826 (2d Cir. 1997). Thus, for each particular document, or designated portion of the document, the movant must establish that a specific prejudice or harm will result if there is no sealing. Moreover, redactions, as opposed to sealing entire documents, are favored in that they are limited and clear in scope. *See, e.g., Suntoke v. PSEG Power Connecticut, LLC*, No. CIVA 3:06-CV-01520 (JCH), 2007 WL 1455847, at *1 (D. Conn. May 16, 2007) ("A blanket sealing order ... would rarely, if ever, be appropriate.").

In this District, Local Civil Rule 5(e) sets forth the proper procedure for sealing. The Rule mandates that in "an order sealing a judicial document" – [*i.e.*, one that is "relevant to the performance of the judicial function and useful in the judicial process," *Amodeo I*, 44 F.3d at 145] – "shall include particularized findings demonstrating that sealing is supported by clear and compelling reasons and is narrowly tailored to serve those reasons." D. Conn. L. Civ. R. 5(e) 3. To file a document under seal, a party, whether *pro se* or represented by counsel, must comply with the procedures set forth in Local Rule 5(e) 4. Per that Rule, that party may "choose among the following procedures":

> (a) Counsel may e-file (1) a motion to seal, which may be e-filed as a public motion or a sealed motion, (2) a redacted version of each document sought to be sealed, which shall be e-filed as a public document, (3) unredacted copies of each document sought to be sealed, which shall be e-filed as sealed motions or sealed documents, and (4) any memorandum or other documents supporting the assertion that grounds exist for sealing the documents sought to be sealed, which may be e-filed as public or sealed documents.

**\*3** *Id.* 5(e) 4.(a)(1)-(4). To support a motion to seal, one must file a memorandum and any supporting documents, setting forth the specific reasons for sealing. In this District, "[a]ny motion involving disputed issues of law shall be accompanied by a memorandum of law," and "[f]ailure to submit a required memorandum may be deemed sufficient cause to deny the motion." *Id.* 7(a)1.

In general, as in the context of protective orders, "good cause" exists where the movant can identify the "specific prejudice or oppression that will be caused by disclosure." *Burgess v. Town of Wallingford*, No. 3:11-CV-1129 CSH, 2012 WL 4344194, at *9 (D. Conn. Sept. 21, 2012). With respect to privacy interests, the Second Circuit has stated that a court "should consider the degree to which the subject matter is traditionally considered private rather than public." *Amodeo II*, 71 F.3d at 1051. For example, "[f]inancial records of a wholly owned business, family affairs, illnesses, embarrassing conduct with no public ramifications, and similar matters will weigh more heavily against access than conduct affecting a substantial portion of the public." *Id.*

Moreover, the "nature and degree" of the alleged injury must be weighed by the court. *Id.* The court then balances the sensitivity of the information against the presumption of access. *Id.* For example, when information appears in a judicial document, "[t]he mere fact that some level of discomfort, or even embarrassment, may result from the dissemination of [the particular material] is not in and of itself sufficient to establish good cause to support the issuance of [a] protective order." *Flaherty v. Seroussi,* 209 F.R.D. 295, 299 (N.D.N.Y. 2001) (citations omitted). To support "good cause," any such embarrassment "must be substantial." *Id. See also United States v. Martoma*, No. S1 12-CR-973 (PGG), 2014 WL 164181, at *5 (S.D.N.Y. Jan. 9, 2014) ("The mere fact that judicial records may reveal potentially embarrassing information is not in itself sufficient reason to block public access.") (citation omitted).

## B. Plaintiff's Motion to Redact

In the case at bar, Plaintiff filed the information he seeks to redact as part of his motion for appointment of counsel [Doc. 7]. That information bore on the issue of whether Plaintiff was indigent, lacking sufficient funds to obtain his own counsel, and the circumstances he believed supported that motion. The information was central to the Court's ruling that appointment of counsel was unwarranted. Therefore, the financial information was integral to the Court's performance of its judicial function. The

Case 6:24-cv-01009-DNH-TWD    Document 8    Filed 11/08/24    Page 24 of 89

**Sardarian v. Federal Emergency Management Agency, Not Reported in Fed. Supp. (2019)**
2019 WL 8331444

presumption of public access adheres to this information because it was necessarily submitted in a judicial document, providing the basis for judicial decision-making. *See Lugosch*, 435 F.3d at 121 ("[D]ocuments submitted to a court for its consideration in a ... motion are – as a matter of law – judicial documents to which a strong presumption of access attaches, under both the common law and the First Amendment."). [2]

[2]    Public access to information which is the basis for judicial decisions helps to "ensure judicial accountability and public confidence in the adjudicative process." *Vargas v. CH Hosp. Mgmt., LLC*, No. 14-CV-2439 (ENV) (JO), 2014 WL 2930462, at *1 (E.D.N.Y. June 27, 2014) (collecting cases).

Bearing this presumption of access in mind, the Court notes that Plaintiff has provided no specific reason that all designated "personal" information should be sealed. Perhaps he is uncomfortable knowing that his finances have been revealed and/or simply wishes to prevent people from learning about his private matters. However, discomfort alone is insufficient to redact information from a judicial document. [3] *See, e.g., Mitchell by & Through Hughes v. Mirza*, No. 07-CV-03686 (ILG), 2009 WL 10706571, at *2 (E.D.N.Y. May 6, 2009) (denying motion to seal financial affidavit submitted on motion for appointment of counsel where movant's "request to seal his affidavit [was] motivated by his desire to keep his financial affairs private" and "[h]is financial affairs ... undermined his qualification for the appointment of counsel," which "was the issue before the court").

[3]    If personal financial information were held *per se* grounds for sealing, all prisoner affidavits submitted with requests for *in forma pauperis* status under 28 U.S.C. § 1915 would automatically be sealed. Such is not the case. Financial affidavits, like other judicial documents, are presumptively open to public access and sealed only upon demonstration of compelling grounds.

**\*4** If Plaintiff wishes the Court to redact this information, he must explain why each designated paragraph of information warrants sealing. Pursuant to Local Civil Rule 5(e) 3., Plaintiff must show that "sealing is supported by clear and compelling reasons and is narrowly tailored to serve those reasons." Moreover, he must file a memorandum of law in support of his motion, demonstrating why sealing is appropriate in this case. Absent such a showing and memorandum, the Court will deny his motion to redact.


### III. CONCLUSION

For the reasons discussed above, Plaintiff's motion to redact personal information from his motion to appoint counsel [Doc. 19] is DENIED without prejudice. He voluntarily submitted the information at issue to the Court in a judicial document, requesting that the Court act on such information by ruling on a motion to appoint counsel. Plaintiff may, however, if so advised, re-file his motion for redaction with the particularized grounds to seal any requested paragraph in a supporting memorandum of law.


**All Citations**

Not Reported in Fed. Supp., 2019 WL 8331444

---

**End of Document**                                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Marin v. Chancellor, University of Oxford, Not Reported in Fed. Supp. (2022)

2022 WL 3328154

2022 WL 3328154
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Mel MARIN, Plaintiff,

v.

CHANCELLOR, UNIVERSITY OF OXFORD, et al., Defendants.

22-CV-2839 (LTS)
|
Filed 07/18/2022

**Attorneys and Law Firms**

Mel Marin, San Diego, CA, Pro Se.

Order Directing Payment of Fee or Amended IFP Application

LAURA TAYLOR SWAIN, Chief United States District Judge:

**\*1** Plaintiff brings this action *pro se*. To proceed with a civil action in this court, a plaintiff must either pay $402.00 in fees – a $350.00 filing fee plus a $52.00 administrative fee – or, to request authorization to proceed without prepayment of fees, submit a signed *in forma pauperis* ("IFP") application. *See* 28 U.S.C. §§ 1914, 1915.

Plaintiff submitted with his complaint a motion seeking leave to proceed IFP, but he did not use the court's IFP application form or include the information requested on the court's form. (ECF 1.) Plaintiff asserted that because of privacy concerns, he did not list account numbers or other information, but stated that he did "not object to [providing] details after a sealing order." (*Id.*) By order dated June 15, 2022, the Court directed Plaintiff to file an amended IFP application to indicate whether he: (1) has any money in cash or in a checking or savings account; (2) has any assets, and if so, their value; (3) has any expenses, debts, or other financial obligations, and, if so, their value; or (4) financially supports anyone else and, if so, the amount of support provided. The order stated that it was not necessary for Plaintiff to provide account numbers. (ECF 3.) On June 30, 2022, Plaintiff submitted a motion to seal the "financial records [he] wishes to submit to support his IFP request," and "to amend" the Court's June 15, 2022 order. In his motion, Plaintiff cites a number of cases providing for the sealing of financial records and documents containing social security numbers. (ECF 4.)

Both the common law and the First Amendment protect the public's right of access to court documents. *See Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 597-98 (1978); *Hartford Courant Co. v. Pellegrino*, 380 F.3d 83, 91 (2d Cir. 2004). This right of access is not absolute, and "the decision as to access [to judicial records] is one best left to the sound discretion of the trial court, a discretion to be exercised in light of the relevant facts and circumstances of the particular case." *Nixon*, 435 U.S. at 598-99. A party seeking the sealing of court documents must overcome a strong presumption in favor of public access to judicial records, *see Lugosch v. Pyramid Co.*, 435 F.3d 110, 119 (2d Cir. 2006), and "the burden of demonstrating that a document submitted to a court should be sealed rests on the party seeking such an action," *DiRussa v. Dean Witter Reynolds, Inc.*, 121 F.3d 818, 826 (2d Cir. 1997).

The Court denies Plaintiff's request to seal his IFP application. As stated in the June 15, 2022 order, Plaintiff need not submit financial records or provide account numbers, but must simply fill out the requisite IFP application and answer the questions that will establish whether he qualifies for IFP status. The cases Plaintiff cites, which address financial records and documents

2022 WL 3328154

listing social security numbers, are not relevant here, and he asserts no other facts suggesting that he is differently situated from other litigants seeking IFP status who submit the form without a sealing order.

 **\*2**  Within 30 days of the date of this order, Plaintiff must either pay the $402 in fees or complete, sign, and submit the attached IFP application. If Plaintiff submits the IFP application, it should be labeled with docket number 22-CV-2839 (LTS), and address the deficiencies indicated above by providing facts establishing that he is unable to pay the fees to bring this action. Plaintiff must answer each question on the amended IFP application form, and state all sources of income, all assets, and all monthly expenses but need not identify account numbers. If the Court grants the IFP application, Plaintiff will be permitted to proceed without prepayment of fees. *See* 28 U.S.C. § 1915(a)(1).

No summons shall issue at this time. If Plaintiff complies with this order, the action shall be processed in accordance with the procedures of the Clerk's Office. If Plaintiff fails to comply with this order within the time allowed, the action will be dismissed.

The Court certifies under 28 U.S.C. § 1915(a)(3) that any appeal from this order would not be taken in good faith, and therefore IFP status is denied for the purpose of an appeal. *Cf. Coppedge v. United States*, 369 U.S. 438, 444-45 (1962) (holding that appellant demonstrates good faith when seeking review of a nonfrivolous issue).

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2022 WL 3328154

---

**End of Document**                                                                 © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Marin v. Chancellor, Not Reported in Fed. Supp. (2022)

2022 WL 4780823

2022 WL 4780823
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Mel MARIN, Plaintiff,

v.

The CHANCELLOR; Oxford University, Defendants.

22-CV-2839 (LTS)
|
Signed October 3, 2022

**Attorneys and Law Firms**

Mel Marin, San Diego, CA, Pro Se.

ORDER

LAURA TAYLOR SWAIN, Chief United States District Judge:

**\*1** On June 15, 2022, the Court directed Plaintiff, within 30 days, to either pay the $402 in filing fees or submit an amended *in forma pauperis* ("IFP") application. (ECF 3.) On June 30, 2022, Plaintiff submitted a motion to seal the "financial records plaintiff wishes to submit to support his IFP request," and "to amend" the Court's June 15, 2022 order. (ECF 4.) By order dated July 18, 2022, the Court informed Plaintiff that he was not required to submit financial records, denied Plaintiff's motions, and granted him an additional 30 days to submit an amended IFP application. (ECF 5.) Plaintiff has now submitted motions seeking: (1) "to certify IFP issue for appeal or to reconsider denying of sealing"; and (2) "to stay this action until the circuit rules on the identical issue in another case which he just appealed," *Marin v. Yale*, 22-CV-1025 (D. Conn.) (ECF 6, 8.)

**DISCUSSION**

Certification of an interlocutory order for immediate appeal is governed by 28 U.S.C. § 1292(b). Under that statute, certification is only appropriate if the district court determines: "(1) that such order involves a controlling question of law; (2) as to which there is a substantial ground for difference of opinion; and (3) that an immediate appeal from [that] order may materially advance the ultimate termination of the litigation." *In re Facebook, Inc., IPO Sec. and Derivative Litg.*, 986 F. Supp. 2d 524, 529 (S.D.N.Y. Mar. 13, 2014) (citing 28 U.S.C. § 1292(b)). Because "interlocutory appeals are strongly disfavored in federal practice," *In re Ambac Fin. Grp., Inc. Sec. Litig.*, 693 F.Supp.2d 241, 282 (S.D.N.Y. 2010), the requirements of § 1292(b) must be strictly construed, and "only exceptional circumstances will justify a departure from the basic policy of postponing appellate review until after the entry of a final judgment." *Alphonse Hotel Corp. v. Tran*, No. 13-CV-7859 (DLC), 2014 WL 516642, at \*3 (S.D.N.Y. Feb. 10, 2014) (quoting *Flor v. BOT Fin. Corp.*, 79 F.3d 281, 284 (2d Cir. 1996)). The proponent of an interlocutory appeal bears the burden of showing that these strict requirements are satisfied. *See Casey v. Long Island R.R.*, 406 F.3d 142, 146 (2d Cir. 2005).

Plaintiff has not shown that the requirements of Section 1292(b) have been met. The Court previously informed Plaintiff that he need not submit financial records or provide account numbers, but must simply fill out the same IFP application submitted by any litigant who seeks waiver of the filing fees. Because the Court is not requiring Plaintiff to submit financial records, he is not entitled to an order permitting him to submit such records under seal. Accordingly, Plaintiff has not demonstrated that exceptional circumstances exist for the grant of an interlocutory appeal.

Marin v. Chancellor, Not Reported in Fed. Supp. (2022)
Case 6:24-cv-01009-DNH-TWD    Document 8    Filed 11/08/24    Page 28 of 89
2022 WL 4780823

### CONCLUSION

Plaintiff's motions are denied, and the Clerk of Court is directed to terminate them. (ECF 6, 8.)

The Court grants Plaintiff a final opportunity to comply with the June 15, 2022 order. Within 30 days from the date of this order, Plaintiff must either pay the $402 in fees, or submit an amended IFP application. No summons shall issue. If Plaintiff complies with this order, the case will be processed in accordance with the procedures of the Clerk's Office. If Plaintiff fails to submit an amended IFP application within the time allowed and does not show good cause to excuse such failure, the Court will enter a civil judgment consistent with this order and direct the Clerk of Court to terminate this matter without prejudice.

**\*2** The Court certifies under 28 U.S.C. § 1915(a)(3) that any appeal from this order would not be taken in good faith, and therefore IFP status is denied for the purpose of an appeal. *Cf. Coppedge v. United States*, 369 U.S. 438, 444-45 (1962) (holding that an appellant demonstrates good faith when he seeks review of a nonfrivolous issue).

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2022 WL 4780823

---

**End of Document**                                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

⚑ KeyCite Blue Flag – Appeal Notification

Appeal Filed by Team Kennedy v. Berger, 2nd Cir., September 11, 2024

2024 WL 4144057

Only the Westlaw citation is currently available.

United States District Court, S.D. New York.

TEAM KENNEDY, American Values 2024, and Jeffrey Rose Plaintiffs,

v.

Henry T. BERGER, in his official capacity as Co-Chair of the New York State Board of Elections; Peter S. Kosinski, in his official capacity as Co-Chair of the New York State Board of Elections; Essma Bagnuola, in her official capacity as a Commissioner of the New York State Board of Elections; Anthony J. Cassale, in his official capacity as a Commissioner of the New York State Board of Elections; Kristen Zebrowski Stavisky, in her official capacity as Co-Executive Director of the New York State Board of Elections; Raymond J. Riley, III, in his official Capacity as Co-Executive Director of the New York State Board of Elections; and Letitia James, in her official capacity as the Attorney General of the state of New York, Defendants.

1:24-cv-3897 (ALC)

|

Signed September 10, 2024

**Attorneys and Law Firms**

Jim Walden, Daniel Joseph Chirlin, Georgia K. Winston, Ivy Xiaotian Yao, Walden Macht Haran & Williams LLP, New York, NY, Gary Leon Donoyan, The Law Office of Gary L. Donoyan, Manhasset, NY, for Plaintiff Team Kennedy.

Jed Rubenfeld, New Haven, CT, for Plaintiffs American Values 2024, Jeffrey Rose.

Erin Ruth McAlister, Katherine Rhodes Janofsky, Seth Jonathan Farber, New York State Office of the Attorney General, New York, NY, for Defendants.

## OPINION & ORDER

ANDREW L. CARTER, JR., District Judge:

**\*1** "It is to be expected that [ ] voter[s] hope[ ] to find on the ballot a candidate who comes near to reflecting [their] policy preferences on contemporary issues. The right to vote is heavily burdened if that vote may be cast only for major-party candidates at a time when other parties or other candidates are clamoring for a place on the ballot." *Anderson v. Celebrezze,* 460 U.S. 780, 787-788, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983) (internal citations omitted); "[c]ommon sense, as well as constitutional law, compels the conclusion that government must play an active role in structuring elections; as a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes." *Burdick v. Takushi,* 504 U.S. 428, 433, 112 S.Ct. 2059, 119 L.Ed.2d 245 (1992) (internal citations omitted).

One week after the Supreme Court of the State of New York ordered Robert F. Kennedy Jr., a candidate of the We The People Independent Body for Public Office of President of the United States ("We The People") nomination petition to be invalidated, Team Kennedy, America Values 2024, and Jeffery Rose brought this emergency request for preliminary injunction, approximately twenty days before New York will begin printing and mailing out ballots, asking this Court to enjoin the New

York State Board of Elections' ("NYSBOE") enforcement of the State Court's decision and order the NYSBOE to keep Kennedy on the ballot. For the reasons set forth below, this Court denies this extraordinary relief. Plaintiffs have not demonstrated a likelihood of success on a constitutional injury.

## BACKGROUND

The following facts are drawn from the Original Complaint (ECF No. 1), First Amended Complaint ("FAC"), Plaintiffs' memorandum in support of a temporary restraining order and/or preliminary injunction (ECF No. 34), Defendants' memorandum in opposition of Plaintiffs' motion for a preliminary injunction (ECF No. 46), Plaintiffs' reply memorandum in further support of a preliminary injunction (ECF No. 54), Defendants' memorandum in opposition to proposed Plaintiff-Intervenors motion to intervene (ECF No. 51), the State Court trial testimony (ECF No. 47_Ex.1), and the documents relied upon therein.

### I. Statutory Scheme

Under New York law, for an independent presidential candidate and their electors to secure nomination and access to the November General Election ballot, they must file an independent nominating petition with the NYSBOE. N.Y. Elec. Law §§ 6-138, 6-140, 6-142(1), 6-144. The independent nominating petition must include, among other requisites, the signatures of at least forty-five thousand New York voters and the candidate's "[p]lace of residence." N.Y. Elec. Law §§ 6-140(1), 6-142(1). A candidate's "residence" is where they "maintain[ ] a fixed, permanent and principal home and to which [they], wherever temporarily located, always intend[ ] to return." N.Y. Elec. Law § 1-104(22). A candidate's "residence" is where he "maintains a fixed, permanent and principal home and to which he, wherever temporarily located, always intends to return." N.Y. Elec. Law § 1-104(22). Eligible voters under N.Y. Elec. Law §§ 16-101(1) and 16-102 may bring a proceeding in the Supreme Court of New York to contest an independent presidential candidate nominating petition. N.Y. Elec. Law §§ 16-100(1), 16-101(1), 16-102(1).

### II. Factual Background

**\*2** Kennedy resided in New York for the majority of his life. *Cartwright v. Kennedy*, No. CV-24-1294, 230 A.D.3d 969, 2024 WL 3977541, at \*2 (N.Y. App. Div. Aug. 29, 2024); ECF No. 47_Ex.1, at 18. However, in November 2012, he sold his Bedford, NY property. ECF No. 47_Ex.1, at 11. Then in 2014, Kennedy married Cheryl Hines, who resides in California, and testified that "one of [them] had to move." *Cartwright*, No. CV-24-1294, 230 A.D.3d 969, 2024 WL 3977541, at \*2.; ECF No. 47_Ex.1, at 10. That same year, Kennedy moved his younger than-college-age children, an employee of forty years (and their family), pet emu, turtles, and three dogs to California with him. ECF No. 47_Ex.1, at 10. Kennedy left behind 20 falcons and hawks in New York. ECF No. 47_Ex.1, at 10. In 2015, Kennedy testified to living in his sister's residence for six months or less in New York, before it was sold on November 17, 2015. ECF No. 47_Ex.1, at 12. Kennedy continued to use his sister's address to register to vote in the 2016 primary and general elections. ECF No. 47_Ex.1, at 12.

After that, Kennedy stayed at his friend, David Michaelis's home in Bedford, NY, [1] until January 2017. ECF No. 47_Ex.1, at 7. Two or three weeks per month, Kennedy would arrive on Sunday nights to work at Pace University and Riverkeeper, both located in New York, then travel back to California on Tuesday. ECF No. 47_Ex.1, at 7, 12. In 2017, Kennedy resigned from his positions at Pace University and Riverkeeper. ECF No. 47_Ex.1, at 12. In a resignation letter dated March 10, 2017, to Riverkeeper Kennedy stated, "[a]s you know, I now live on the west coast and the weekly commute has been hard on my family to say nothing of my carbon footprint." ECF No. 47_Ex.1, at 12.

---

[1]    Plaintiffs claim that listing a candidate's residence is an unnecessary burden, dangerous in light of safety concerns for political candidates. The Court takes seriously safety concerns of all litigants. Plaintiffs never sought to redact Kennedy's address on the nominating petition, and Plaintiffs cite to specific addresses throughout their filings in this case, without seeking redaction/sealing. Balancing the public's First Amendment right of access with the privacy interests of Kennedy,

and others mentioned in this case, the Court will not mention specific addresses in this opinion. If Plaintiffs seeks to re-file redacted versions of the pleadings in this case, they should notify the Court.

In 2021, Kennedy purchased a home with his wife in California. ECF No. 47_Ex.1, at 11. Kennedy and Hines owned real property in California and Massachusetts but not in New York. ECF No. 47_Ex.1, at 11. On Kennedy's Federal Election Commission paperwork, he listed his address as 2975 Mandeville Canyon Road. ECF No. 47_Ex.1, at 10. Kennedy also works as counsel for Howard & Street in California. ECF No. 47_Ex.1, at 11.

On April 19, 2023, Kennedy declared his intention to run for President of the United States with America Values 2024, "a political action committee," spending "millions of dollars supporting and advocating [his] candidacy." *Cartwright v. Kennedy*, No. CV-24-1294, 230 A.D.3d 969, 2024 WL 3977541, at *3; ECF No. 34, at 4. In November 2023, Kennedy's lawyer, Paul Rossi, advised him that his "current domicile" "under New York Law and under every other law" is at a specific address in Katonah, New York. ECF No. 47_Ex.1, at 21.

On May 28, 2024, Team Kennedy, Kennedy's campaign organization, submitted an independent nomination petition for Kennedy to the NYSBOE. ECF No. 34, at 2-3. The petition listed Kennedy's place of residence as the address in Katonah, New York, and contained 146,467 signatures. ECF No. 51, at 7; ECF No. 47-Ex.1, at 13. Rose, a New York resident, was one of those signatories. ECF No. 34, at 4. The petition also included Nicole Shanahan, a California resident, as the candidate for vice president. *Cartwright*, No, CV-24-1294, 2024 WL 3977541, at *1, 230 A.D.3d 969; ECF No. 34, at 11.

 *3  Kennedy claimed, from 2023, to have let a room in the Katonah property, owned by his childhood friend's wife, Barbara Moss. ECF No. 34, at 4; ECF No. 47_Ex.1, at 16-17. However, no lease agreement was executed, and Moss received her first payment from Kennedy after a New York Post article was published about Kennedy on May 20, 2024. ECF No. 47_Ex.1, at 14, 17. Moss testified that Kennedy spent just one night at her residence, and that was in June 2024. ECF No. 47_Ex.1, at 16. Kennedy also testified that he did not have a lot of "physical attachment" or "a physical presence" at the Katonah property. ECF No. 47_Ex.1, at 6-7. However, Kennedy testified he intended to return and paid income taxes in New York. ECF No. 54, at 7; ECF No. 47_Ex.1, at 13-14.

On May 31, 2024, and June 10, 2024, Voter-Objectors filed petitions in two separate state actions to invalidate Kennedy's nominating petition based on deficiencies in the petition's residency and signature requirements. ECF No. 46, at 6. The petition was filed against Kennedy and the Commissioners of the NYSBOE: Henry T. Berger, Peter S. Kosinski, Essma Bagnuola, Anthony J. Cassale, Kristen Zebrowski Stavisky, and Raymond J. Riley III. ECF No. 46, at 6. On July 16, 2024, the Commissioners of the NYSBOE found Kennedy's petition had sufficient signatures and was valid "subject to judicial action in any court proceedings." ECF No. 46 at 6.

In August 2024, Kennedy suspended his presidential campaign and endorsed another candidate. ECF No. 46 at 2, 15.

### III. Procedural History

#### A. Proceedings in Federal Court

On May 21, 2024, Team Kennedy commenced this action challenging New York Election Law provisions governing the time and manner for the requisite collection of signatures for an independent candidate and their electors to secure nomination and access to the November General Election ballot, under the First and Fourteenth Amendments. ECF No. 1. On August 22, 2024, Team Kennedy filed an Amended Complaint, adding two parties (American Values 2024 and Rose) and two new claims under the First and Fourteenth Amendments. FAC; ECF No. 46, at 9. Plaintiffs claimed that N.Y. Elec. Law §§ 1-104(22), 6-140(1), which required the disclosure of an independent presidential candidate's place of residence on a nominating petition, was unconstitutional. *Cartwright*, No. CV-24-1294, 230 A.D.3d 969, 2024 WL 3977541, at *3; FAC; ECF No. 46, at 9-10; ECF No. 34, at 9-12. On August 22, 2024, Plaintiffs also filed an emergency motion for an order to show cause for a temporary

restraining order and a preliminary injunction seeking to restrain and enjoin the State Court's August 13, 2024, ruling and NYSBOE from removing Kennedy's name from the ballot, as an independent party candidate for the office of the President of the United States. ECF Nos. 33, 34.

On September 4, 2024, the Court conducted a hearing on Plaintiffs' application for a preliminary injunction. Representatives for Team Kennedy, American Values 2024, Rose, Berger, Kosinski, Bagnuola, Cassale, Stavisky, Rilley, James, Cartwright, Nelson, and Rhone appeared. Plaintiffs filed a Motion for Leave to file a Second Amended Complaint on September 9, 2024. ECF Nos. 70-71.

### B. Proceedings in State Court

On May 31, 2024, two New York voters filed a petition under N.Y. Elec. Law § 16-102, against Kennedy and the Commissioners of the NYSBOE in New York Supreme Court, Nassau County, seeking to invalidate Kennedy's nominating petition. *Smith v. Kennedy*, 83 Misc. 3d 1239(A), 212 N.Y.S.3d 921, at *1 (N.Y. Sup. Ct. 2024). The Petitioner-Objectors claimed Kennedy's nominating petition was "invalid and lacks the requisite number of signatures sufficient to be placed on the ballot." *Id.*; *see* N.Y. Elec. Law §§ 6-138, 6-140, 6-142(1).

On June 10, 2024, four New York voters filed a petition under N.Y. Elec. Law § 16-102, against Kennedy and the Commissioners of the NYSBOE in New York Supreme Court, Dutchess County, seeking to invalidate Kennedy's nominating petition. *Cartwright v. Kennedy*, No. 906349-24, 2024 WL 3880344, at *2 (N.Y. Sup. Ct. July 23, 2024). The Petitioner-Objectors claimed Kennedy's nomination petition should be invalidated, "on a myriad of grounds, including allegations that a number of subscribing witness statements and individual signatures suffer from fatal defects, that fraudulent methods were used during the signature collection process, and that respondent Kennedy falsely represented on the nominating petition that he is a resident of New York State when in truth he is a resident of California." *Id.* On August 13, 2024, the State Court granted the petition in its entirety and ordered the invalidation of the nomination petition filed to designate Kennedy as the presidential candidate, Shanahan as the vice-presidential candidate, and the electors for We The People. *Cartwright v. Kennedy*, No. 906349-24, 2024 WL 3894605, at *15-16 (N.Y. Sup. Ct. Aug. 13, 2024), *aff'd*, No. CV-24-1294, 230 A.D.3d 969, 2024 WL 3977541. The court found that Kennedy's address listed on the nomination petition was not his "bona fide and legitimate residence, but merely a 'sham' address" therefore violating New York Election Law. *Id.*; *see* N.Y. Elec. Law §§ 1-104(22), 6-138, 6-140.

 **\*4** Kennedy appealed the decision to the Appellate Division, Third Department, claiming the New York Election law violated the First, Twelfth, and Fourteenth Amendments. *Cartwright*, No. CV-24-1294, 230 A.D.3d 969, 2024 WL 3977541, at *3. On August 29, 2024, the Third Department affirmed the state trial court's August 13, 2024 judgment. *Cartwright*, No. CV-24-1294, 230 A.D.3d 969, 2024 WL 3977541, at *3-4. On September 10, 2024, the Court of Appeals of New York dismissed Plaintiffs' pending appeal of the Third Department's decision. 2024 N.Y. Slip Op. 73915, *In the Matter of Caroline Cartwright, et al., Respondents, v. Robert F. Kennedy Jr., et al., Appellants, et al., Respondents.*, No. 2024-632, 2024 WL 4127460, at *1 (N.Y. Sept. 10, 2024)

### STANDARD OF REVIEW

"[T]o obtain a preliminary injunction against governmental action taken pursuant to a statute, the movant has to demonstrate (1) irreparable harm absent injunctive relief, (2) a likelihood of success on the merits, and (3) public interest weighing in favor of granting the injunction. The movant also must show that the balance of equities tips in his or her favor." *Yang v. Kosinski*, 960 F.3d 119, 127 (2d Cir. 2020) (internal quotation marks, footnote, and alteration omitted). A district court may enter a *prohibitory* preliminary injunction staying "government action taken in the public interest pursuant to a statutory or regulatory scheme" only when the moving party has demonstrated that (1) absent injunctive relief, he will suffer "irreparable injury," and (2) there

is "a likelihood that he will succeed on the merits of his claim." *Mastrovincenzo v. City of New York*, 435 F.3d 78, 89 (2d Cir. 2006) (internal citations omitted).

The Second Circuit has held that in the temporary restraining order or preliminary injunction context, the status quo is "the last actual, peaceable uncontested status which preceded the pending controversy." *Mastrio v. Sebelius*, 768 F.3d 116, 120 (2d Cir. 2014) (quotation marks and internal citations omitted). The Second Circuit has also explained that the status quo "is really a 'status quo *ante*,' " which is intended to preclude "[parties] from seeking shelter under a current 'status quo' precipitated by their wrong-doing." *North American Soccer League, LLC v. United States Soccer Fed'n, Inc.*, 883 F.3d at 32, 37 n.5 (2d Cir. 2018)

The Parties dispute whether Plaintiffs seek a prohibitory or mandatory injunction. Plaintiffs assert that the last peaceable uncontested status was when the Board of Elections voted and decided that Kennedy's petitions were valid. Preliminary Injunction Hearing Transcript ("Hearing Tr.") at 6:18-7:4. At that point he was on the ballot. *Id.* The controversy is that the State Court ruling knocked him off the ballot, and therefore this a prohibitory injunction not a mandatory one. *Id.* Defendants argue that Plaintiffs seek a mandatory injunction because the Board of Elections had never determined Kennedy was going on the ballot, and always recognized that this residence question was for the State Court to decide. *Id.* at 12:10-13:11.

Here, the last actual, peaceable, uncontested status between the Parties was on July 29, 2024 when Defendant Board Commissioners determined that Kennedy's petition was valid "subject to judicial action in any court proceeding." Def. Opp., ECF No. 46 at 6. As such, Plaintiffs seek a prohibitory injunction to enjoin enforcement of the State Court's decision to invalidate Kennedy's nominating petition. [2]

[2]    Given the Court's finding that Plaintiffs are unlikely to succeed on the merits of their requested prohibitory injunction, Plaintiffs fail to meet the heightened standard of "clear and substantial" likelihood of success for mandatory injunctions.

  **\*5**  Plaintiffs are not subject to the heightened standard for mandatory injunctions, and therefore only need to show a "greater than fifty percent probability of success." *Citigroup Glob. Markets, Inc.*, 598 F.3d at 34-35 (2d Cir. 2010).


## DISCUSSION

Before turning to the merits, the Court will address Defendants' non-merit-based objections to the preliminary injunction in turn: abstention, mootness, collateral estoppel, and res judicata.


### I. This Court's Exercise of Subject Matter Jurisdiction is Proper

Because the existence of subject matter jurisdiction is a threshold question, the Court must resolve jurisdictional issues before delving into the merits of a dispute. *See McCrory v. Adm'r of the Fed. Emergency Mgmt. Agency of the United States Dep't of Homeland Sec.*, 22 F. Supp. 3d 279, 286-87 (S.D.N.Y. 2014). The First Amended Complaint indicates that this Court has jurisdiction under the U.S. Constitution, 28 U.S.C. § 1331, and 42 U.S.C. § 1983. *See* FAC ¶ 25. This Court has subject matter jurisdiction and will not abstain from exercising that jurisdiction. [3]

[3]    In their Opposition Brief, Defendants argued that this Court lacks subject matter jurisdiction under the *Rooker-Feldman* doctrine. During Oral Argument, Defendants conceded that this doctrine does not apply and does not deprive this Court of subject matter jurisdiction. Hearing Tr. at 13: 20-25. This Court dismisses Defendants' *Rooker-Feldman* argument because the state-court case had not ended by the time Plaintiffs filed this action. *See Hunter v. McMahon*, 75 F.4th 62, 70 (2d Cir. 2023) ("If a ... state-court appeal remains pending ... the state-court proceedings have not ended and *Rooker-Feldman* does not apply.").

Case 6:24-cv-01009-DNH-TWD    Document 8    Filed 11/08/24    Page 34 of 89

In deciding whether to abstain under *Colorado River*, a district court must first determine whether the federal and state court cases are parallel. Federal and state proceedings are parallel for purposes of abstention when the two proceedings are "essentially the same" -- when there is an identity of parties, and the issues and relief sought are the same. Id. If the actions are deemed parallel, courts are then to consider six factors to determine whether abstention is appropriate. These factors are: (1) the assumption of jurisdiction by either court over any res or property; (2) the inconvenience of the federal forum; (3) the avoidance of piecemeal litigation; (4) the order in which jurisdiction was obtained; (5) whether state or federal law supplies the rule of decision; and (6) whether the state court proceeding will adequately protect the rights of the party seeking to invoke federal jurisdiction. *Nat'l Coal. on Black Civic Participation v. Wohl*, 498 F. Supp. 3d 457, 473 (S.D.N.Y. 2020) (internal citations and quotations omitted).

In this case, although the issues are the same, the parties are not identical to those of the State Court proceedings. *Compare Cartwright v. Kennedy*, No. 906349-24, ⸺ N.Y.S.3d ⸺, 2024 N.Y. Misc. LEXIS 3768 (N.Y. Sup. Ct. Albany Cnty. Aug. 13, 2024) *with* FAC ¶¶ 12-24. Even if the parties were identical, in applying the six-factor test, *Colorado River* would not apply. *See U.S. Bank Nat'l Assoc. v. E. Fordham De LLC*, 385 F. Supp. 3d 256, 258 (S.D.N.Y. 2019), aff'd 804 F. App'x 106 (2d Cir. 2020) ("*Colorado River* abstention is reserved for exceptional circumstances.").

**\*6** Because the first two factors are irrelevant and do not apply to this case, they are neutral. Neutrality weighs against abstention. *Gentes v. Osten*, No. 21-2022-CV, 2022 WL 16984686, at \*3 . (2d Cir. Nov. 17, 2022).

Regarding the third factor, ("[t]here is no threat of piecemeal litigation" if "[t]he resolution of the federal constitutional questions will settle the federal issues, regardless of the outcome of the state litigation"). *Alliance of Am. Insurers*, 854 F.2d at 603 (full cite).

The fourth factor disfavors abstention because this proceeding, *Team Kennedy et al. v. Berger et al.*, (1:24-cv-03897-ALC) (filed May 20, 2024) predated the state case. *Cartwright et al. v. Kennedy et al.*, 906349-24 (filed June 10, 2024). *De Cisneros v. Younger*, 871 F.2d 305, 308 (2d. Cir. 1989) ("The fourth factor looks at the chronological order in which the actions were filed.").

Under the fifth factor, since federal law supplies the rule of decision, abstention is disfavored. *See Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 26, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983) ("the presence of federal-law issues must always be a major consideration weighing against surrender [of federal jurisdiction].").

The sixth factor favors abstention. We consider whether the procedures of New York's state courts "are adequate to protect [Kennedy's] federal rights." *Niagara Mohawk Power Corp. v. Hudson River-Black River Regulating Dist.*, 673 F.3d 84, 103 (2d Cir. 2012) (internal citation omitted). Specifically, we are to determine whether "the parallel state-court litigation will be an adequate vehicle for the complete and prompt resolution of the issues between the parties." *Id.* We do not doubt that the New York courts provide a fair alternative forum that is capable of resolving the constitutional issues Kennedy alleges.

Balancing the factors militates against abstention. Moreover, federal courts have an obligation to exercise jurisdiction in all but the most exceptional circumstances. "[W]here a federal court has subject matter jurisdiction, it has a 'virtually unflagging obligation to exercise that jurisdiction,' even if an action concerning the same matter is pending in state court." *Mochary v. Bergstein*, 42 F.4th 80, 84 (2d Cir. 2022) (internal citation omitted). In recognition of that principle, this Circuit has insisted on a "heavy presumption" against "[a]bstention from the exercise of federal jurisdiction." *LeChase Constr. Servs., LLC v. Argonaut Ins. Co.*, 63 F.4th 160, 173 (2d Cir. 2023) (internal citations omitted). "In abstention cases, the district court's discretion must be exercised within the narrow and specific limits prescribed by the particular abstention doctrine involved," such that "there is little or no discretion to abstain in a case which does not meet traditional abstention requirements." *Niagara Mohawk Power*, 673 F.3d at 99 (citation omitted)

The Court will not abstain, and therefore this Court's exercise of subject matter jurisdiction is proper.

## II. This Case is Not Moot

Defendants claim that since Kennedy suspended his campaign and has stated he has no path to victory the case is moot. This argument is unavailing. A suspended campaign is different from a terminated campaign, and in any event, there is no requirement that a candidate must be likely to win, have a real possibility of winning, or even want to win a presidential election in order to be on the ballot for a particular state. [4] As Team Kennedy has stated, there are important goals for Kennedy and his party in future elections in New York if Kennedy garners five percent of the national vote. Under New York law, his party will qualify as a party automatically eligible for placement on the ballot at a future election if he receives a significant percentage of the New York vote. *See* Election Law §§ 1-104(3), 6-128.

[4]     Whether suspending a campaign or only appearing on ballots for some states is a prudent political strategy is irrelevant to the legal issues in this case. The prudence of such a strategy will be debated by an array of political pundits, a flock of history and political science professors, and a chattering of voices on social media.

## III. Res Judicata and Collateral Estoppel Do Not Bar This Action

### A. Claim Preclusion (Res Judicata) [5]

[5]     To determine if res judicata applies to a New York state court judgment, federal courts apply New York res judicata law. *See New York v. Mountain Tobacco Co.*, 942 F.3d 536, 543 (2d Cir. 2019).

**\*7** For a party to succeed on the affirmative defense of res judicata–also known as claim preclusion– it "must show that (1) the previous action involved an adjudication on the merits; (2) the previous action involved plaintiffs or those in privity with them; and (3) the claims asserted in the subsequent action were, or could have been raised in the prior action." *Mendez v. Pretium Mortg. Credit Partners I, Loan Acquisition*, LP, No. 21-CV-826(KAM)(JRC), 2023 W; 8283148, at \*13 (E.D.N.Y. Nov. 30, 2023).

The parties do not dispute the third element. At a minimum the federal constitutionality of New York's residence requirement could have been raised in the prior action.

### 1. Adjudication on the Merits

The issue of federal constitutionality of the residence requirement was decided on the merits. As discussed in the section on issue preclusion, the State courts decided the issue. *Cartwright*, No. 906349-24, 2024 WL 3894605, at \*15; *Cartwright*, No. CV-24-1294, 230 A.D.3d 969, 2024 WL 3977541, at \*3. A ruling by the Appellate division counts as a decision on the merits. *Cartwright*, No. CV-24-1294, 230 A.D.3d 969, 2024 WL 3977541, at \*3-4.

### 2. Privity

"[P]laintiffs in a federal suit that follows a state suit are in privity with the state plaintiffs where 'their interests are the same and [the federal plaintiffs] are controlled by the same party or parties' as the state plaintiffs." *Hoblock v. Albany Cnty. Nd. of Elections*, 422 F.3d 77, 95 (2d Cir. 2005) (brackets in original) (quoting *Ferris v. Cuevas*, 118 F.3d 122, 128 (2d Cir. 1997)).

For privity, the federal plaintiffs must have the same interests and be controlled by the same party or parties as the state plaintiffs. *Id.*

### i. Same Interests

Plaintiffs do not dispute that Kennedy has identical interests with his campaign. But there are three plaintiffs here: Team Kennedy, American Values 2024, and Jeffrey Rose. [6] While Team Kennedy shares identical interests with the state Defendant, Robert Kennedy Jr., the other federal plaintiffs may not share all of the same interests with the state plaintiffs.

[6]    The Court takes notice that Plaintiffs have sought leave to file a second amended complaint to include class action allegations pursuant to Fed. R. C. O. 23(b)(2) on behalf of classes of voters who are similarly situated to Mr. Rose, including: (1) all New York voters who in 2024 signed a petition seeking to place any independent or non-recognized-party presidential candidate on the ballot; (2) all New York voters who are not registered in political parties whose nominees for President will be on the ballot in 2024; and/or (3) all New York voters "whose political preferences lie outside the existing political parties." Pl. Memo. Mot. Leave to Amend, ECF No. 71 at 2.

American Values 2024 has a different motivation for having Kennedy on the ballot—this Political Action Committee wants independent candidates on state ballots. This is not limited to Kennedy; American Values 2024 supports even opponents of Kennedy on the ballot. Mr. Rose wants Kennedy on the ballot in order to vote for Kennedy in this election; he may not be necessarily concerned about Kennedy's party being placed on future ballots, or Kennedy's eligibility for certain federal benefits. Because Mr. Rose represents a class of putative voters, all members of this class do not have identical motivations for having Kennedy placed on the ballot. In addition, voters' interests carry greater weight than the interests of Kennedy–the voter has a constitutional right to vote for a candidate of their choice, but a candidate has no constitutional right to be on a ballot.

 *8  However, motivations need not be identical for there to be an identity of interest. All of these plaintiffs share one identical interest: having Kennedy placed on the ballot. The Court finds that this shared desired outcome is sufficient to satisfy the same interest requirement.

### ii. Control

Defendants are correct that "there can be no dispute that Kennedy and his principal campaign are one in the same, because Kennedy is certainly in control of his own campaign." Def. Opp., ECF No. 46 at 14. Plaintiffs do not meaningfully challenge this argument. But American Values 2024 is not controlled by Team Kennedy nor Robert Kennedy Jr. Both American Values 2024 and Mr. Rose have a different attorney than the attorneys representing Team Kennedy. Perhaps more importantly, Mr. Rose represents a class of putative voters. Kennedy certainly does not control them. [7] Accordingly American Values 2024 and the class of putative voters, represented by Mr. Rose, are not in privity with Kennedy.

[7]    In the First Amended Complaint, Jeffrey Rose is listed as a plaintiff in his individual capacity. Rose's counsel has indicated that he wishes to amend the complaint, stating that Rose represents a putative class of independent voters. For purposes of this opinion, the Court will assume that the Second Amended Complaint will be accepted.

Because Defendants bear the burden to establish res judicata, and they have failed to establish that Kennedy controls American Values 2024 and Mr. Rose (on behalf of himself and the putative class), the defense does not apply to them. [8] *See, e.g.*, *Hoblock, 422 F.3d at 91* ("It remains possible, however, that the plaintiff voters and candidates are in privity if the candidates in fact are controlling the voters' federal suit, not to advance the interests of all voters who submitted challenged absentee ballots, but rather to further the interests of the candidates and a subset of voters whose interests *do* coincide exactly with those of the candidates.") If the plaintiff voters are in reality the candidates' pawns, then by definition the plaintiff voters' interests are identical to the candidates' (and different from the interests of all similarly situated voters) and were adequately represented in the candidates' state-court lawsuit.

8      Because Team Kennedy is in privity with Kennedy, and the other requirements of res judicata have been met, it is unlikely that Team Kennedy would succeed on the merits.

## B. Collateral Estoppel (Issue Preclusion)

Under New York law, [9] issue preclusion will apply only if "(1) the issue in question was actually and necessarily decided in a prior proceeding, and (2) the party against whom [issue preclusion] is asserted had a full and fair opportunity to litigate the issue in the first proceeding." *Hoblock*, 422 F.3d at 94 (2d Cir. 2005) (internal citation omitted). Under New York law, the doctrine of collateral estoppel, a narrower species of res judicata, precludes a party from relitigating in a subsequent action or proceeding an issue clearly raised in a prior action or proceeding and decided against that party or those in privity, whether or not the tribunals or causes of action are the same. *Ripley v. Storer*, 309 N.Y. 506, 517, 132 N.E.2d 87 (1956); see also Restatement (Second) of Judgments § 2 (1982); 46 Am. Jur. 2d Judgments § 415; 9 Carmody-Wait 2d, NY Prac, Judgments, § 63:205.

9      Under the Full Faith and Credit Act, 28 U.S.C. § 1738, a federal court must apply New York issue preclusion (collateral estoppel) law to New York state-court judgments. *Hoblock*, 422 F.3d at 93.

 **\*9**  "The party seeking the benefit of collateral estoppel has the burden of demonstrating the identity of the issues in the present litigation and the prior determination, whereas the party attempting to defeat its application has the burden of establishing the absence of a full and fair opportunity to litigate the issue in the prior action." *Kaufman v. Eli Lilly & Co.*, 65 N.Y.2d 449, 456, 492 N.Y.S.2d 584, 482 N.E.2d 63 (1985) (internal citation omitted).

### 1. Whether the Issue Was Actually Decided

The Supreme Court in Albany decided that the residence requirement complied with the U.S. Constitution. *Cartwright v. Kennedy*, No. 906349-24, 2024 WL 3894605, at \*15-16 (N.Y. Sup. Ct. Aug. 13, 2024), *aff'd*, No. CV-24-1294, 230 A.D.3d 969, 2024 WL 3977541. The Third Department also found that Kennedy's federal constitutional challenges were without merit. *Cartwright*, No. CV-24-1294, 230 A.D.3d 969, 2024 WL 3977541, at \*3-4.

Plaintiffs in the State Court matter did not bring claims under the federal Constitution. The claims dealt solely with the application of New York Election law as it applied to Kennedy under New York law. Kennedy raised the federal constitutional issue in his answer, requesting the State Supreme Court to address it. He raised the issue in the Third Department. He appealed the Third Department's decision to the Court of Appeals. See *Cartwright*, No. 906349-24, 2024 WL 3894605, at \*15; *Cartwright*, No. CV-24-1294, 230 A.D.3d 969, 2024 WL 3977541, at \*3; *Cartwright*, No. 2024-632, 2024 N.Y. Slip Op. 73915. Both State courts came to a determination on the constitutional issues. Kennedy got answers. He didn't like them. He cannot now claim that the issue was not actually decided by the State courts and that it is not precluded in this action. [10] He made it necessary for those decisions to be rendered, through the same lawyer representing Team Kennedy here and in the Appellate Division.

10      Arguing that the constitutional issue was not actually decided below, Plaintiffs cite to an out of context statement Judge Ryba made during trial when discussing the proper scope of witness testimony when Kennedy attempted to establish his claim of unconstitutionality though his attorney Rossi's testimony although he was not disclosed or shown to be qualified as an expert in either Constitutional or New York State Law. *Cartwright v. Kennedy*, 2024 WL 3860022, \*——, 2024 N.Y. Misc. LEXIS 3768, \*51 (N.Y. Sup. Ct. Albany County Aug. 13, 2024). She noted, "We're not going to start a constitutional trial on the last day of testimony." (ECF No. 56-1, 205:5-10). Her statement does not detract from the State Supreme Court's findings on the constitutional issues.

### 2. Whether the Issue Was Necessarily Decided [11]

2024 WL 4144057

11    Given the paucity of case law on this issue, this analysis is a context-specific inquiry closely wedded to the facts at hand. For the purposes of analyzing this specific case, this Court distinguishes between rulings and outcomes.

Since collateral estoppel requires that an issue be necessarily decided in the prior proceeding, "a finding which is but an alternative ground for the prior court's decision" will not ordinarily be given preclusive effect. *Malloy v. Trombley*, 50 N.Y.2d 46, 49, 427 N.Y.S.2d 969, 405 N.E.2d 213 (1980); *see Pollicino v. Roemer & Featherstonhaugh P.C.*, 277 A.D.2d 666, 716 N.Y.S.2d 416 (3d Dep't 2000). Moreover, language that is not necessary to resolve an issue, constitutes dicta and should not be accorded preclusive effect. *See Stokes v. Stokes*, 172 N.Y. 327, 341, 65 N.E. 176 (1902).

**\*10** The State Court's ruling on the constitutional issue was neither dicta nor an alternative ground for arriving at the ultimate decision or outcome of the case. This was not simply part of the court's thought process or comments regarding the policy considerations further justifying the ruling. To the extent Plaintiffs claim that it was not necessary for the state courts to rule at all on the second issue—whether the residence requirement complies with the federal constitution–this argument fails. [12] *Cartwright*, No. 906349-24, 2024 WL 3894605, at \*14-15.

12    Plaintiffs do not explicitly raise the argument that the constitutional issues were not necessarily decided at the State Court, but that Judge Ryba erred by not addressing the constitutional issues, which the Court understands to be an argument that the constitutional issues were not actually decided. They assert that the state trial court "expressly blocked the constitutional rights that Plaintiffs seek to vindicate here from being litigated in the state court." Pl. Reply at 4.

As relevant here, the State Court ruled on two issues: (1) Kennedy's listed residence did not comply with New York's residence requirement under New York Election law; (2) New York's residence requirement complies with the federal constitution. Plaintiffs do not challenge, in this litigation, the State Court's first ruling, nor do they claim that the first ruling was unnecessary. [13] *See Cartwright*, No. 906349-24, 2024 WL 3894605, at \*14-15; *Cartwright*, No. CV-24-1294, 230 A.D.3d 969, 2024 WL 3977541, at \*3

13    Even though a judge's rulings on discrete legal issues contribute to the ultimate outcome of a case, the concepts of ruling on discrete legal issues and the ultimate outcome are distinct. There were two possible outcomes: Kennedy is placed on the ballot or Kennedy is not on the ballot. There are two possible rulings regarding the discrete legal issue concerning constitutionality of the residence requirement: it violates the Constitution or it does not. If the state courts had chosen the other possible alternative regarding constitutionality–stating that the residence requirement violated the Constitution– the outcome would be different. Kennedy would appear on the ballot. Due to the Supremacy Clause, the state courts could not state that although the residence requirement violates the constitution, Kennedy should not be placed on the ballot because his residence isn't valid under New York law. Therefore, it was necessary for the Court to decide the issue since the ruling on that discrete issue could change the ultimate outcome of the case. The state courts could not simply ignore the constitutional issue raised by Kennedy.

The State Court decided that the residence requirement did not violate the constitution. That ruling, standing alone, would not keep Kennedy off the ballot. The ruling regarding constitutionality was tethered to the State Court's decision regarding compliance with the residence requirement, not an alternative basis that would result in excluding Kennedy from the ballot. *See Stegemann v. Rensselaer Cty. Sheriff's Office*, 2021 WL 5492966, \*—— – ——, 2021 U.S. App. LEXIS 34783, \*11-12 (2d Cir. 2021) (holding that an issue was necessary to the resolution of a motion because it was at the heart of the alleged constitutional injury) (citing to *Kret by Kret v. Brookdale Hosp. Med. Ctr.*, 93 A.D.2d 449, 458-59, 462 N.Y.S.2d 896 (N.Y. App. Div. 2d Dep't 1983)).

### 3. Whether Plaintiffs Had a Full and Fair Opportunity to Litigate

Kennedy had a full and fair opportunity to adjudicate the claim. The trial court stated that this was not a constitutional trial, meaning there was no need for witness testimony on the constitutional issue. Plaintiffs claim that "little record was allowed to

be made on the constitutional issues, and the Appellate Division addressed the constitutional issues only in a single conclusory paragraph devoid of reasoning, facts, or analysis." Pl. Reply at 7-8, ECF No. 54.

**\*11**  Plaintiffs claim that this deprived them of a full and fair opportunity to litigate the issue. Plaintiffs are wrong. Plaintiffs rely on *West v. Ruff*, 961 F.2d 1064, 1065-66 (2d Cir. 1992) for this proposition. In *West*, the Court found the lack of a fair opportunity to litigate "because (1) the appointment of counsel in the federal matter pursuant to Hodge reflected a finding that West's claim had colorable substance and could not be adequately presented pro se; (2) West had at best a single day's notice of his state trial; (3) his appointed counsel in a factually identical federal case was never notified of the parallel state litigation; (4) the Court of Claims judge had no notice of the potential availability of appointed counsel; and (5) West has shown prejudice in the availability of an eyewitness in circumstances in which he seems to have had neither discovery nor sufficient notice to obtain the presence of the witness." *Id.*

In this case Kennedy and Team Kennedy were not pro se and were represented by the same attorney in the state and federal proceedings. Plaintiffs point to no case law indicating that testimony from witnesses must be held before a court can determine constitutional issues. Although in a passing statement, made in the midst of an expedited bench trial, the Supreme Court judge indicated that the federal constitutional issue was not before them, the judge ultimately ruled on the issue.

It matters not that the state judges declined to write a tome, instead choosing to decide the issue with brevity. Plaintiffs have not carried their burden to show that they lacked a full and fair opportunity to litigate the issues.

Because Defendants have failed to establish that the American Values 2024 and the voters, represented by Mr. Jeffrey Rose, were in privity in both the State action and the instant action, collateral estoppel does not apply. Team Kennedy is in privity with Kennedy. Since the other requirements for collateral estoppel have been met, the defense makes it unlikely that Team Kennedy would succeed on the merits.

### IV. Plaintiffs Have Failed to Prove Likelihood of Success on the Merits

#### A. Standard for Constitutional Challenges to State Election Laws – *Anderson-Burdick* Framework

This Circuit has held that when considering whether a state election law imposes an unconstitutional burden on voting rights, instead of strict scrutiny, courts apply what has come to be known as the *Anderson-Burdick framework* derived from *Anderson v. Celebrezze*, 460 U.S. 780, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983) and *Burdick v. Takushi*, 504 U.S. 428, 112 S.Ct. 2059, 119 L.Ed.2d 245 (1992). *Sam Party of N.Y. v. Kosinski*, 987 F.3d 267, 271 (2d Cir. 2021). Under this standard, the rigorousness of the court's inquiry into the propriety of a state election law depends upon the extent to which a challenged regulation burdens First and Fourteenth Amendment rights. *Id.* (citing *Burdick v. Takushi*, 504 U.S. 428, 433, 112 S.Ct. 2059, 119 L.Ed.2d 245 (1992)) (internal quotation marks removed). First, if the restrictions on those rights are severe, then strict scrutiny applies. *Id.* But when a state election law provision imposes only reasonable, nondiscriminatory restrictions upon the First and Fourteenth Amendment rights of voters, the State's important regulatory interests are generally sufficient to justify the restrictions. *Id.* This latter, lesser scrutiny is not pure rational basis review. *Price v. N.Y. State Bd. of Elections*, 540 F.3d 101, 108 (2d Cir. 2008). Rather, "the court must actually 'weigh' the burdens imposed on the plaintiff against 'the precise interests put forward by the State,' and the court must take 'into consideration the extent to which those interests make it necessary to burden the plaintiff's rights.' " *Id.* at 108-09 (quoting *Burdick*, 504 U.S. at 434, 112 S.Ct. 2059). Review under this balancing test is "quite deferential," and no "elaborate, empirical verification" is required. *Id.* at 109 (quoting *Timmons*, 520 U.S. at 364, 117 S.Ct. 1364).

#### 1. Whether Strict Scrutiny Applies

**\*12**  Plaintiffs argue that the residence requirement is both severe and discriminatory as applied, [14] and thus subject to strict scrutiny because this case is closely analogous to *Anderson*. Moreover, Plaintiffs allege that the constitutional interests in this

case are identical to that of *Anderson* and the state interests here are weaker. As described in depth below, this assertion is misguided. This Circuit has made clear that certain election law requirements that function as presumptively higher hurdles to the ballot for independent parties pass constitutional muster.

14 Plaintiffs have confirmed that they assert an as-applied challenge to the residence requirement. They do not argue that the statute is constitutionally impermissible on its face such that no application of the statute would be constitutional but and as-applied to Kennedy operates unconstitutionally as to him because of his particular circumstances. *See* Hearing Tr. 71: 13-19.

In *Sam Party of N.Y. v. Kosinski*, the Second Circuit affirmed a Southern District of New York Court's denial of preliminary relief where the plaintiff political organization was unlikely to succeed on the merits of its First and Fourteenth Amendment claims. *Sam Party of N.Y.*, 987 F.3d at 274. When applying the *Anderson-Burdick* framework, the Court found that New York's presidential-election party-qualification requirement did not impose a severe burden on minor parties, even though the amendment significantly changed the method New York had employed for 85 years to confer party status on a political organization. *Id.* at 275. The amendment raised the threshold from 50,000 votes to the greater of 130,000 votes or two percent of the total vote, and instead of requalifying every four years, political organizations now had to requalify by meeting the higher threshold in the gubernatorial *and* presidential elections. *Id.* at 272. Ultimately, the Circuit held that the State set forth a coherent account of why the requirement would help guard against disorder and waste. *Id.* at 278.

In *Sam Party*, the constitutional interests at issue were identical to the ones asserted in this case, the state's interests were similarly situated, and the requirement at issue was far weightier than requiring candidates to accurately disclose his or her place of residence. Because the burden against constitutional rights is minimal and nondiscriminatory, strict scrutiny does not apply.

### a. Severity of Burden

Plaintiffs claim that the residence requirement is a severe burden that falls unequally on independent candidates. Courts have identified three types of severe burdens on the right of individuals to associate as a political party: (1) regulations meddling in a political party's internal affairs; (2) regulations restricting the core associational activities of the party or its members; and (3) regulations that make it virtually impossible for minor parties to qualify for the ballot. *Sam Party of N.Y.*, 987 F.3d at 275 (collecting cases). When considering the impact of the ballot access process, the "hallmark of a severe burden is exclusion or virtual exclusion from the ballot." *Libertarian Party of Conn. v. Lamont*, 977 F.3d 173, 177 (2d Cir. 2020). To gauge whether minor parties have been so burdened, we look at the "combined effect of [New York's] ballot-access restrictions." *Libertarian Party of Ky.*, 835 F.3d at 575 (internal quotation marks omitted).

It is certainly true that at present Kennedy is completely excluded from the ballot. But this is not dispositive. In *Libertarian Party v. Lamont*, the Second Circuit held that Connecticut's petitioning laws which prevented Libertarian Party candidates from appearing on the ballot did not impose a severe burden on their First and Fourteenth Amendment rights. *Libertarian Party of Conn.*, 977 F.3d at 177. The Court found that a reasonably diligent candidate could be expected to satisfy the signature requirements and gain a place on the ballot. *Id.* at 179. Here, a reasonably diligent candidate can meet the residence requirement under New York law and gain a place on the ballot. 15 As set forth by the State Court, the applicable standard of residency under New York law provides:

 **\*13** According to Election Law § l-104 (22) and New York State case law, a residence is that place where a person maintains a fixed, permanent, and principal home and to which he or she, wherever temporarily located, always intends to return. As used in the Election Law, the term 'residence' is synonymous with 'domicile'. Case law has also established that an individual having two residences may choose one to which she or he has legitimate, significant and continuing attachments as her or his residence for purposes of the Election Law. The crucial factor in determining whether a particular residence complies

with the requirements of the Election Law is that the individual must manifest an intent to reside there, coupled with physical presence, without any aura of sham.

*Cartwright v. Kennedy*, 2024 WL 3860022, *——, 2024 N.Y. Misc. LEXIS 3768, *5 (N.Y. Sup. Ct. Albany County Aug. 13, 2024)

15  The Court need not determine whether the disclosure of an address on a nominating petition, standing alone, is a severe burden. However, the Court does recognize the legitimate safety concerns that candidates express when required to publicly list the addresses of their residence.

Residency is generally a factual question, dependent on the particular circumstances presented. *Matter of Glickman v Laffin*, 27 N.Y.3d 810, 815, 37 N.Y.S.3d 792, 59 N.E.3d 527 (2016) [citation omitted]. Notwithstanding Plaintiffs' assertion that candidates like Kennedy, who have more than one home are forced by the residence requirement to guess at and gamble on which of his residences a New York court will later determine to satisfy the state's domiciliary "permanent home" definition, New York case law is clear. The "Election Law does not preclude a person from having two residences and choosing one for election purposes provided he or she has legitimate, significant and continuing attachments to that residence" *Matter of Cartwright v. Kennedy*, 230 A.D.3d 969, —— (3d Dep't 2024) (internal citations omitted).

Plaintiffs' argument that the "strict compliance" standard contradicts *Anderson* is similarly unavailing. Election Law § 6-140 (1) requires that each page of an independent nominating petition set forth the address of the candidate's "place of residence" (Election Law § 6-140 [1]). The Court of Appeals has repeatedly emphasized that although substantial compliance with Election Law requirements is acceptable as to details of form, "there must be strict compliance with statutory commands as to matters of prescribed content." *Matter of Hutson v. Bass*, 54 N.Y.2d 772, 774, 426 N.E.2d 749, 443 N.Y.S.2d 57 (1981); *see Matter of Stoppenbach v. Sweeney*, 98 N.Y.2d 431, 433, 778 N.E.2d 1040, 749 N.Y.S.2d 210 (2002). The requirement that each page of a nominating petition set forth the candidate's "place of residence" is a matter of prescribed content, rather than form, and therefore strict compliance with the requirement is necessary (*see Matter of Stoppenbach v Sweeney*, 98 N.Y.2d at 433, 749 N.Y.S.2d 210, 778 N.E.2d 1040 (2002); *Matter of Hutson v Bass*, 54 N.Y.2d at 774, 443 N.Y.S.2d 57, 426 N.E.2d 749 (1981); *Matter of Sheehan v Scaringe*, 154 A.D.2d 832, 546 N.Y.S.2d 698 (1989), *appeal denied* 74 N.Y.2d 615, 549 N.E.2d 151, 549 N.Y.S.2d 960 (1989)).

Unlike the filing deadline at issue in *Anderson*, residency is a matter of prescribed content, and as New York courts have expressed, mandating strict compliance with the Election Law in this regard is designed to guarantee the integrity of the election process by facilitating the discovery of fraud and reducing the likelihood of unequal enforcement of the law (*see, Seawright v Bd. of Elections in City of New York*, 35 N.Y.3d 227, 233, 127 N.Y.S.3d 45, 150 N.E.3d 848 (2020); *Matter of Gross v Albany County Bd. of Elections*, 3 N.Y.3d 251, 258, 819 N.E.2d 197, 785 N.Y.S.2d 729 (2004)). The strict compliance standard is a safeguard against constitutional violations, and it is neutrally applied regardless of a candidate's history, background, party affiliation, protected class, or any other criterion irrelevant to a determination of whether its requirements have been met. *Matter of Staber v Fidler*, 65 N.Y.2d 529, 534, 482 N.E.2d 1204, 493 N.Y.S.2d 288 (1985).

*14  There is no dispute that Kennedy listed an address on every page of the nominating petition, and that he intended to list the address on each page of the nominating petition. Hearing Tr. at 76:7-24. There is also no evidence to suggest that Kennedy made some sort of error or mistake in listing the address, as was the case in *Matter of Ferris v Sadowski* (45 N.Y.2d 815, 381 N.E.2d 339, 409 N.Y.S.2d 133 (978)) and *Matter of Maloney v Ulster County Bd. of Elections* (21 A.D.3d 692, 800 N.Y.S.2d 249 (3d Dept 2005), *lv denied* 5 N.Y.3d 706, 801 N.Y.S.2d 800, 835 N.E.2d 660 (2005)). *Ferris* and *Maloney* involved situations in which candidates inadvertently listed previous addresses of genuine bona fide residences within the meaning of the Election Law, unlike Kennedy who intentionally, deliberately, and on the advice of counsel, listed an address at that does not qualify as a residence under New York law. *Matter of Cartwright v. Kennedy*, 230 A.D.3d at ——. Relevant here is whether a reasonably diligent candidate could be expected to satisfy the residence requirement. *Libertarian Party v. Lamont*, 977 F.3d 173, 179 (2d. Cir. 2020). At issue in the State court proceeding was not whether Kennedy maintained a residence that would satisfy the

residence requirements under the Election Law, but whether the address Kennedy listed on the nominating petition was in fact his actual residence. *Matter of Cartwright v. Kennedy*, 230 A.D.3d at —— .

And in any event, New York state courts have routinely invalidated nominating petitions where candidates did not actually reside at the addresses listed on the designating petition as their residences. *See e.g.*, *Eisenberg v Strasser*, 768 N.Y.S.2d 773, 1 Misc. 3d 299, 2003 N.Y. Misc. LEXIS 1144 (N.Y. Sup. Ct.), *aff'd*, 307 A.D.2d 1053, 763 N.Y.S.2d 782, 2003 N.Y. App. Div. LEXIS 9049 (N.Y. App. Div. 2d Dep't 2003) (finding address candidate listed on designating petition was false and for a business from which he retired); *Lemishow v. Black*, 104 A.D.2d 460, 478 N.Y.S.2d 971, 1984 N.Y. App. Div. LEXIS 19907 (N.Y. App. Div. 2d Dep't), *aff'd*, 63 N.Y.2d 684, 479 N.Y.S.2d 972, 468 N.E.2d 1109, 1984 N.Y. LEXIS 4538 (N.Y. 1984) (candidate resided in different assembly district and had never slept, eaten, or kept any clothes at the address appearing on the petition but used the address to receive mail for one to two weeks prior to the hearing and changed his place of party enrollment to that address); *Brigandi v. Barasch*, 144 A.D.2d 177, 535 N.Y.S.2d 117, 1988 N.Y. App. Div. LEXIS 15078 (N.Y. App. Div. 3d Dep't 1988) (designating petition for Congressional candidate invalidated where record supported that candidate never actually resided at address listed). Moreover, State Courts have cautioned against the creation and use of sham addresses solely for the purpose of circumventing residence requirements under the Election Law. *People v. O'Hara*, 96 N.Y.2d 378, 385, 729 N.Y.S.2d 396, 754 N.E.2d 155 (2001), citing *Matter of Hosley v Curry*, 207 A.D.2d 116, 118, 621 N.Y.S.2d 399, *revd on other grounds* 85 N.Y.2d 447, 626 N.Y.S.2d 32, 649 N.E.2d 1176; *see also*, *Matter of Lemishow v Black*, 104 A.D.2d 460, 478 N.Y.S.2d 971, *affd* 63 N.Y.2d 684, 685, 479 N.Y.S.2d 972, 468 N.E.2d 1109.

Listing correct information about a candidate's actual residence is far from a severe burden that would be constitutionally impermissible. That twenty-two States across the country require presidential candidates to publish either a domicile or residential address on ballot access petitions suggests that such disclosures are minimal requirements that assist States in regulating and ordering fair elections. *See* Pl. Memo. at n.10-12.

Because Plaintiffs have failed to demonstrate that the residence requirement imposed a severe burden on their rights, strict scrutiny does not apply under the *Anderson-Burdick* framework. [16]

[16]    Assuming, *arguendo*, that strict scrutiny applies, the residence requirement is narrowly tailored to further the compelling governmental interests elucidated below.

#### b. **Whether the Burden is Discriminatory**

Plaintiffs' argument that the residence requirement discriminates against independent candidates as opposed to established party candidates and should thus be subject to strict scrutiny is without merit. [17] Independent candidates and established party nominees must both disclose the same identifying information, including their name and residence. *Compare* N.Y. Elec. Law § 6-140(1)(a) *with* N.Y. Elec. Law § 6–156 ("Party nominations; certification"). Because the requirement is neutral and applies to all candidates regardless of their party size or affiliation, the burden is nondiscriminatory and not subject to strict scrutiny.

[17]    Plaintiffs have conceded that, contrary to statements made in the FAC and Plaintiffs' opening brief, Section 6-156 does require President nominees of national political parties—and not merely the nominees of their New York state affiliates who are recognized "parties" pursuant to New York Election Law—to file Certificates of Nomination that include their "residence" address. *See* Plaintiff's Letter dated Sept. 9, 2024 (ECF No. 69).

#### c. **Weighing the State's Interests**

**\*15** The balancing test at the second stage of the *Anderson-Burdick* framework is "quite deferential." *Price v. N.Y. State Bd. of Elections*, 540 F.3d 101, 109 (2d Cir. 2008). "[A] State's important regulatory interests will usually be enough to justify

2024 WL 4144057

reasonable, nondiscriminatory restrictions." *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 364, 117 S. Ct. 1364, 137 L. Ed. 2d 589 (1997) (cleaned up). Otherwise, we would "hamper the ability of States to run efficient and equitable elections, and compel federal courts to rewrite state electoral codes." *Sam Party of N.Y.*, 987 F.3d at 276 (citing *Clingman*, 544 U.S. at 593, 125 S.Ct. 2029).

The purpose of inclusion of the residence address of the candidate (Election Law, § 6-132, subd 1) is not only to facilitate the processing of his petition by the Board of Elections and to ease the task of one checking his qualification to run, but perhaps most important to assure that the signers of his petition are aware of the identity of their candidate. *Ferris v. Sadowski*, 45 N.Y.2d 815, 817, 381 N.E.2d 339, (409 N.Y.S.2d 133 [1978]). Ultimately, a "too-liberal construction of the Election Law has the potential for inviting mischief on the part of candidates, or their supporters or aides, or worse still, manipulations of the entire election process." Cartwright v. Kennedy, No. 906349-24, 2024 N.Y. Misc. LEXIS 3768 (N.Y. Sup. Ct. Albany Cnty. Aug. 13, 2024) (cleaned up). Moreover, "[t]he United States Constitution cannot be construed to protect candidates from making false statements on their petitions for public office." *Id.* at 33, 103 S.Ct. 927.

In the instant case, this Court need not determine whether Kennedy intended to mislead or confuse anyone when he listed the New York address as his residence though he had never resided there within the meaning of the Election Law. But the State's legitimate concern in requiring candidates to accurately disclose their residency to avoid voter confusion is neither fanciful nor flimsy. Voters might be entirely misled and manipulated into voting for a presidential candidate because he claimed to be a New York resident, although he actually resided in Oklahoma and never lived at the address he listed on his nominating petition. Perhaps the candidate had no intent of posing as a hometown candidate to attract voters. But it might certainly be the case that some voters will vote for a hometown candidate, without considering any other factors. Consider the fact that there are presently three Representatives in U.S. Congress with the last name Smith. One clear way to identify them is by their residency (Representative Smith from New Jersey, Representative Smith from Washington, and Representative Smith from Missouri). Residency is certainly a significant requirement to ensure that voters correctly identify their intended candidates. New York's residence requirement withstands the lesser exacting inquiry under *Anderson-Burdick* because it furthers the States' legitimate interests in providing voters with accurate information about the identities of candidates.

At its most extreme, requiring accurate residency disclosures protects voters from the type of criminal fraud and manipulation at issue in *United States v. Smilowitz*. There, developer defendants fraudulently registered voters, falsified registration forms, and falsely listed an address in which their chosen candidate did not reside in so that the developers could control local government decisions and further their real estate development project. *United States v. Smilowitz*, 974 F.3d 155, 156 (2d Cir. 2020). The residence requirement is neither a Sisyphean hurdle nor an antiquated artifact. Rather, as Judge Ryba suggested in the State Action, the provision furthers legitimate state interests:

> **\*16** Using a friend's address for political and voting purposes, while barely stepping foot on the premises, does not equate to residency under the Election Law. To hold otherwise would establish a dangerous precedent and open the door to the fraud and political mischief that the Election Law residency rules were designed to prevent.

*Cartwright v. Kennedy*, 2024 N.Y. Misc. LEXIS 3768, \*47 (N.Y. Sup. Ct. Albany County, Aug. 13, 2024).

On balance, requiring strict compliance with the residence requirement is an important mechanism the State uses to regulate and administer fair and orderly elections. New York Election Law's interpretation of residence effects voters and candidates alike. *See Wit v. Berman*, 306 F.3d 1256, 1262 (2d Cir. 2002) (noting that "[d]omicile as a rule may have its philosophical defects ... but it has enormous practical advantages over the alternatives" providing "workable standards" for election regulatory officials). And, while residency determinations might have greater import in determining in-state residency qualifications for local and state elections such as town selectman races, gubernatorial races, or U.S. Congressional races, New York does have

an important interest that Presidential candidates qualify and comport with Twelfth Amendment requirements that Presidential "Electors ... shall vote ... for a President and Vice President, one of whom, at least, shall not be an inhabitant of the same state with themselves." U.S. CONST. amend. XII. [18] Plaintiffs have not sufficiently demonstrated that they are likely to succeed on their claim that the residence requirement violates the Presidential Qualifications Clause. Plaintiffs argue that the residence requirement violates the limits set forth in U.S. CONST., art. II, § 1, cl. 5, because it imposes two additional qualifications on independent candidates seeking ballot access in New York. However, the residence requirement applies equally to independent and established candidates. Whether any of the twenty-one States, in addition to New York, who have similar residence requirements violate the Qualifications clause has yet to be decided by the Supreme Court.

[18]    See Jones v. Bush, 122 F. Supp. 2d 713 (N.D. Tex. 2000). Notably, the Court's analysis rested upon determining whether Vice President nominee Cheney qualified as an inhabitant of Wyoming within the meaning of the Twelfth Amendment.

And, as described above, New York's residence requirement as it is defined is more forgiving than inhabitancy under the Twelfth Amendment. Compare N.Y. Elec. Law § 1-104(22) ("A candidate's "residence" is where he "maintains a fixed, permanent and principal home and to which he, wherever temporarily located, always intends to return.") with Jones v. Bush, 122 F. Supp. 2d 713, 719-20 (N.D. Tex. 2000) citing State of Texas v. State of Florida, 306 U.S. 398, 424, 59 S. Ct. 563, 83 L. Ed. 817 (1939) ("[A] person is an 'inhabitant' of a state, within the meaning of the Twelfth Amendment, if he (1) has a physical presence within that state and (2) intends that it be his place of habitation. The test for ascertaining inhabitance is thus a dual inquiry concerning physical presence in fact and intent to remain in or to return to the state after an absence."). New York State allows for multiple states of residence while an individual may only have one state of inhabitancy under the Twelfth Amendment.

 **\*17**  Under the "quite deferential" review at the second step of the Anderson-Burdick inquiry, Price, 540 F.3d at 109, the State's purported regulatory interests in guarding against voter confusion justify the de minimis burden of requiring candidates to comply with the residence requirement.

Plaintiffs have failed to show they are likely to succeed on the merits of their U.S. constitutional claims. See Matter of Cartwright v. Kennedy, 230 A.D.3d 969, —— (3d Dep't 2024) ("[W]e find that none of the constitutional challenges raised by the respondent candidates has merit.").

### V. Plaintiffs Have Not Sufficiently Proved Irreparable Harm

In the First Amendment context, plaintiffs must demonstrate a likelihood of success on the merits in order to show irreparable harm. Libertarian Party of N.Y. v. N.Y. Bd. of Elections, 539 F. Supp. 3d 310, 329-30 (S.D.N.Y. 2021). Because Plaintiffs have not demonstrated a likelihood of success on the merits, the Court finds that they have not established irreparable harm. [19]

[19]    Defendants claim that there is no irreparable harm because Kennedy has stopped trying to win the 2024 Presidential election, he cannot win, and his voters can write his name in if they so choose to on the ballot. These arguments fail. There is no question that "voting is of the most fundamental significance under our constitutional structure." Burdick, 504 U.S. at 433, 112 S.Ct. 2059. (internal citation omitted). Citizens have a right to vote for the candidate of their choice. Defendants claim that if the injunction is denied, Kennedy will not suffer irreparable harm because he cannot win the election and his supporters can write his name in. For the same reasons discussed in the section on mootness, these arguments fail. Whether a candidate can win an election is irrelevant to a citizens' constitutional right to vote for that candidate. As described above, there are important goals for Kennedy and his party in future elections in New York if Kennedy garners five percent of the national vote. Under New York law, Kennedy's party will qualify as a party automatically eligible for placement on the ballot at a future election if he receives a significant percentage of the New York vote. See Election Law §§ 1-104(3), 6-128.

A write-in vote is not an adequate substitute for having a candidate's name appear on the ballot. Anderson v. Celebrezze, 460 U.S. 780 n. 26, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983). "The realities of the electoral process, however, strongly suggest that 'access' via write-in votes falls far short of access in terms of having the name of the candidate on the

ballot.... [A candidate] relegated to the write-in provision, would be forced to rest his chances solely upon those voters who would remember his name and take the affirmative step of writing it on the ballot." *Lubin v. Panish*, 415 U.S. 709, n. 5, 94 S.Ct. 1315, 39 L.Ed.2d 702 (1974).

**VI. The Public Interest and Balancing of the Equities Do Not Support Preliminary Relief**

When balancing the equities, Plaintiff has failed to prove that this extraordinary relief is warranted. In a suit against the government, balancing of the equities merges into our consideration of the public interest. *New York v. U.S. Dep't of Homeland Sec.*, 969 F.3d 42, 58-59 (2d Cir. 2020). As explained above, the presidential-election requirement serves important regulatory interests. Certainly, "securing First Amendment rights is in the public interest," *N.Y. Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013), but "that is of no help to a plaintiff [like Kennedy] who is not likely to succeed on its First Amendment claim." *Sam Party of N.Y.*, 987 F.3d at 278. Even if Plaintiffs could establish a likelihood of prevailing on the merits, the public interests of the State outweigh those of the Plaintiffs.

 **\*18**  While a significant number of voters certainly want to see Kennedy's name on the ballot for the upcoming Presidential election, "the interest of these voters does not outweigh the broader public interest in administrable elections." *Id.* There is no question that "[no] right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live." But, as the Supreme Court has advised, "the right to vote is the right to participate in an electoral process that is necessarily structured to maintain the integrity of the democratic system". *Burdick*, 504 U.S. 428, 441, 112 S.Ct. 2059, 119 L.Ed.2d 245 (1992) (internal citations omitted).

<u>**CONCLUSION**</u>

For the reasons set forth above, Plaintiff's emergency request for a preliminary injunction is hereby **DENIED**.

**SO ORDERED.**

**All Citations**

Slip Copy, 2024 WL 4144057

---

End of Document    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Kennedy v. Berger, Not Reported in Fed. Rptr. (2024)

2024 WL 4274191

2024 WL 4274191
Only the Westlaw citation is currently available.
United States Court of Appeals, Second Circuit.

Team KENNEDY, American Values 2024, Jeffrey Rose, Plaintiffs-Appellants,

v.

Henry T. BERGER, in his official capacity as the Co-Chair of the New York State Board of Elections, Peter S. Kosinski, in his official capacity as the Co-Chair of the New York State Board of Elections, Essma Bagnuola, in her official capacity as a Commissioner of the New York State Board of Elections, Anthony J. Cassale, in his official capacity as a Commissioner of the New York State Board of Elections, Kristen Zebrowski Stavisky, in her official capacity as Co-Executive Director of the New York State Board of Elections, Letitia James, in her official capacity as the Attorney General of the state of New York, Raymond J. Riley III, in his official capacity as Co-Executive Director of the New York State Board of Elections, Defendants-Appellees.

24-2385
|
September 18, 2024

S.D.N.Y. – N.Y.C., 24-cv-3897, Carter, J.

**Attorneys and Law Firms**

Gary L. Donoyan, The Law Office of Gary L. Donoyan, Manhasset, NY, for Plaintiff-Appellant Team Kennedy.

Gary L. Donoyan, The Law Office of Gary L. Donoyan, Manhasset, NY, Richard Jaffe, Sacramento, CA, Jed Rubenfeld, New Haven, CT, for Plaintiffs-Appellants American Values 2024, Jeffrey Rose.

Andrea W. Trento, Judith Naomi Vale, Barbara D. Underwood, New York State Office of the Attorney General, Division of Appeals & Opinions, New York, NY, for Defendants-Appellees.

Present: Gerard E. Lynch, Beth Robinson, Sarah A. L. Merriam, Circuit Judges.

**Opinion**

**\*1** Appellants move for an emergency injunction pending appeal. Having weighed the applicable factors, we conclude that an injunction pending appeal is not warranted. *See Agudath Isr. of Am. v. Cuomo*, 980 F.3d 222, 225-26 (2d Cir. 2020). Accordingly, upon due consideration, it is hereby ORDERED that the motion is DENIED.

**All Citations**

Not Reported in Fed. Rptr., 2024 WL 4274191

---

End of Document                                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

2024 WL 4312515
Only the Westlaw citation is currently available.
Supreme Court of the United States.

TEAM KENNEDY, et al.

v.

Henry BERGER, et al.

No. 24A285
|
September 27, 2024

Case below, 2024 WL 4274191.

**Opinion**

 **\*1**  The application for writ of injunction presented to Justice Sotomayor and by her referred to the Court is denied.

**All Citations**

--- S.Ct. ----, 2024 WL 4312515 (Mem)

---

**End of Document**                      © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Strong v. New York, Not Reported in Fed. Supp. (2019)

2019 WL 2723372

2019 WL 2723372
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Charles L. STRONG, Plaintiff,

v.

The State of NEW YORK; New York State Court of Appeals; Supreme
Court of the State of New York; and Robert E. Kelly, Esq., Defendants.

1:19-CV-63 (MAD/CFH)
|
Signed 07/01/2019

**Attorneys and Law Firms**

CHARLES L. STRONG, 04A4227, Greene Correctional Facility, P.O. Box 975, Coxsackie, New York 12051, Plaintiff pro se.


### MEMORANDUM-DECISION AND ORDER

Mae A. D'Agostino, U.S. District Judge:


### I. INTRODUCTION

 **\*1** On January 17, 2019, *pro se* plaintiff, Charles L. Strong ("Plaintiff"), a current New York State inmate, commenced this civil action against the State of New York, New York State Court of Appeals, the Supreme Court of the State of New York–specifically Judge John Hall and District Attorney Kathleen Hogan–and Public Defender Robert E. Kelly. *See* Dkt. No. 1. Plaintiff claims these Defendants violated his constitutional rights in connection with his New York State conviction in 2004 and his resulting sentence of twenty-two years in jail, followed by five years of supervised release. *See id.*

For a complete recitation of the relevant background, the Court refers the parties to Magistrate Judge Hummel's Report and Recommendation dated April 19, 2019. *See* Dkt. No. 9. Briefly, the Court notes Plaintiff alleged that on November 1, 2003, he was wrongfully placed into custody by the Glens Falls Police Department and then once at the police station, made a written statement. Dkt. No. 1 at 4-5. Plaintiff claims that police then arrested him for making a false statement and "denying guilt of the crime," which he claims he did not commit. *Id.* Plaintiff stated he was improperly arraigned the next morning and then held illegally and interrogated without a lawyer present, which caused him to suffer a nervous breakdown and later attempt suicide. *Id.* at 4-5, 9-10. Plaintiff also alleges that New York State took years to "conclude" his state court remedies, and that evidence had been kept from him and his public defender. *Id.* at 3-5. He further contends New York frivolously denied his claims and his motions to vacate the judgment against him or set aside his sentence. *Id.* at 3-5. Plaintiff alleges that these injustices and failures of the State, the State Court system, and his public defender are why he was wrongly convicted and sentenced to twenty-two years in jail, with five years of supervised release. *See id.* Plaintiff demands the evidence that he claims was kept from him and his attorney, an investigation into his entire case, and review of his sentence. *Id.* at 5.

On January 22, 2019, the Court closed this case for Plaintiff's failure to comply with filing fee requirements, but upon Plaintiff's filing of a motion for leave to proceed *in forma pauperis* ("IFP"), the Court reopened Plaintiff's case and granted his motion. *See* Dkt. Nos. 4, 5, 8. At the same time Plaintiff also filed a motion requesting the Court appoint him counsel. *See* Dkt. No. 7. In response, Magistrate Judge Hummel reviewed Plaintiff's case and provided the April 19, 2019 Report and Recommendation presently before the Court. *See* Dkt. No. 9.

2019 WL 2723372

Magistrate Judge Hummel recommended dismissal of Plaintiff's claims with prejudice. *See* Dkt. No. 9. Upon review of Plaintiff's complaint, Magistrate Judge Hummel found the applicable statutes of limitations had expired for Plaintiff's claims, and recommended that even if they had not, the Court dismiss Plaintiff's claims on their merits. *See id.* As the Report and Recommendation indicates, *Heck v. Humphrey* prohibits Plaintiff from recovering on the merits of his § 1983 claims because Plaintiff's 2004 conviction has not been overturned. *See id.* Further, Magistrate Judge Hummel points to the State of New York's and the New York State Court of Appeals' Eleventh Amendment immunity, Judge Hall's judicial immunity, and District Attorney Hogan's absolute immunity for additional support for his recommendation to dismiss Plaintiff's claims. *See id.*

**\*2** When addressing Plaintiff's allegations against Public Defender Robert Kelly, Magistrate Judge Hummel found Defendant Kelly could not be held liable pursuant to § 1983 because he was not a state actor and was only performing his traditional functions as counsel. *See id.* Additionally, Magistrate Judge Hummel found that any state law claim Plaintiff may assert against Defendant Kelly for legal malpractice would be outside of a federal court's subject matter jurisdiction, and barred by the statute of limitations. *See id.* Finally, in light of his recommendations to dismiss Plaintiff's claims with prejudice, Magistrate Judge Hummel recommends denying Plaintiff's motion for the Court to appoint counsel as moot. *See id.*

Plaintiff filed his objections to the Report and Recommendation on June 12, 2019 after the Court granted an extension of his time to object. *See* Dkt. No. 12. Plaintiff's objections reiterated many of his prior complaints, including allegations that New York State frivolously denied his various motions and refused "to uphold state laws and regulations on the 440" in connection with his 2004 conviction and "illegal 27 year sentence." *See id.* at 2. Plaintiff again seeks to proceed IFP, requests reimbursement for costs charged to him in this matter, and repeats his initial requests for relief. *See id.*

## II. DISCUSSION

When a plaintiff files "[g]eneral or conclusory objections, or objections which merely recite the same arguments presented to the magistrate judge," the district court will review the magistrate judge's report and recommendation for clear error. *O'Diah v. Mawhir*, No. 9:08-CV-322, 2011 WL 933846, \*1 (N.D.N.Y. Mar. 16, 2011). Upon the court's review, it may "accept, reject, or modify in whole or in part, the findings or recommendations made by the magistrate judge." *Id.* (quoting 28 U.S.C. § 636(b) (1)(C)).

Here, Plaintiff's various objections are general and conclusory in nature, and are similar, if not the same arguments presented in his complaint. Therefore, this Court reviews the April 19, 2019 Report and Recommendation for clear error. The Court finds Magistrate Judge Hummel's recommendations to be appropriate and without error for the reasons stated herein.

### A. Section 1983 Claims

Magistrate Judge Hummel appropriately addressed whether Plaintiff, proceeding IFP, could properly maintain his complaint in the April 19, 2019 Report and Recommendation. *See* 28 U.S.C. § 1915(e)(2)(B). The Court agrees with Magistrate Judge Hummel that Plaintiff's complaint must be dismissed with prejudice because Plaintiff's claims are barred by the statute of limitations. For Plaintiff's § 1983 claims, Magistrate Judge Hummel necessarily applied New York's three year statute of limitations and found, pursuant to federal law, that these claims accrued when Plaintiff knew or should have known of the alleged harm. *See* N.Y. C.P.L.R. § 214(5); *Pearl v. City of Long Beach*, 296 F.3d 76, 79-80 (2d Cir. 2002) (quoting *Owens v. Okure*, 488 U.S. 235, 249-50 (1989); *Heard v. Sheahan*, 253 F.3d 316, 317-18 (7th Cir. 2001); *Harvey v. Waldron*, 210 F.3d 1008, 1013 (9th Cir. 2000); *Singleton v. City of New York*, 632 F.2d 185, 191 (2d Cir. 1980)). Accordingly, the statute of limitations on Plaintiff's claims began to accrue in 2004 and expired in 2007. Therefore, Plaintiff's § 1983 claims are dismissed with prejudice on this basis.

Alternatively, even if Plaintiff's § 1983 claims were not time-barred, the Court finds Magistrate Judge Hummel appropriately concluded they would be barred by *Heck v. Humphrey. See Delaney v. City of Albany*, No. 1:18-CV-1193, 2019 WL 1486836,

2019 WL 2723372

*3 (N.D.N.Y. Apr. 4, 2019) (citing *Godley v. Onondaga County*, No. 6:16-CV-01419, 2017 WL 2805162, *5 (N.D.N.Y. Jan. 6, 2017)). Further, Magistrate Judge Hummel correctly recommended dismissal of Plaintiff's § 1983 claims against the State of New York, the New York State Court of Appeals, Judge Hall, and District Attorney Hogan because these Defendants are shielded from Plaintiff's allegations by sovereign, judicial, and absolute immunity.

**\*3** The State of New York and the New York State Court of Appeals enjoy immunity under the Eleventh Amendment. *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 120 (1984) (citing *Quern v. Jordan*, 440 U.S. 332 (1979)) (holding that "if a § 1983 action alleging a constitutional claim is brought directly against a [s]tate, the Eleventh Amendment bars a federal court from granting any relief on that claim"); *see also Peterson v. N.Y.S. Court of Appeals*, No. 8:12-CV-1873, 2012 WL 7480033, *2 (N.D.N.Y. Dec. 27, 2012) (holding that a lawsuit "against a state court ... is considered to be a suit against the state, and is therefore also prohibited by the Eleventh Amendment") (quoting *Abrahams v. Appellate Div. of Supreme Court*, 473 F. Supp. 2d 550, 556 (S.D.N.Y. 2007)).

Defendant Judge Hall, a New York State Supreme Court Judge, enjoys judicial immunity. *See Green v. Maraio*, 722 F.2d 1013, 1016 (2d Cir. 1983) (holding that "a judge defending against a section 1983 action is entitled to absolute judicial immunity from damages liability for acts performed in his judicial capacity") (citing *Dennis v. Sparks*, 499 U.S. 24, 27 (1980); *Supreme Court of Virginia v. Consumers Union of the U.S., Inc.*, 446 U.S. 719, 734-35 (1980); *Stump v. Sparkman*, 435 U.S. 349, 360 (1978)); *see also Anonymous v. Kaye*, 987 F. Supp. 131, 135 (N.D.N.Y. 1997).

Defendant District Attorney Hogan has absolute immunity. In the Second Circuit, "it is well-established ... that claims of malicious prosecution of a particular charge are tied to the judicial phase, and warrant absolute immunity for a defendant district attorney." *McKeon v. Daley*, 101 F. Supp. 2d 79, 87 (N.D.N.Y. 2000) (citing *Day v. Morgenthau*, 909 F.2d 75, 77 (2d Cir. 1990)); *Hill v. City of New York*, 45 F.3d 653, 661 (2d Cir. 1995); *Eisenberg v. Dist. Att'y of Kings*, 847 F. Supp. 1029, 1036 (E.D.N.Y. 1994); *Smith v. Gribetz*, 958 F. Supp. 145, 152 (S.D.N.Y. 1997); *see Van Lewis v. Kyle*, No. 5:18-CV-1128, 2019 WL 643174, *2 (N.D.N.Y. Feb. 15, 2019); *see also Kneitel v. Danchuk*, No. 04-CV-0971, 2007 WL 4441224, *8 (E.D.N.Y. Dec. 17, 2007).

Finally, Magistrate Judge Hummel correctly found that Plaintiff cannot sue Defendant Kelly, Plaintiff's appointed counsel in his 2004 criminal proceedings, under § 1983. *See Kunz v. Brazill*, No. 6:14-CV-1471, 2015 WL 792096, *7 (N.D.N.Y. Feb. 25, 2015); *Rodriguez v. Weprin*, 116 F.3d 62, 65-66 (2d Cir. 1997) (holding that "it is well-established that court-appointed attorneys performing a lawyer's traditional functions as counsel to defendant do not act 'under color of state law' and therefore are not subject to suit under 42 U.S.C. § 1983") (citation omitted). Therefore, the Court agrees with and adopts Magistrate Judge Hummel's recommendation to dismiss Plaintiff's § 1983 claims with prejudice.

## B. Plaintiff's Malpractice Claim

The Court also agrees with Magistrate Judge Hummel that any claim Plaintiff may have against Defendant Kelly for legal malpractice under New York state law would be barred by the statute of limitations. *See* N.Y. C.P.L.R. § 214(6); *Kunz*, 2015 WL 792096, at *6. Further, even if Plaintiff's claim was timely, the Court adopts Magistrate Judge Hummel's recommendation and declines to exercise supplemental jurisdiction because the Court dismissed Plaintiff's other claims over which it does have subject matter jurisdiction. *See* 28 U.S.C. § 1367(c).

Accordingly, the Court dismisses Plaintiff's complaint in its entirety, with prejudice.

## C. Motion to Appoint Counsel

**\*4** Finally, the Court denies Plaintiff's motion to appoint counsel as moot.

## III. CONCLUSION

2019 WL 2723372

After carefully reviewing the entire record in this matter, Magistrate Judge Hummel's April 19, 2019 Report and Recommendation, and the applicable law, and for the reasons stated herein, the Court hereby

**ORDERS** that Magistrate Judge Hummel's April 19, 2019 Report and Recommendation (Dkt. No. 9) is **APPROVED** and **ADOPTED in its entirety** for the reasons stated therein; and the Court further

**ORDERS** that Plaintiff's Complaint (Dkt. No. 1) is **DISMISSED with prejudice**; and the Court further

**ORDERS** that Plaintiff's Motion to Appoint Counsel (Dkt. No. 7) be **DENIED** as moot; and the Court further

**ORDERS** the Clerk of the Court shall enter judgment in Defendants' favor and close this case; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2019 WL 2723372

---

**End of Document**                                                                  © 2024 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Blue Flag – Appeal Notification

Appeal Filed by Dees v. Zurlo, 2nd Cir., June 12, 2024

2024 WL 2291701

Only the Westlaw citation is currently available.

United States District Court, N.D. New York.

Jennifer Lynn DEES and Ethan Davis Smith, Plaintiffs,

v.

Michael ZURLO, et al., Defendants.

1:24-CV-1 (MAD/DJS)

|

Signed May 21, 2024

Attorneys and Law Firms

JENNIFER LYNN DEES and ETHAN DAVIS SMITH, 16 Grant Hill Road, Clifton Park, New York 12065, Plaintiffs, pro se.

## MEMORANDUM-DECISION AND ORDER

Mae A. D'Agostino, United States District Judge:

## I. INTRODUCTION

**\*1** On January 2, 2024, Plaintiffs Jennifer Lynn Dees and Ethan Davis Smith commenced this action, *pro se*, against fifty-three Defendants. *See* Dkt. No. 1. In their 170-page complaint, Plaintiffs allege that Defendants have deprived them of various constitutional rights because of Defendants' roles and involvement in state-court custody, support, and/or criminal disputes. *See id.* Plaintiffs submitted applications to proceed *in forma pauperis* ("IFP") and for leave to file electronically. *See* Dkt. Nos. 2, 3, 4, 5.

On March 11, 2024, Magistrate Judge Daniel J. Stewart issued an Order granting Plaintiffs' IFP motions. *See* Dkt. No. 11. Magistrate Judge Stewart also issued a Report-Recommendation and Order reviewing Plaintiffs' complaint pursuant to 28 U.S.C. § 1915(e) and recommending that the complaint be dismissed. *See* Dkt. No. 12. He also ordered that Plaintiffs be denied leave to file electronically. *See id.*

Plaintiffs objected to every single aspect of the Report-Recommendation and Order. *See* Dkt. No. 13.[1] "Generally, when a *specific* objection is made to a portion of a magistrate judge's report-recommendation, the Court subjects that portion of the report-recommendation to a *de novo* review." *Boice v. M+W U.S., Inc.*, 130 F. Supp. 3d 677, 683 (N.D.N.Y. 2015) (citing FED. R. CIV. P. 72(b)(2); 28 U.S.C. § 636(b)(1)(C)). "To be 'specific,' the objection must, with particularity, 'identify [1] the portions of the proposed findings, recommendations, or report to which it has an objection and [2] the basis for the objection.' " *Id.* (quoting N.D.N.Y. L.R. 72.1(c)) (footnote omitted). "When only a *general* objection is made to a portion of a magistrate judge's report-recommendation, the Court subjects that portion of the report-recommendation to only a *clear error* review." *Id.* at 684 (citations omitted). "Similarly, when an objection merely reiterates the same arguments made by the objecting party in its original papers submitted to the magistrate judge, the Court subjects that portion of the report-recommendation challenged by those arguments to only a *clear error* review." *Id.* (footnote omitted). After the appropriate review, "the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1).

1    Plaintiffs' objections are thirty-eight pages. *See* Dkt. No. 13. Local Rule 71.2(c) instructs that "[o]bjections may not exceed twenty-five (25) pages without the Court's prior approval." N.D.N.Y. L.R. 72.1(c). The Court will consider the entirety of Plaintiffs' objections because they are proceeding *pro se*. However, the Court warns Plaintiffs that future compliance with the Federal Rules, the Court's Local Rules, and the undersigned's Individual Rules is required.

As Plaintiffs are proceeding *pro se*, the Court must review their complaint under a more lenient standard. *See Govan v. Campbell*, 289 F. Supp. 2d 289, 295 (N.D.N.Y. 2003). The Court must "make reasonable allowances to protect *pro se* litigants from inadvertent forfeiture of important rights because of their lack of legal training." *Traguth v. Zuck*, 710 F.2d 90, 95 (2d Cir. 1983). Thus, "a document filed *pro se* is 'to be liberally construed,' and 'a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers.' " *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (quoting *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)). "Although the court has the duty to show liberality towards pro se litigants, ... there is a responsibility on the court to determine that a claim has some arguable basis in law before permitting a plaintiff to proceed with an action in forma pauperis." *Moreman v. Douglas*, 848 F. Supp. 332, 333-34 (N.D.N.Y. 1994) (internal citations omitted).

## II. BACKGROUND

**\*2** Plaintiffs summarize their claims at the beginning of their complaint as allegations against "a broad spectrum of governmental entities and private defendants" including judges, attorneys, family members, the Saratoga County Sheriff's Office, district attorneys' offices, departments of social service, Warren County, Saratoga County, and the City of Mechanicville. Dkt. No. 1 at ¶ 2. The complaint concerns New York State Family Court and County Court proceedings and events related to custody and supervision of Plaintiff Smith's children. The proceedings are primarily between Plaintiff Smith and Defendant Veronica Smith—the mother of his children. Plaintiff Dees is Plaintiff Smith's partner. Plaintiffs allege that the Defendants engaged in a conspiracy to violate their constitutional rights as well as Plaintiff Smith's rights under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12131, *et seq.*, and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794.

For a fuller recitation of the relevant background information, the Court refers to Plaintiffs' complaint and Magistrate Judge Stewart's Report-Recommendation and Order. *See generally* Dkt. No. 1; *see also* Dkt. No. 12 at 4-5.

## III. DISCUSSION

### A. *Rooker-Feldman* Doctrine

In his Report-Recommendation and Order, Magistrate Judge Stewart first addressed the *Rooker-Feldman* doctrine, under which federal courts are divested of jurisdiction over claims that seek to overrule state court determinations. *See* Dkt. No. 12 at 8-9; *see also Green v. Mattingly*, 585 F.3d 97, 101 (2d Cir. 2009). Magistrate Judge Stewart concluded that because Plaintiffs' complaint seeks to overturn state-court custody and support decisions, the Court's review of Plaintiffs' claims is barred by the *Rooker-Feldman* doctrine. *See* Dkt. No. 12 at 8. Plaintiffs object, arguing that because they have appealed the state court decisions, and those appeals have not been decided, the *Rooker-Feldman* doctrine does not apply. *See* Dkt. No. 13 at 1-3.

"The Supreme Court has explained that *Rooker-Feldman* bars 'a party losing in state court ... from seeking what in substance would be appellate review of the state judgment in a United States district court.' " *Hunter v. McMahon*, 75 F.4th 62, 67 (2d Cir. 2023) (quoting *Johnson v. De Grandy*, 512 U.S. 997, 1005-06 (1994)). "*Rooker-Feldman* 'is confined to cases of the kind from which the doctrine acquired its name: cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments.' " *Id.* at 67-68 (quotation omitted). "The doctrine 'does not otherwise override or supplant preclusion doctrine or augment the circumscribed doctrines that allow federal courts to stay or dismiss proceedings in deference to state-court actions.' " *Id.* at 68 (quotation omitted).

The doctrine " 'applies only in limited circumstances where a party in effect seeks to take an appeal of an unfavorable state-court decision to a lower federal court.' " *Id.* (quoting *Lance v. Dennis*, 546 U.S. 459, 466 (2006)). In adopting "the unanimous position of every other circuit court to address it[,]" the Second Circuit in *Hunter* held that "[i]f a federal-court plaintiff's state-court appeal remains pending when she files her federal suit, the state-court proceedings have not ended and *Rooker-Feldman* does not apply." *Id.* at 70 (quoting *Butcher v. Wendt*, 975 F.3d 236, 246 (2d Cir. 2020) (Menashi, J., concurring in part and concurring in the judgment)).

In their objections, Plaintiffs list eight "currently pending" appeals. Dkt. No. 13 at 1-2. The relevant inquiry is whether those appeals were pending when they filed their complaint with this Court on January 2, 2024. *See* Dkt. No. 1; *see also Hunter*, 75 F.4th at 71 (quoting *E.R. Squibb & Sons, Inc. v. Lloyd's & Cos.*, 241 F.3d 154, 163 (2d Cir. 2001)) ("[F]ederal courts 'assess[ ] jurisdiction ... as of the moment the complaint was filed' "). Upon the Court's review of the state court dockets, seven of the eight appeals that Plaintiffs list were pending at the time they filed their complaint in this Court. *See Smith v. Smith*, CV-23-1726 (3d Dep't 2023); *Smith v. Smith*, CV-23-1805 (3d Dep't 2023); *Veronica LL. v. Ethan LL.*, CV-23-1874 (3d Dep't 2023); *Smith v. Smith*, CV-23-1265 (3d Dep't 2023); *Smith v. Smith*, CV-23-1642 (3d Dep't 2023); *Matter of Smith v. Smith*, CV-23-2087 (3d Dep't 2023); *Matter of Smith v. Smith*, CV-23-2195 (3d Dep't 2023); *Matter of Ethan LL v. Veronica LL.*, CV-24-0306 (3d Dep't 2024). Plaintiffs also contend that their "Article 78 action CV-23-1727, against multiple defendants still remains open." Dkt. No. 13 at 2. Upon the Court's search of that case number in the New York State Unified Court System Electronic Filing System, it appears that the final entry is an "order" dated November 21, 2023. *See Ethan Smith et al. v. Karen Heggen et al.*, CV-23-1727 (3d Dep't 2023), Dkt. No. 36. The Court is unable to view the document as it is sealed. *See id.* Plaintiffs do not contend that they appealed this "order" from the Appellate Division.

**\*3** To the extent Plaintiffs have not appealed Supreme Court, Family Court, or Appellate Division decisions, and such decisions are final, the *Rooker-Feldman* doctrine precludes the Court's consideration of the decisions in which Plaintiffs lost. Insofar as appeals are pending in the Appellate Division from Supreme Court or Family Court decisions, Plaintiffs are correct that the *Rooker-Feldman* doctrine does not apply. *See Hunter*, 75 F.4th at 67-71. However, even where the *Rooker-Feldman* doctrine does not apply, as thoroughly set forth in Magistrate Judge Stewart's Report-Recommendation and Order, Plaintiffs' complaint must be dismissed on numerous other grounds.

**B.** *Younger* **Abstention**

Magistrate Judge Stewart next addressed the *Younger* abstention doctrine which mandates that federal courts abstain from interfering in claims seeking declaratory or injunctive relief over ongoing state proceedings. *See* Dkt. No. 12 at 10 (citing *Younger v. Harris*, 401 U.S. 37, 43-44 (1971)). Magistrate Judge Stewart explained that *Younger* abstention does not apply to claims seeking only monetary relief, as Plaintiffs do in this case, but noted that the doctrine implicates "domestic relations" abstention, which "is based upon a policy dictating that the states have traditionally adjudicated marital and child custody disputes, developing 'competence and expertise in adjudicating such matters,' which the federal courts lack.' " Dkt. No. 12 at 10 (quoting *Thomas v. N.Y. City*, 814 F. Supp. 1139, 1146 (E.D.N.Y. 1993)).

Plaintiffs objected, arguing that they are not seeking declaratory or injunctive relief, so *Younger* abstention does not apply. *See* Dkt. No. 13 at 5. Plaintiffs contends that "[t]he principle of Younger abstention typically applies in scenarios where significant state interests are at stake and does not extend to precluding federal jurisdiction merely due to possible inconsistencies with state court rulings." *Id.* at 6.

*Younger* demands that

> federal courts [ ] decline to exercise jurisdiction in three [ ] exceptional categories of cases: "First, *Younger* preclude[s] federal intrusion into ongoing state criminal prosecutions. Second, certain civil enforcement proceedings warrant[ ] abstention. Finally, federal courts [must] refrain[ ] from interfering with pending civil proceedings involving certain orders uniquely in furtherance of the state courts' ability to perform their judicial functions."

*Trump v. Vance*, 941 F.3d 631, 637 (2d Cir. 2019), *aff'd and remanded*, 591 U.S. 786 (2020) (quoting *Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S. 69, 72 (2013)). "*Younger* abstention is [ ] an 'exception to th[e] general rule' that 'a federal court's obligation to hear and decide a case is virtually unflagging,' ... and the doctrine is also subject to exceptions of its own in cases of bad faith, harassment, or other 'extraordinary circumstances.' " *Id.* (quotations omitted). "[T]he *Younger* doctrine is inappropriate where the litigant seeks money damages for an alleged violation of § 1983." *Rivers v. McLeod*, 252 F.3d 99, 101-02 (2d Cir. 2001).

The Second Circuit, in *American Airlines, Inc. v. Block*, 905 F.2d 12, 14 (2d Cir. 1990), explained that "[a]lthough matrimonial actions may ordinarily be instituted in federal court on diversity grounds, the Supreme Court in *Barber v. Barber*, 62 U.S. .. 582, 584 ... (1859), went so far as to disclaim all federal subject matter jurisdiction for some classes of matrimonial actions." *Id.* This is known as the domestic relations exception to federal jurisdiction, *i.e.*, federal courts should not exercise jurisdiction over matrimonial actions brought under diversity grounds. "[H]owever, the scope of this matrimonial exception to federal jurisdiction is 'rather narrowly confined,' ... only 'where a federal court is asked to grant a divorce or annulment, determine support payments, or award custody of a child' does it generally decline jurisdiction pursuant to the matrimonial exception." *Id.* (quotations omitted). The Second Circuit, in *American Airlines*, expanded the domestic relations exception, noting that "even if subject matter jurisdiction lies over a particular matrimonial action, federal courts may properly abstain from adjudicating such actions in view of the greater interest and expertise of state courts in this field." *Id.* "A federal court presented with matrimonial issues or issues 'on the verge' of being matrimonial in nature should abstain from exercising jurisdiction so long as there is no obstacle to their full and fair determination in state courts." *Id.* (citations omitted). This is known as the domestic relations abstention doctrine. *See Deem v. DiMella-Deem*, 941 F.3d 618, 621 (2d Cir. 2019) ("Although the domestic relations '*exception*' to subject matter jurisdiction ... does not apply in federal-question cases, the domestic relations *abstention* doctrine articulated in *American Airlines* does").

**\*4** The abstention doctrine has been utilized across the country by federal courts removing themselves from considering a state court domestic relations matter. *See Deem*, 941 F.3d at 623 (collecting cases) (citing, *inter alia*, *DeMauro v. DeMauro*, 115 F.3d 94, 99 (1st Cir. 1997) ("[A]bstention by use of a stay may be permissible where a RICO action is directed against concealment or transfer of property that is the very subject of a pending divorce proceeding")); *see also Falco v. Justs. of the Matrimonial Parts of Supreme Ct. of Suffolk Cnty.*, 805 F.3d 425, 427 (2d Cir. 2015) (quotation omitted) ("[W]e independently conclude that Falco's case presents circumstances that qualify as 'exceptional' under *Sprint* and that *Younger* abstention was therefore warranted. Falco's federal lawsuit implicates the way that New York courts manage their own divorce and custody proceedings—a subject in which 'the states have an especially strong interest' ").

Here, "the domestic relations *exception* clearly does not apply to this case because it is 'before this Court on federal question jurisdiction, not diversity.' " *Deem*, 941 F.3d at 623 (quoting *Williams v. Lambert*, 46 F.3d 1275 (2d Cir. 1995)) (emphasis added). However, *abstention* is appropriate because Plaintiffs' complaint concerns family court disputes over custody, visitation, and protective orders. *See Reeves v. Reeves*, No. 22-CV-2544, 2022 WL 1125267, *1 (S.D.N.Y. Apr. 14, 2022); *Stumpf v. Maywalt*, 605 F. Supp. 3d 511, 518 (W.D.N.Y. 2022); *Dasler v. Knapp*, No. 2:21-CV-135, 2023 WL 8354441, *9 (D. Vt. Oct. 13, 2023).

Plaintiffs are correct that abstention is usually exercised in scenarios where significant state interests are at stake. *See* Dkt. No. 13 at 6; *see also Sprint*, 571 U.S. at 72-73. This is such a case because states are traditionally tasked with addressing domestic matters. *See Deem*, 941 F.3d at 624 (quoting *In re Burrus*, 136 U.S. 586, 593-94 (1890)) ("[T]he existence of a distinct abstention doctrine for certain domestic relations disputes is supported by the Supreme Court's longstanding recognition — in a non-diversity case involving a child custody dispute — that '[t]he whole subject of the domestic relations of husband and wife, parent and child, belongs to the laws of the states, and not to the laws of the United States' "); *see also Amato v. McGinty*, No. 1:17-CV-593, 2017 WL 9487185, *10 (N.D.N.Y. June 6, 2017). Thus, the Court will abstain from exercising jurisdiction over Plaintiffs' complaint insofar as it concerns state court domestic relations matters.

### C. RICO Claims

2024 WL 2291701

Magistrate Judge Stewart concluded that Plaintiffs failed to set forth a cognizable claim under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), *18 U.S.C. § 1961, et seq.*, because, as explained in *Kim v. Kimm*, 884 F.3d 98 (2d Cir. 2018), RICO cannot be used to address litigation activity. *See* Dkt. No. 12 at 11-14. Plaintiffs object, arguing that *Kim* is inapplicable because that case involved a single instance of litigation activity, whereas their case concerns "actions [that] have been concertedly executed over a period of four years." Dkt. No. 13 at 7. Plaintiffs rely on Fifth and Eleventh Circuit caselaw to argue that their claims support a RICO violation. *See id.* at 6-7. Plaintiffs also contend that Magistrate Judge Stewart's decision supports their assertion of corruption in the judiciary because he took sixty-nine days to issue his Report-Recommendation and Order "as opposed to the swifter resolutions typically observed in cases under the same magistrate." *Id.* at 8.

As an initial matter, Plaintiffs' reliance on out-of-circuit case law is not binding on this Court. *See Goldstein v. Pro. Staff Cong./ CUNY*, 643 F. Supp. 3d 431, 443, n.6 (S.D.N.Y. 2022), *aff'd*, 96 F.4th 345 (2d Cir. 2024) (discussing "vertical stare decisis"). Further, the Court finds no error in the time Magistrate Judge Stewart took to issue his Report-Recommendation and Order. Magistrate Judge Stewart was tasked with reviewing a 170-page complaint and a forty-eight-page RICO statement. *See* Dkt. Nos. 1, 9. A two-month time frame to do so is not inappropriate, let alone conspiratorial, where Magistrate Judge Stewart must balance a heavy case load.

**\*5** As to the substance of Plaintiffs' RICO claims and their objections, Plaintiffs are correct that *Kim* concerned one federal litigation alleged to be conspiratorial. *See Kim*, 884 F.3d at 101-02. In that case, the Second Circuit specifically "decline[d] to reach the issue of whether all RICO actions based on litigation activity are categorically meritless." *Id.* at 105. Rather, the Second Circuit held only that "where ... a plaintiff alleges that a defendant engaged in a single frivolous, fraudulent, or baseless lawsuit, such litigation activity alone cannot constitute a viable RICO predicate act." *Id.*

The Second Circuit distinguished *Sykes v. Mel Harris & Assocs., LLC*, 757 F. Supp. 2d 413 (S.D.N.Y. 2010) wherein the court allowed a RICO claim to proceed because the plaintiff pled "a pattern of racketeering activity that included 'at least twenty allegedly fraudulent statements and eighteen acts involving use of the mail and wires over three years, in furtherance of the alleged fraud.' " *Kim*, 884 F.3d at 105 (quoting *Sykes*, 757 F. Supp. 2d at 425). This court has also noted that "the Second Circuit decision in *United States v. Eisen*, 974 F.2d 246 (2d Cir. 1992), allows RICO claims based on abusive litigation tactics involving conduct external to any of the particular disputes between the litigants in improperly filed and litigated civil actions." *Carroll v. U.S. Equities Corp.*, No. 1:18-CV-667, 2020 WL 11563716, *9 (N.D.N.Y. Nov. 30, 2020).

The Court concludes that *Kim* does not automatically preclude Plaintiffs' purported RICO claim just because Plaintiffs' complaint concerns litigation activity as the alleged activity is conduct occurring over four years and dozens of individuals. However, Magistrate Judge Stewart did not state that such preclusion was automatic. Rather, he applied the "reasons" and "principle[s]" set forth by *Kim* to Plaintiffs' complaint. Dkt. No. 12 at 12-13. The Court agrees with such application.

"To state a claim for RICO conspiracy under § 1962(d), the plaintiff must also 'allege the existence of an agreement to violate RICO's substantive provisions.' " *Butcher v. Wendt*, 975 F.3d 236, 241 (2d Cir. 2020) (quoting *Williams v. Affinion Grp., LLC*, 889 F.3d 116, 124 (2d Cir. 2018)); *see also First Capital Asset Mgmt. v. Satinwood, Inc.*, 385 F.3d 159, 164 (2d Cir. 2004) (concluding that where the plaintiffs failed to "adequately allege a substantive violation of RICO," the district court properly dismissed allegations of "a RICO conspiracy in violation of *18 U.S.C. § 1962(d)*"); *Discon, Inc. v. NYNEX Corp.*, 93 F.3d 1055, 1064 (2d Cir. 1996), *as corrected*, 93 F.3d 1055 (2d Cir. 1996) ("Since we have held that the prior claims do not state a cause of action for substantive violations of RICO, the present claim does not set forth a conspiracy to commit such violations").

"To state a claim of a substantive RICO violation under § 1962(c), a plaintiff must allege, among other things, two or more predicate acts 'constituting a pattern' of 'racketeering activity.' " *Butcher*, 975 F.3d at 241 (quoting *Williams*, 889 F.3d at 124). "The RICO statutory scheme defines 'racketeering activity' to include 'a host of criminal offenses, which are in turn defined by federal and state law.' " *Curtis & Assocs., P.C. v. L. Offs. of David M. Bushman, Esq.*, 758 F. Supp. 2d 153, 168 (E.D.N.Y. 2010), *aff'd*, 443 Fed. Appx. 582 (2d Cir. 2011) (quoting *Cofacredit, S.A. v. Windsor Plumbing Supply Co. Inc.*, 187 F.3d 229, 242 (2d Cir. 1999)). "Specifically, the RICO statute defines 'racketeering activity' as including any 'act' indictable under various

specified federal statutes, including the mail and wire fraud statutes." *Id.* (quoting 18 U.S.C. § 1961(1)). " 'Pattern' is defined by the statute as 'at least two acts of racketeering activity' within a ten-year period." *Id.* (quoting 18 U.S.C. § 1961(5)).

**\*6** In their RICO statement, Plaintiffs allege that Defendants violated 18 U.S.C. §§ 1341 (relating to mail fraud), 1343 (relating to wire fraud), 1344 (relating to financial institution fraud), 1503 (relating to financial institution fraud), 1510 (relating to obstruction of criminal investigations), 1513 (relating to retaliating against a witness, victim, or an informant), and 1951 (relating to interference with commerce, robbery, or extortion). *See* Dkt. No. 9 at 18-19.

Plaintiffs' complaint and statement fail to sufficiently allege these predicate acts. Plaintiffs allege that Defendants committed mail fraud "by a series of fraudulent support collection letters" which "were issued despite knowledge of fraud and without proper investigation into the claims." Dkt. No. 9 at 22. They contend that Defendants committed wire fraud and financial institution fraud by sending bills and enforcing child support collection orders. *See id.* Plaintiffs state that they have been mailed fraudulent protection orders. *See id.* at 23. They aver that they were e-mailed "fraudulent legal documents including affirmations, affidavits, and protection orders." *Id.* at 25. Plaintiffs also allege that "Defendants each obstructed justice by interfering in state court matters ostensibly to undermine the plaintiffs' federal court case and hinder U.S. attorneys' investigations." *Id.* at 19. They state that Defendants have obstructed justice by "tampering with trial proceedings and witnesses, failing to file pertinent motions into the court record, and deliberately withholding compliance with legally mandated FOIL requests." *Id.* at 20-21. Plaintiffs allege that Defendants "engaged in coercive and illicit practices to extort payments from the plaintiff. The purported extortion involved the utilization of duress, public denigration, threats of incarceration, the manipulation of child custody, tolerance of ongoing abuse, initiation of vindictive charges and protective orders, unlawful intimidation, and the fabrication of federal crime accusations." *Id.* at 21.

Although *Kim* concerned only a single litigation, the principles underlying the Second Circuit's decision are applicable to Plaintiffs' claims because their claims stem entirely from state family and criminal court proceedings. Allowing such claims to be the base underlying RICO violations "would erode the principles undergirding the doctrines of res judicata and collateral estoppel, as such claims frequently call into question the validity of documents presented in the underlying litigation as well as the judicial decisions that relied upon them." *Kim*, 884 F.3d at 104 (quotation omitted).

The allegations in Plaintiffs' complaint and RICO statement are similar to those in cases which have not allowed a RICO claim to proceed where the allegations concern only litigation activity. Plaintiffs have not alleged any conduct that is unrelated to state-court litigation. *See Wang v. Yien-Koo King*, No. 18-CV-8948, 2019 WL 1763230, \*7 (S.D.N.Y. Apr. 22, 2019) ("[B]ecause the Court has held that [the p]laintiffs have not adequately alleged RICO claims premised on the sale of restrained artwork or the proceedings in probate court, [the p]laintiffs' RICO claim would be rooted solely in litigation-related mail or wire fraud predicates -- specifically, the use of mail and wires in filing legal documents"); *Weaver v. New York State Off. of Ct. Admin.*, No. 22-CV-559, 2023 WL 2500390, \*9 (N.D.N.Y. Mar. 14, 2023); *Rajaratnam v. Motley Rice, LLC*, 449 F. Supp. 3d 45, 69 (E.D.N.Y. 2020); *Robinson v. Vigorito, Barker, Patterson, Nichols & Porter, LLP*, No. 19-CV-2914, 2019 WL 13417190, \*3 (E.D.N.Y. July 31, 2019); *Verschleiser v. Frydman*, No. 22-CV-7909, 2023 WL 5835031, \*13 (S.D.N.Y. Sept. 7, 2023) (citing, *inter alia, Curtis & Assocs., P.C. v. L. Offs. of David M. Bushman, Esq.*, 758 F. Supp. 2d 153, 174 (E.D.N.Y. 2010); *Daddona v. Gaudio*, 156 F. Supp. 2d 153, 161-62 (D. Conn. 2000)).

**\*7** Plaintiffs' complaint is also distinguishable from cases where RICO claims have been permitted to proceed. For example, in *Carroll*, the plaintiff alleged that the defendants initiated thousands of lawsuits against the plaintiff and unnamed individuals for fraudulent debts in order to recover monetary default judgments. *Carroll*, 2020 WL 11563716, at \*3. The court noted that many acts as alleged by the plaintiff "involved matters beyond proper legal representation and went beyond any of the particular disputes between the litigants" "such as buying uncollectable debts that lacked proof that the debts were owed, conspiring to use a process serving firm that engaged in sewer service to ensure that defendants would not contest the debt-collection actions, using an individual who filed false affidavits of merit in every case, and pressuring defendants to compromise on illegally obtained default judgments were actions external to the individual suits in the state courts." *Id.* at \*9. The court concluded that the "case is more closely aligned with *Sykes* than *Kim*." *Id.* In *Sykes*, "[t]he gravamen of [the] racketeering activity was not so

much litigation activities, as it was the use of courts to obtain default judgments en masse against defendants who had not been served. The 'litigations' in *Sykes* were mere perfunctory steps to cash in on a portfolio of defaulted debts." *Rajaratnam*, 449 F. Supp. 3d at 71; *see Sykes*, 757 F. Supp. 2d at 425.

Here, the gravamen of Plaintiffs' complaint concerns state court litigation. There are no allegations in either the complaint or RICO statement that are entirely unrelated to litigation. The Defendants are judges, attorneys, law firms, or the mother of Plaintiff Smith's children—who is the primary adversary in the state court cases. Allowing a RICO violation to proceed under these circumstances would, as the Second Circuit cautioned against, " 'chill litigants and lawyers and frustrate the well-established public policy goal of maintaining open access to the courts' because 'any litigant's or attorney's pleading and correspondence in an unsuccessful lawsuit could lead to drastic RICO liability.' " *Kim*, 884 F.3d at 105 (quotation omitted). Thus, the Court concludes that Plaintiffs' complaint fails to state a cognizable RICO claim.

## D. Absolute Judicial Immunity

Plaintiffs seek to bring claims under 42 U.S.C. §§ 1983 and 1985 for alleged constitutional violations against numerous state court judges: Defendants Paul Pelagalli, John Ellis, Jeffrey Wait, Felix Catena, Dianne Freestone, James Murphy, and Elizabeth Garry. *See* Dkt. No. 1 at ¶¶ 24-47. Magistrate Judge Stewart correctly explained that judges are typically immune from such actions. *See* Dkt. No. 12 at 14. Plaintiffs object, arguing that the judicial Defendants' conduct, as outlined in the complaint, constitutes "a significant departure from their judicial responsibilities." Dkt. No. 13 at 11.

"Absolute immunity for judges is 'firmly established' for acts 'committed within their judicial jurisdiction.' " *Peoples v. Leon*, 63 F.4th 132, 138 (2d Cir. 2023) (quoting *Cleavinger v. Saxner*, 474 U.S. 193, 199-200 (1985)). "Absolute immunity for a judge performing his or her judicial functions is conferred in order to insure 'that a judicial officer, in exercising the authority vested in him shall be free to act upon his own convictions, without apprehension of personal consequences to himself.' " *Libertarian Party of Erie Cnty. v. Cuomo*, 970 F.3d 106, 123 (2d Cir. 2020), *abrogated on other grounds by New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022) (quoting *Bliven v. Hunt*, 579 F.3d 204, 209 (2d Cir. 2009)). "Entitlement to absolute immunity does not depend on the individual's title or on the office itself.... A judge may perform tasks that are not essentially judicial, such as supervising and managing court employees, which do not warrant absolute immunity ...; on the other hand, such immunity may be warranted for a person who is not a judge but whose duties are quasi-judicial." *Id.* at 124 (citations omitted). "Judicial acts principally involve adjudication of particularized, existing issues." *Id.* "Thus, some functions may be viewed as judicial acts when performed in the context of a particular case but as administrative when performed for the purpose of overall management in anticipation of future cases." *Id.*

 **\*8** "In determining a jurisdictional issue that depended on 'whether a particular proceeding before another tribunal was truly judicial,' ... the Supreme Court stated that the form of the proceeding is less significant than the proceeding's nature and effect." *Id.* (quoting *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462, 476 n.13, 478 (1983)). "Judicial immunity is overcome in only two circumstances: (1) 'a judge is not immune from liability for nonjudicial actions, *i.e.*, actions not taken in the judge's judicial capacity'; and (2) 'a judge is not immune for actions, though judicial in nature, taken in the complete absence of all jurisdiction.' " *McCluskey v. Roberts*, No. 20-4018, 2022 WL 2046079, \*5 (2d Cir. June 7, 2022) (quoting *Mireles v. Waco*, 502 U.S. 9, 11-12 (1991)).

Plaintiffs' allegations against the judicial Defendants stem entirely from the judge's orders and decisions or conduct in controlling their courtroom. *See* Dkt. No. 1 at ¶¶ 24-47. Although Plaintiffs disagree with the judge's actions or inactions related to protective orders, custody orders, and court proceedings, those actions are entirely within the scope of the judges' jurisdiction. Plaintiffs have not presented more than conclusory allegations to establish that the judicial Defendants were acting absent all jurisdiction. They are, therefore, entitled to absolute immunity for that conduct. *See, e.g.*, *King v. New York State*, No. 23-CV-3421, 2023 WL 5625440, \*4 (E.D.N.Y. Aug. 31, 2023); *Wilkins v. Soares*, No. 8:20-CV-00116, 2020 WL 5238598, \*4 (N.D.N.Y. May 27, 2020); *Viola v. Bryant*, No. 3:17-CV-00853, 2017 WL 2676407, at \*4 (D. Conn. June 21, 2017); *Topolski v. Wrobleski*, No. 5:13-CV-0872, 2014 WL 2215761, \*5 (N.D.N.Y. May 29, 2014).

### *1. Sovereign Immunity*

As an alternative to absolute judicial immunity, Magistrate Judge Stewart explained in a footnote that the judicial Defendants were also protected by sovereign immunity. *See* Dkt. No. 12 at 18, n.3. Plaintiffs object to the application of sovereign immunity because "their allegations are distinctly targeted at the defendants in their personal capacities." Dkt. No. 13 at 21.

"The Eleventh Amendment states: 'The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.' " *Gollomp v. Spitzer*, 568 F.3d 355, 365 (2d Cir. 2009) (quoting U.S. Const. amend. XI). "[T]he Eleventh Amendment means that, 'as a general rule, state governments may not be sued in federal court unless they have waived their Eleventh Amendment immunity,' or unless Congress has 'abrogate[d] the states' Eleventh Amendment immunity when acting pursuant to its authority under Section 5 of the Fourteenth Amendment.' " *Id.* at 366 (quoting *Woods v. Rondout Valley Cent. Sch. Dist. Bd. of Educ.*, 466 F.3d 232, 236 (2d Cir. 2006)).

"The Unified Court System, or 'UCS,' is the name for the entire New York State judiciary." *T.W. v. New York State Bd. of L. Examiners*, 996 F.3d 87, 95 (2d Cir. 2021). "[A] lawsuit against the Unified Court System is 'in essence one for the recovery of money from the state, [so that] the state is the real, substantial party in interest and is entitled to invoke its sovereign immunity from suit.' " *Gollomp*, 568 F.3d at 368 (quotation omitted). As Magistrate Judge Stewart explained, the Second Circuit has recently reaffirmed the application of Eleventh Amendment sovereign immunity to New York State judges. *See* Dkt. No. 12 at 18, n.3 (citing *Bythewood v. New York*, No. 22-CV-2542, 2023 WL 6152796, *1 (2d Cir. Sept. 21, 2023)) ("We agree with the district court that Bythewood's claims against the State of New York and the Judicial Defendants are barred by Eleventh Amendment sovereign immunity")).

**\*9** As the Court has already concluded that the judicial Defendants were acting within their roles as judges, the Court concludes that they are entitled to sovereign immunity. To the extent Plaintiffs argue that they seek to sue the judicial Defendants in only their individual capacities, such claims "are [ ] barred by absolute judicial immunity." *Bythewood*, 2023 WL 6152796, at *2.

### *2. Court Attorney*

Magistrate Judge Stewart concluded that Defendant Karla Conway, Judge Pelagalli's court attorney, is also entitled to absolute judicial immunity. *See* Dkt. No. 12 at 19. In Plaintiffs' objections, they state that Conway was "acting beyond her judicial capacity and outside her jurisdiction by orchestrating these unauthorized hearings and issuing void orders when she had no legal authority to do so." Dkt. No. 13 at 14.

Law clerks and court attorneys are entitled to absolute immunity. *See Jackson v. Pfau*, 523 Fed. Appx. 736, 737-38 (2d Cir. 2013) (affirming dismissal of Section 1983 claims against judicial law clerk, the N.Y.S. Chief Administrative Judge, court attorneys, and the Chief Clerks of several state courts, finding that the "defendants were entitled to judicial immunity[ ] because [the] allegations against each of them concerned actions that were judicial in nature or closely related to the judicial process"); *see also Gollomp*, 568 F.3d at 365; *Fishman v. Off. of Ct. Admin. New York State Cts.*, No. 18-CV-282, 2020 WL 1082560, *6 (S.D.N.Y. Mar. 5, 2020), *aff'd*, No. 20-1300, 2021 WL 4434698 (2d Cir. Sept. 28, 2021).

Plaintiffs' allegations against Conway relate solely to "orders and statements in court." Dkt. No. 1 at ¶ 122. Although Plaintiffs argue otherwise, their allegations relate entirely to work performed as an extension of Judge Pelagalli such that Conway is entitled to absolute immunity.

### E. Quasi-Judicial Immunity

Magistrate Judge Stewart next addressed the claims against court-appointed psychologists—Defendants O'Connor and Bashkoff, and court-appointed attorneys for Plaintiff Smith's children—Defendants Carbone, Tastensen, and Corey-Mongue.

*See* Dkt. No. 12 at 19-20. Magistrate Judge Stewart concluded that the psychologists and attorneys were entitled to quasi-judicial immunity. *See id.*

Plaintiffs argue that the psychologists should not be entitled to immunity because of "their active participation in a conspiracy." Dkt. No. 13 at 22. Similarly, Plaintiffs contend that the attorneys should not be afforded immunity because of "their repeated violations of constitutional rights and legal statutes." *Id.* at 23. Plaintiffs state that the "attorneys actively campaign and participate in fundraisers for judges who oversee their appointments and approve their billings." *Id.* [2]

[2]    Magistrate Judge Stewart also addressed court-appointed attorney Defendant Tobin. *See* Dkt. No. 12 at 19-20. Plaintiffs clarify that Defendant Tobin was not an attorney for a child. *See* Dkt. No. 13 at 23. Rather, Tobin represented Defendant Smith. *See* Dkt. No. 1 at ¶¶ 58-59, 162. Insofar as Tobin was retained counsel, "defense attorneys—even if court-appointed or public defenders—do not act under color of State law when performing traditional functions of counsel." *Krug v. McNally*, 488 F. Supp. 2d 198, 200 (N.D.N.Y. 2007), *aff'd*, 368 Fed. Appx. 269 (2d Cir. 2010). Therefore, Plaintiffs' claims against Tobin must be dismissed for failure to plead state action.

**\*10**   "A private actor may be afforded the absolute immunity ordinarily accorded judges acting within the scope of their jurisdictions if his role is 'functionally comparable' to that of a judge, ... or if the private actor's acts are integrally related to an ongoing judicial proceeding." *Mitchell v. Fishbein*, 377 F.3d 157, 172 (2d Cir. 2004) (quoting *Butz v. Economou*, 438 U.S. 478, 513, (1978); citing *Scotto v. Almenas*, 143 F.3d 105, 111012 (2d Cir. 1998); *Dorman v. Higgins*, 821 F.2d 133, 136-38 (2d Cir. 1987)) (additional quotation marks omitted).

The Second Circuit has affirmed application of quasi-judicial immunity to a "law guardian and her director." *Yapi v. Kondratyeva*, 340 Fed. Appx. 683, 685 (2d Cir. 2009). This is because law guardians or attorneys for children serve "serve[ ] as an 'arm of the court,' or act[ ] as an 'integral part[ ] of the judicial process.' " *Holland v. Morgenstern*, 12-CV-4870, 2013 WL 2237550, \*4 (E.D.N.Y. May 20, 2013) (quoting *Scotto v. Almenas*, 143 F.3d 105, 111 (2d Cir. 1998)). The same can be said for court-appointed psychologists. *See Vargas v. Mott*, No. 21-CV-6165, 2022 WL 3236744, \*3 (W.D.N.Y. July 13, 2022) ("[P]sychiatrists who perform court-ordered examinations enjoy absolute quasi-judicial immunity"). Because these Defendants were appointed by the court and performing court-related functions, they are afforded quasi-judicial immunity. *See Cherner v. Westchester Jewish Cmty. Servs., Inc.*, No. 20-CV-8331, 2022 WL 596074, \*4 (S.D.N.Y. Feb. 28, 2022), *aff'd*, No. 22-642, 2022 WL 17817882 (2d Cir. Dec. 20, 2022); *Wilson v. Wilson-Polson*, No. 09-CV-9810, 2010 WL 3733935, \*7 (S.D.N.Y. Sept. 23, 2010), *aff'd*, 446 Fed. Appx. 330 (2d Cir. 2011); *Thomas v. Martin-Gibbons*, No. 19-CV-7695, 2020 WL 5026884, \*7 (S.D.N.Y. Aug. 25, 2020).

**F. Government Attorney Immunity**

Magistrate Judge Stewart addressed the immunity typically afforded to government attorneys when acting as an advocate of a state. *See* Dkt. No. 12 at 21. He concluded that such immunity should apply to Defendants Samuel Maxwell, Emily Williams, Michelle Granger, and Michael Hartnett as district and county attorneys. *See id.* Plaintiffs contend that Defendants William and Maxwell are not entitled to immunity because they engaged in malicious prosecution. *See* Dkt. No. 13 at 23-24. As to Hartnett and Granger, Plaintiffs argue that immunity should not be afforded because their "alleged conduct represents a severe misuse of their positions and constitutes active participation in a broader conspiracy to violate the plaintiffs' rights." *Id.* at 25. Plaintiffs assert that the attorneys requested illegal protective orders, withheld evidence, revoked Plaintiff Smith's drivers license, and refused to investigate Plaintiffs' allegations of fraud. *See id.* at 23-25.

"Absolute immunity protects government officials from suit arising out of acts associated with their 'function as an advocate.' " *Jeanty v. Sciortino*, 669 F. Supp. 3d 96, 108 (N.D.N.Y. 2023) (quoting *Buari v. City of New York*, 530 F. Supp. 3d 356, 378 (S.D.N.Y. 2021)). "Absolute immunity extends to 'government attorneys defending civil suits' and 'government attorneys who initiate civil suits.' " *Id.* (quoting *Spear v. Town of West Hartford*, 954 F.2d 63, 66 (2d Cir. 1992)). "In determining whether an official is entitled to absolute immunity, courts employ a 'functional' approach, 'looking at "the nature of the function performed, not the identity of the actor who performed it." ' " *Id.* (quoting *Mangiafico v. Blumenthal*, 471 F.3d 391, 394 (2d

Cir. 2006)) (additional quotation omitted). "The principle applies to 'functions of a government attorney' that can fairly be characterized as closely associated with the conduct of litigation or potential litigation" in civil suits—including the defense of such actions.' " *Id.* (quotations omitted). " '[O]nce a court determines that challenged conduct involves a function covered by absolute immunity, the actor is shielded from liability for damages regardless of the wrongfulness of his motive or the degree of injury caused.' " *Id.* (quoting *Bernard v. County of Suffolk*, 356 F.3d 495, 503 (2d Cir. 2004)).

**\*11** "Post-arraignment, pre-trial 'acts undertaken by a prosecutor in preparing for the initiation of judicial proceedings or for trial, and which occur in the course of his role as an advocate for the State, are entitled to the protections of absolute immunity.' " *Werkheiser v. Cnty. of Broome*, 655 F. Supp. 3d 88, 101 (N.D.N.Y. 2023) (quoting *Buckley v. Fitzsimmons*, 509 U.S. 259, 273 (1993)). "In contrast, pre-arraignment actions—such as interviewing a witness to obtain probable cause for an arrest— are not entitled to the protections of absolute immunity." *Id.* (citing *Hill v. City of New York*, 45 F.3d 653, 658, 661 (2d Cir. 1995)). "Additionally, 'absolute immunity may not apply when a prosecutor is not acting as "an officer of the court," but is instead engaged in other tasks, say, investigative or administrative tasks.' " *Id.* (quoting *Van de Kamp v. Goldstein*, 555 U.S. 335, 342 (2009)) (additional quotation omitted). "Investigative tasks beyond the scope of absolute immunity are those 'normally performed by a detective or police officer.' " *Id.* at 102 (quoting *Buckley*, 509 U.S. at 273).

Plaintiffs' allegations against government attorneys stem entirely from these Defendants' functions as counsel for the state. *See* Dkt. No. 1 at ¶¶ 67-71. These Defendants are entitled to absolute immunity for such conduct, even where Plaintiffs contend that the conduct was improperly motivated or "unbecoming." Dkt. No. 13 at 23; *see also Bernard*, 356 F.3d at 504 ("Where ... a prosecutor's charging decisions are not accompanied by any such unauthorized demands, the fact that improper motives may influence his authorized discretion cannot deprive him of absolute immunity"). Moreover, Plaintiffs' allegations of a conspiracy do not save these claims. *See Pinaud v. Cnty. of Suffolk*, 52 F.3d 1139, 1148 (2d Cir. 1995) (quotations omitted) ("As this Court and others circuits have repeatedly held, since absolute immunity covers 'virtually all acts, regardless of motivation, associated with [the prosecutor's] function as an advocate,' ... when the underlying activity at issue is covered by absolute immunity, the 'plaintiff derives no benefit from alleging a conspiracy' "). Thus, the claims against government attorneys are dismissed.

## G. Witness Immunity

Plaintiffs' complaint alleges constitutional violations based on various Defendants providing testimony. Magistrate Judge Stewart recommended dismissing any such claims based on absolute witness immunity. *See* Dkt. No. 12 at 22-23. Plaintiffs object, "grounding their objection in the assertion that the corruption, conspiracy, and collusion among the defendants have led to fraudulent activities within court proceedings." Dkt. No. 13 at 26.

"It is well established that testifying witnesses, including police officers, are entitled to absolute immunity from liability under [Section] 1983 based on their testimony." *Rolan v. Henneman*, 389 F. Supp. 2d 517, 519 (S.D.N.Y. 2005) (citing *Briscoe v. LaHue*, 460 U.S. 325 (1983)) (collecting cases). "As explained in *Briscoe*, absolute immunity for witness testimony in [Section] 1983 cases is rooted in the belief that '[a] witness's apprehension of subsequent damages liability might induce two forms of self-censorship." *Id.* "First, witnesses might be reluctant to come forward to testify. And once a witness is on the stand, his testimony might be distorted by the fear of subsequent liability.' " *Id.* (quoting *Briscoe*, 460 U.S. at 333). "Such absolute immunity applies to witnesses, 'whether governmental, expert, or lay witnesses' in Family Court proceedings." *Santos v. Syracuse Police Dep't*, No. 5:22-CV-1102, 2022 WL 16949542, \*7 (N.D.N.Y. Nov. 15, 2022) (quoting *Storck v. Suffolk Cnty. Dep't of Soc. Servs.*, 62 F. Supp. 2d 927, 945 (E.D.N.Y. 1999)).

"In this Circuit, however, absolute witness immunity does not extend to allegations of conspiracy." *Cipolla v. Cnty. of Rensselaer*, 129 F. Supp. 2d 436, 451 (N.D.N.Y.), *aff'd*, 20 Fed. Appx. 84 (2d Cir. 2001) (citing *Dory v. Ryan*, 999 F.2d 679 (2d Cir. 1994); *San Filippo v. U.S. Trust Co.*, 737 F.2d 246, 254 (2d Cir. 1984)); *see also Coggins v. Buonora*, 362 Fed. Appx. 224, 225 (2d Cir. 2010). The Supreme Court, in *Rehberg v. Paulk*, 566 U.S. 356 (2012), "held that grand jury witnesses, like trial witnesses, are entitled to absolute immunity if a plaintiff's claim is based on their allegedly perjurious testimony." *Gonzalez v. Baart*, No. 5:21-CV-01379, 2023 WL 8818302, \*3 (N.D.N.Y. Dec. 20, 2023). The Supreme Court stated that "this rule may not be circumvented by claiming that a grand jury witness conspired to present false testimony or by using evidence of the witness'

testimony to support any other § 1983 claim concerning the initiation or maintenance of a prosecution." *Rehberg*, 566 U.S. at 369. "Courts have distinguished presenting false testimony and soliciting false testimony from others and creating fabricated evidence." *Gonzalez*, 2023 WL 8818302, at *4 (collecting cases).

**\*12** Plaintiff contends that psychological reports that were used as evidence during hearings were false or unfinished, and that various Defendants either refrained from testifying or testified falsely. *See* Dkt. No. 1 at ¶¶ 93-94, 96, 98, 100-01, 127, 162, 186, 190. Insofar as Plaintiffs allege that witnesses testified falsely, such testimony is protected by absolute immunity. To the extent Plaintiffs allege that some of the Defendants conspired to present false testimony, the claims might not automatically be subject to dismissal on witness immunity grounds. *See* *Cipolla*, 129 F. Supp. 2d at 451; *Gonzalez*, 2023 WL 8818302, at *4. However, Plaintiffs have not provided enough information concerning non-testimonial actions used to create fabricated testimony, beyond their assertions of a conspiracy-at-large. Even assuming not all witness Defendants are entitled to absolute immunity, the claims must be dismissed for failure to sufficiently plead state action or a conspiracy.

## H. State Action

Plaintiffs bring their suit against numerous private parties, including Defendant Smith, Plaintiff Smith's stepfather and mother, a nurse, and private lawyers and law firms. *See* Dkt. No. 1 at ¶¶ 82-89, 99-111. Magistrate Judge Stewart recommended that those claims be dismissed because the private Defendants are not state actors: a prerequisite to bringing Section 1983 and 1985 claims. *See* Dkt. No. 12 at 24-25. Plaintiffs object to that conclusion because the private individuals "orchestrated their actions in unison with state actors." Dkt. No. 13 at 27.

" 'Because the United States Constitution regulates only the Government, not private parties, a litigant claiming that his constitutional rights have been violated must first establish that the challenged conduct constitutes state action.' " *Fabrikant v. French*, 691 F.3d 193, 206 (2d Cir. 2012) (quoting *Flagg v. Yonkers Sav. & Loan Ass'n*, 396 F.3d 178, 186 (2d Cir. 2005)). " 'A plaintiff pressing a claim of violation of his constitutional rights under § 1983 is thus required to show state action.' " *Id.* (quoting *Tancredi v. Metro. Life Ins. Co.*, 316 F.3d 308, 312 (2d Cir. 2003)). " "[S]tate action requires both an alleged constitutional deprivation "caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the State or by a person for whom the State is responsible," and that "the party charged with the deprivation must be a person who may fairly be said to be a state actor." ' " *Id.* (quoting *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 50 (1999)) (additional quotation omitted). " 'Conduct that is formally "private" may become so entwined with governmental policies or so impregnated with a governmental character that it can be regarded as governmental action.' " *Id.* (quoting *Rendell-Baker v. Kohn*, 457 U.S. 830, 847 (1982)).

" 'To state a claim against a private entity on a section 1983 conspiracy theory, the complaint must allege facts demonstrating that the private entity acted in concert with the state actor to commit an unconstitutional act.' " *Ciambriello v. Cnty. of Nassau*, 292 F.3d 307, 324 (2d Cir. 2002) (quoting *Spear v. Town of West Hartford*, 954 F.2d 63, 68 (2d Cir. 1992)). "Put differently, a private actor acts under color of state law when the private actor 'is a willful participant in joint activity with the State or its agents.' " *Id.* (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 152 (1970)). "A merely conclusory allegation that a private entity acted in concert with a state actor does not suffice to state a § 1983 claim against the private entity." *Id.*

Plaintiffs state in their objections that the attorneys for the children conspired with state actors because their hours are approved by the state court judicial Defendants and their positions are dependent on state funding. *See* Dkt. No. 13 at 28-29. Plaintiffs contend that they "personally observed 'meetings of the mind' occurring during off [the] record court proceedings and informal gatherings, like lunches, where conspiratorial strategies were devised and later executed in court." *Id.* at 29.

**\*13** These contentions and the allegations in Plaintiffs' complaint are insufficient to hold the private Defendants out to be state actors. It is well-settled that " '[t]he fact that a private entity uses the state courts does not transform the private party into a state actor.' " *Rice v. City of New York*, 275 F. Supp. 3d 395, 403-04 (E.D.N.Y. 2017) (quoting *Graham v. Select Portfolio Servicing, Inc.*, 156 F. Supp. 3d 491, 516 (S.D.N.Y. 2016)); *see also* *Malave-Sykes v. Endicott Police Dep't*, No. 3:23-CV-1215, 2023 WL 6847684, \*5 (N.D.N.Y. Oct. 17, 2023) (quotation omitted) ("[P]roviding false information to the police does not make a private

individual a state actor and liable under § 1983' ''); *Parent v. New York*, 786 F. Supp. 2d 516, 538 (N.D.N.Y. 2011), *aff'd*, 485 Fed. Appx. 500 (2d Cir. 2012) ("[A]lthough appointed by the state, an attorney for the children or law guardian is not a state actor because he or she must exercise independent professional judgment on behalf of the clients they represent"); *Milan v. Wertheimer*, 808 F.3d 961, 962-64 (2d Cir. 2015) (affirming dismissal of claims against children's grandmother for initiating protective services investigations because grandmother was not a state actor).

Because Plaintiffs have stated no more than conclusory allegations that the private Defendants conspired with state actors, the Court dismisses the complaint against those private Defendants for failure to state a claim under Section 1983.

## I. Affirmative Duty
In Magistrate Judge Stewart's Report-Recommendation and Order, he next addressed Plaintiffs' claims against Saratoga County police officers, county departments of social services, and school district administrators. *See* Dkt. No. 12 at 26-30. Magistrate Judge Stewart summarized the allegations against those various entities and individuals as resting on the failure "to better intervene and prevent misconduct of private parties against [Plaintiffs] or the Smith children." *Id.* at 28. He explained, however, that the Supreme Court has rejected claims of an affirmative duty to act under Section 1983. *See id.* at 28-29 (citing *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 192 (1989); *Town of Castle Rock, Colorado v. Gonzales*, 545 U.S. 748, 768-69 (2005)).

Plaintiffs object and "express confusion and disagreement with Magistrate [Judge] Stewart's ruling, which concluded that the officers had no affirmative duty, a decision that contradicts the policies stated by the plaintiffs in their original complaint." Dkt. No. 13 at 30. Plaintiffs "characterize" the police officers' conduct "as a sustained campaign of retaliation and a persistent failure to provide protection, spanning four years." *Id.* at 32. Plaintiffs also "highlight Magistrate [Judge] Stewart's failure to assert qualified immunity for the officers as further evidence that their claims warrant progression in the legal process. This stance underscores their belief in the seriousness of their allegations and the need for judicial scrutiny of the officers' actions." *Id.* at 31.

First, there is no requirement that a court address every single potential ground for dismissal where it is clear that a claim should be dismissed. *See, e.g., Curtis v. Greenberg*, No. 22-252-CV, 2023 WL 6324324, *2, n.3 (2d Cir. Sept. 29, 2023) ("Because we affirm the dismissal of the RICO claims based on the failure to adequately plead a RICO enterprise, we need not address the district court's alternative grounds for dismissal"); *Cusamano v. Sobek*, 604 F. Supp. 2d 416, 441 (N.D.N.Y. 2009) ("[B]ecause the Court has found adequate grounds on which to adopt Magistrate Judge Lowe's Report-Recommendation, ... the Court does not address th[e] alternative recommendation ...."). Therefore, the Court takes no issue with Magistrate Judge Stewart's decision not to address qualified immunity.

 *14 Second, it is well settled that police officers do not have an affirmative duty to investigate alleged crimes to the extent and in the way that a complainant or arrestee requests. *See Buari*, 530 F. Supp. 3d at 389 (quotation omitted) (" '[A] police officer's failure to pursue a particular investigative path is not a constitutional violation' "); *Brown v. City of New York*, No. 12-CV-3146, 2014 WL 5089748, *5 (S.D.N.Y. Sept. 30, 2014) ("Police officers do not have an affirmative duty to investigate allegations made by a complaining witness prior to effectuating an arrest"); *Curley v. Vill. of Suffern*, 268 F.3d 65, 70 (2d Cir. 2001) ("Although a better procedure may have been for the officers to investigate plaintiff's version of events more completely, the arresting officer does not have to prove plaintiff's version wrong before arresting him.... Nor does it matter that an investigation might have cast doubt upon the basis for the arrest").

Third, insofar as Plaintiffs allege that the officers violated their First Amendment rights, there are insufficient allegations in Plaintiffs' complaint to state such a claim. *See* Dkt. No. 13 at 31; *see also* Dkt. No 1. Plaintiffs summarily allege that Defendant police officers brought false charges and protection orders against Plaintiffs in retaliation for Plaintiffs' ''legal challenges against governmental grievances.'' Dkt. No. 1 at ¶ 250. Plaintiffs' contention that "the officers" retaliated against them by "levying fraudulent harassment charges," Dkt. No. 13 at 31, cannot stand because criminal charges are brought by a prosecutor, not police officers. *See Mortimer v. Wilson*, No. 15-CV-7186, 2020 WL 3791892, *8-9 (S.D.N.Y. July 7, 2020).

2024 WL 2291701

As to social services and the school district, Plaintiffs contend that "[i]ndividuals in these positions are expected to respond to, and report, any instances of wrongdoing, unethical behaviors, or legal violations." Dkt. No. 13 at 32. Specifically, Plaintiffs rely on a school or administrator's mandatory reporting requirements for suspected child abuse. *See id.* at 33.

As Magistrate Judge Stewart aptly explained, "[a]lthough New York State law requires that mandated individuals report instances of suspected child abuse or maltreatment, such reporting is not constitutionally required." Dkt. No. 12 at 30. In other words, violation of a state law does not create a cognizable Section 1983 claim. *See Jackson v. Pfau,* No. 9:10-CV-1484, 2011 WL 13127988, \*15 (N.D.N.Y. May 12, 2011), *aff'd,* 523 Fed. Appx. 736 (2d Cir. 2013) ("[A] Section 1983 claim brought in federal court is not the appropriate forum to assert violations of state law or regulations"). Thus, the Court agrees with Magistrate Judge Stewart that Plaintiffs' claims concerning a school's mandatory reporting obligations does not create a cognizable Section 1983 claim. As such, those claims are dismissed.

### J. *Monell* and Supervisory Liability

Plaintiffs seek to bring municipal and supervisory liability, or *Monell*, claims in count nine of their complaint. *See* Dkt. No. 1 at ¶¶ 267-73. Magistrate Judge Stewart addressed Plaintiffs' *Monell* claims. *See* Dkt. No. 12 at 30-31. He noted that Plaintiffs are required to plead that each Defendant violated the Constitution through their own acts and that Plaintiffs failed to do so. *See id.* at 31. Magistrate Judge Stewart also explained that because Plaintiffs failed to state any underlying constitutional violations, the *Monell* claims were required to be dismissed. *See id.*

Plaintiffs objected and listed the ways in which they believe their complaint established *Monell* liability. *See* Dkt. No. 13 at 33-34. In doing so, Plaintiffs contend that their constitutional rights were violated through every possible route for supervisory liability: "a specific policy," "actions undertaken by policymaking officials," "pervasive practices by subordinate officials," and "a notable failure by these policymakers to adequately train or supervise municipal employees." *Id.* at 34.

 **\*15**  " 'It is well settled in this Circuit that personal involvement of defendants in the alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Forrest v. Cnty. of Greene,* 676 F. Supp. 3d 69, 78 (N.D.N.Y. 2023) (quoting *Johnson v. Miller,* No. 9:20-CV-622, 2020 WL 4346896, \*9 (N.D.N.Y. Jul. 29, 2020)). "As to supervisory liability, there is no 'special test,' and 'a plaintiff must plead and prove "that each Government-official defendant, through the official's own individual actions, has violated the Constitution." ' " *Id.* (quoting *Tangreti v. Bachmann,* 983 F.3d 609, 616 (2d Cir. 2020)) (additional quotation omitted). " 'To establish a violation of § 1983 by a supervisor, as with everyone else, then, the plaintiff must establish a deliberate, intentional act on the part of the defendant to violate the plaintiff's legal rights.' ... It is not sufficient to plead that an official was 'conceivably personally involved.' " *Id.* (quoting *Tangreti,* 983 F.3d at 615-16, 618). " '*Tangreti* makes clear that, after *Iqbal,* [a p]laintiff can no longer succeed on a § 1983 claim against [a d]efendant by showing that a supervisor behaved knowingly or with deliberate indifference that a constitutional violation would occur at the hands of his subordinates, unless that is the same state of mind required for the constitutional deprivation.' " *Lalonde v. City of Ogdensburg,* 662 F. Supp. 3d 289, 322 (N.D.N.Y. 2023) (quotation, quotation marks, and emphasis omitted); *see Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009).

" 'Thus, an official's conduct in making and executing policy, or failing to make or execute policy, may satisfy *Iqbal*'s requirement of personal involvement if such conduct meets the elements required to establish an underlying constitutional violation and is undertaken with the required state of mind.' " *Lalonde,* 662 F. Supp. 3d at 322 (quotation omitted). Importantly, "if the plaintiff cannot show that his or her constitutional rights were violated by any individual defendants, the *Monell* claim will also fail." *Oliver v. City of New York,* 540 F. Supp. 3d 434, 436 (S.D.N.Y. 2021); *see also Segal v. City of New York,* 459 F.3d 207, 219 (2d Cir. 2006) ("Because the district court properly found no underlying constitutional violation, its decision not to address the municipal defendants' liability under *Monell* was entirely correct").

Plaintiff's contentions closely track the pre-*Tangreti* standards for supervisory liability. *See Hendrix v. Annucci, et al.,* No. 9:20-CV-0743, 2021 WL 4405977, \*6 (N.D.N.Y. Sept. 27, 2021) (quoting *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir. 1995)) ("[T]he Second Circuit's general rule was that a supervisory official's personal involvement could have been proven by showing

any five factors: '(1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring' "). Plaintiffs' complaint does not set forth personal involvement in a constitutional violation against every single Defendant.

Regardless, Plaintiffs' *Monell* claims cannot proceed because their underlying constitutional claims fail for the reasons set forth in this decision—abstention, immunity, lack of state action, and failure to state a claim. *See Segal*, 459 F.3d at 219. Thus, without underlying constitutional violations, Plaintiffs' *Monell* claims must be dismissed.

### K. ADA and Rehabilitation Act Claims

Plaintiffs set forth an ADA and Rehabilitation Act claim. *See* Dkt. No. 1 at ¶¶ 299-301. Plaintiffs refer to themselves in the plural form when discussing these claims, but it appears that Plaintiff Smith is the individual with alleged disabilities of "ADHD, Auditory Processing Delay, and a Written Learning Disability." *Id.* at ¶ 300; *see also id.* at ¶¶ 178, 185. Plaintiffs allege that Defendant Judge Wait denied Plaintiff Smith "an ADA-complaint note-taker for court hearings" and that Defendant Wait made derogatory and demeaning comments about Plaintiff Smith's disabilities. *See id.* at ¶¶ 178, 185, 300.

 **\*16**  Magistrate Judge Stewart recommended dismissing these claims as "barred by the *Rooker-Feldman* doctrine, judicial immunity, and by § 1983's requirement that injunctive relief against a judge is barred unless a declaratory decree was violated, or declaratory relief was unavailable." Dkt. No. 12 at 32. He also noted that neither the ADA nor Rehabilitation act provide for individual liability. *See id.*

Plaintiffs summarily object, stating that the ADA claim does not fall under the *Rooker-Feldman* doctrine and does not qualify for immunity. *See* Dkt. No. 13 at 33. Plaintiffs contend that "the ADA violations were not only discriminatory but also strategic, serving as a means for the defendants to shield themselves from exposure related to their corruption and malfeasance." *Id.*

The Second Circuit has explicitly applied the *Rooker-Feldman* doctrine to ADA claims. *See DiLauria v. Town of Harrison*, 64 Fed. Appx. 267, 270 (2d Cir. 2003). Similarly, "[c]ourts in this Circuit and others have found judicial immunity to extend to claims under the ADA." *Brooks v. Onondaga Cnty. Dep't of Child. & Fam. Servs.*, No. 5:17-CV-1186, 2018 WL 2108282, *4 (N.D.N.Y. Apr. 9, 2018) (collecting cases). Thus, the Court finds no clear error in Magistrate Judge Stewart's applications of these rules of law to Plaintiffs' ADA and Rehabilitation Act claims.[3]  Importantly, as Magistrate Judge Stewart explained, and to which Plaintiffs do not respond, "neither statute provides for individual liability." Dkt. No. 12 at 32 (citing *Goe v. Zucker*, 43 F.4th 19, 35 (2d Cir. 2022)); *see also Lalonde v. City of Ogdensburg*, 662 F. Supp. 3d 289, 327 (N.D.N.Y. 2023) (quoting *Fera v. City of Albany*, 568 F. Supp. 2d 248, 259 (N.D.N.Y. 2008)) ("[T]o the extent that Plaintiffs are suing the individual Defendants in their individual capacities, 'neither Title II of the ADA nor § 504 of the Rehabilitation Act provides for individual capacity suit ....' "). Plaintiffs' ADA and Rehabilitation Act claims are therefore dismissed.

[3]     Insofar as Magistrate Judge Stewart addressed the injunctive relief issue, the Court reiterates Plaintiffs' contention that they do not seek injunctive or declaratory relief, and request only monetary damages.

### L. State Claims

Because Magistrate Judge Stewart recommended dismissing all of Plaintiffs' federal claims, he also recommended dismissing Plaintiffs' state-law claims. *See* Dkt. No. 12 at 32-33. Plaintiffs object, arguing that their federal claims are meritorious and should not be dismissed which would save their state-law claims. *See* Dkt. No. 13 at 35.

It is well settled that the Court is not required to retain jurisdiction over state-law claims if the Court dismisses all federal claims. *See Hyman v. Cornell Univ.*, 834 F. Supp. 2d 77, 83 (N.D.N.Y. 2011), *aff'd*, 485 Fed. Appx. 465 (2d Cir. 2012). Indeed, "[a]

district court usually should decline the exercise of supplemental jurisdiction when all federal claims have been dismissed at the pleading stage." *Denney v. Deutsche Bank AG*, 443 F.3d 253, 266 (2d Cir. 2006). " 'Dismissal of the pendent state law claims is not, however, "absolutely mandatory" even where the federal claims have been dismissed before trial....' " *Hyman*, 834 F. Supp. 2d at 83 (quoting *Marcus v. AT & T Corp.*, 138 F.3d 46, 57 (2d Cir. 1998)).

All of Plaintiffs' federal claims are subject to dismissal for the reasons set forth in this Memorandum-Decision and Order. As such, the Court declines to exercise jurisdiction over the state-law claims and they too will be dismissed.

## M. Leave to Amend

**\*17** "[P]laintiffs object to the dismissal of any claims without first being given the opportunity to amend them. As pro se litigants, they request that the court allows them the chance to revise their claims if necessary, emphasizing the importance of this consideration in the context of self-representation." Dkt. No. 13 at 37.

Magistrate Judge Stewart recommended dismissal of Plaintiffs' complaint against the following Defendants with prejudice and without leave to amend: Judge Paul Pelagalli; Saratoga Supreme Court Judges John Ellis and Dianne Freestone; City Court Judge Jeffrey Wait; Saratoga County Court Judge James Murphy; Administrative Judge for the Fourth Judicial District Judge Felix Catena; Appellate Division Justices Elizabeth Garry and Christine Clark; Court Attorney Karla Conway; Court-appointed experts Jaqueline Bashkoff and Dr. Mary O'Connor; the private attorneys appointed by the Court to represent the Smith children - Jessica Vinson of Vella Carbone, LLP; Elena Tastensen; and Heather Corey-Mongue; Samuel Maxwell, Emily Williams, Michelle Granger, Michael Hartnett; Jillian Knox; Veronica Smith; and Denise Rista-Tobin. *See* Dkt. No. 12 at 33-34. Magistrate Judge Stewart recommended as such because the claims against those individuals are barred by judicial, quasi-judicial, government attorney, and/or witness immunities. *See id.* He recommended that Plaintiffs be given leave to amend all other claims. *See id.* at 34-35.

" 'Sua sponte dismissal of *pro se* [ ] petitions which contain non-frivolous claims without requiring service upon respondents or granting leave to amend is disfavored by' " the Second Circuit. *Collymore v. Krystal Myers, RN*, 74 F.4th 22, 27 (2d Cir. 2023) (quoting *Moorish Sci. Temple of Am., Inc. v. Smith*, 693 F.2d 987, 990 (2d Cir. 1982)). "In the § 1983 context, such dismissals are 'inappropriate' – regardless of the merits – if the complaint alleges that '(1) the defendant was a state actor ... when he committed the violation and (2) the defendant deprived the plaintiff of rights, privileges or immunities secured by the Constitution or laws of the United States.' " *Id.* (quoting *Milan v. Wertheimer*, 808 F.3d 961, 964 (2d Cir. 2015)). However, courts often dismiss claims barred by immunity without leave to amend because better pleading cannot dure the deficiency, *i.e.*, amending a complaint does not destroy immunity. *See Clay v. Bishop*, No. 1:22-CV-0983, 2023 WL 3352903, \*7 (N.D.N.Y. Feb. 7, 2023) (collecting cases); *Woods v. Vermont*, No. 2:22-CV-00008, 2023 WL 2624352, \*2 (D. Vt. Mar. 24, 2023); *Burdick v. Town of Schroeppel*, No. 5:16-CV-01393, 2017 WL 5509355, \*9 (N.D.N.Y. Jan. 31, 2017), *aff'd*, 717 Fed. Appx. 92, 93 (2d Cir. 2018).

Because the deficiency in Plaintiffs' claims against judges, court staff, witnesses, government attorneys, and court-appointed individuals are substantive and cannot be cured by better pleading, the Court dismisses those claims with prejudice and without leave to amend. However, the Court will permit Plaintiffs to otherwise amend their complaint. Plaintiffs are informed that any amended complaint will replace the existing complaint and must be a wholly integrated and complete pleading that does not rely upon or incorporate by reference any pleading or document previously filed with the Court. *See Jeanty*, 669 F. Supp. 3d at 118. [4]

---

[4]    The Court directs Plaintiffs to the instructions outlined in Magistrate Judge Stewart's Report-Recommendation and Order. *See* Dkt. No. 12 at 35-36.

## N. Electronic Filing

**\*18**  Plaintiffs ask that Court "reconsider and override" Magistrate Judge Stewart's decision to deny their request to file electronically. Dkt. No. 13 at 38; *see also* Dkt. No. 12 at 36. Because Plaintiffs' complaint is being dismissed, their request to file electronically is moot. The Court will not reconsider it at this time.

## IV. CONCLUSION

After carefully the Plaintiffs' submissions, Magistrate Judge Stewart's Report-Recommendation and Order, and the applicable law, the Court hereby

**ORDERS** that Magistrate Judge Stewart's Report-Recommendation and Order (Dkt. No. 12) is **ADOPTED in its entirety** for the reasons set forth herein; and the Court further

**ORDERS** that Plaintiffs' complaint (Dkt. No. 1) is **DISMISSED**; and the Court further

**ORDERS** that the claims against Judge Paul Pelagalli; Saratoga Supreme Court Judges John Ellis and Dianne Freestone; City Court Judge Jeffrey Wait; Saratoga County Court Judge James Murphy; Administrative Judge for the Fourth Judicial District Judge Felix Catena; Appellate Division Justices Elizabeth Garry and Christine Clark; Court Attorney Karla Conway; Court-appointed experts Jaqueline Bashkoff and Dr. Mary O'Connor; the private attorneys appointed by the Court to represent the Smith children - Jessica Vinson of Vella Carbone, LLP; Elena Tastensen; and Heather Corey-Mongue; government attorneys Samuel Maxwell, Emily Williams, Michelle Granger, Michael Hartnett; and testifying witnesses Jillian Knox and Veronica Smith be **DISMISSED WITH PREJUDICE AND WITHOUT LEAVE TO AMEND**; and the Court further

**ORDERS** that all other claims be **DISMISSED WITHOUT PREJUDICE** with leave to file an amended complaint within thirty (30) days of the date of this Order; and the Court further

**ORDERS** that, if Plaintiffs fail to file an amended complaint within **thirty (30) days** of this Order, the Clerk of the Court shall enter judgment in Defendants' favor and close this case, without further order of this Court; and the Court further

**ORDERS** that Plaintiffs request to reconsider Magistrate Judge Stewart's denial of leave for electronic filing is **DENIED**; and the Court further

**ORDERS** that the Clerk of the Court serve a copy of this Order upon Plaintiffs in accordance with Local Rules.

**IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2024 WL 2291701

---

**End of Document**                                      © 2024 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Blue Flag – Appeal Notification
Appeal Filed by  Kurtz v. State of New York,  2nd Cir.,  August 8, 2024

2024 WL 3488408
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Thomas KURTZ, Plaintiffs,

v.

The State of NEW YORK, et al., Defendants.

9:24-CV-0073 (AMN/DJS)
|
Signed July 19, 2024

**Attorneys and Law Firms**

THOMAS KURTZ, Plaintiff, pro se, 553816, STARC OAKVIEW, PO Box 300, Marcy, NY 13403.

**DECISION and ORDER**

ANNE M. NARDACCI, United States District Judge

## I. INTRODUCTION

 **\*1**  This action was purportedly commenced by pro se plaintiffs Thomas Kurtz, also known as T. Kurtz-Schumacher ("Kurtz"), and Jessica Applegate-Bishop ("Applegate-Bishop"), pursuant to 42 U.S.C. § 1983 ("Section 1983"). Dkt. No. 1 ("Compl."). Only Kurtz signed the complaint and provided a mailing address for future communication, and neither plaintiff paid the required filing fee or submitted the documents required to proceed in forma pauperis ("IFP"). By Decision and Order entered on January 29, 2024, the Court directed the plaintiffs to each comply with the filing fee requirement within thirty days if they wished to proceed with this action, and further directed Applegate-Bishop to sign a certification pursuant to Rule 11 of the Federal Rules of Civil Procedure based on her failure to sign the complaint. Dkt. No. 5 ("January 2024 Order").

Following the issuance of the January 2024 Order, Kurtz filed an application to proceed IFP, along with the inmate authorization form required in this District. *See* Dkt. No. 7 ("Kurtz IFP Application"); Dkt. No. 8 ("Kurtz Authorization Form").

By Decision and Order entered on May 21, 2024, this Court dismissed Applegate-Bishop as a party to this proceeding, conditionally granted the Kurtz IFP Application, and dismissed the complaint without prejudice pursuant to 28 U.S.C. § 1915(e)(2)(B)(i) and (ii), 28 U.S.C. § 1915A(1), and for failure to comply with the pleading requirements of Federal Rule of Civil Procedure 8. Dkt. No. 10 ("May 2024 Order"). In light of Kurtz's pro se status, he was afforded thirty (30) days to file an amended complaint. *Id.* at 9-11.

Presently before the Court is a document filed by Kurtz, which purports to be an amended complaint, but also seemingly seeks reconsideration of the May 2024 Order. Dkt. No. 11. [1]

[1]    The cover page of plaintiff's submission lists the "inclosed [sic]" documents, which includes "amended complaints[,]" a "map" of certain property. Dkt. No. 11 at 1. Although "motion for reconsideration" is not listed as one of the enclosures,

the top of the eighth page of plaintiff's submission contains the following header: "Motion for reconsideration of amended complaints[.]" *Id.* at 8.

## II. REQUEST FOR RECONSIDERATION

A court may justifiably reconsider its previous ruling if: (1) there is an intervening change in the controlling law; (2) new evidence not previously available comes to light; or (3) it becomes necessary to remedy a clear error of law or to prevent manifest injustice. *Delaney v. Selsky*, 899 F. Supp. 923, 925 (N.D.N.Y. 1995) (McAvoy, C.J.) (citing *Doe v. New York City Dep't of Soc. Servs.*, 709 F.2d 782, 789 (2d Cir. 1983)). The standard for granting a motion for reconsideration is strict. *Shrader v. CSX Transportation, Inc.*, 70 F.3d 255, 257 (2d Cir. 1995). A motion for reconsideration "should not be granted where the moving party seeks solely to relitigate an issue already decided." *Id.* Thus, a motion for reconsideration is not to be used for "presenting the case under new theories, securing a rehearing on the merits, or otherwise taking a 'second bite at the apple.' " *Sequa Corp. v. GBJ Corp.*, 156 F.3d 136, 144 (2d Cir. 1998).

 **\*2** Although plaintiff's submission is far from a model of clarity, he appears to argue that the Court erred in dismissing his co-plaintiff from this action because he is "licensed to practice law in the State of New York." *See* Dkt. No. 11 at 7-8. Plaintiff further alleges that he graduated from "Cornell University Colambia [sic] Law[,]" and identifies his "bar roll number" as "1470625[.]" *Id.* at 7.

As an initial matter, Applegate-Bishop was dismissed from this action not only because she did not sign the complaint, but also because she failed to comply with the filing fee requirement. Thus, plaintiff's alleged status as a licensed attorney is not, by itself, a reason to reinstate Applegate-Bishop as a plaintiff in this action.

Furthermore, the New York State Unified Court System website maintains, among other things, a searchable record of registered attorneys in New York. *See* https://iapps.courts.state.ny.us/attorneyservices/search (last visited July 16, 2024). Upon review of that website, it is clear that plaintiff is not in fact a licensed attorney. [2] In other words, plaintiff's sole basis for reconsideration of the May 2024 Order is frivolous.

[2]     Pursuant to Fed. R. Evid. 201, a court may at any stage of a proceeding take judicial notice of "a fact that is not subject to reasonable dispute because it (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." This includes "information publicly announced on a party's website, as long as the website's authenticity is not in dispute and 'it is capable of accurate and ready determination.' " *Doron Precision Sys., Inc. v. FAAC, Inc.*, 423 F. Supp. 2d 173, 179 n. 8 (S.D.N.Y. 2006) (quoting prior version of Fed. R. Evid. 201(b) amended in 2011 as part of the restyling of the Evidence Rules). The accuracy and authenticity of the New York State Unified Court System's website cannot reasonably be questioned.

Thus, insofar as plaintiff seeks reconsideration of the May 2024 Order, his request is denied in its entirety.

## III. SUFFICIENCY OF THE AMENDED COMPLAINT

### A. The Complaint and May 2024 Order

In his original complaint, plaintiff named the State of New York, the American Medical Academy, and two District Courts as defendants, and presented incoherent allegations of wrongdoing, which failed to explain, in any respect, how any of the named defendants may have violated his rights under federal law. *See generally* Compl.

Following review of the complaint pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b), plaintiff's Section 1983 claims were dismissed without prejudice pursuant to 28 U.S.C. § 1915(e)(2)(B)(i) and (ii), 28 U.S.C. § 1915A(b)(1), and for failure to comply with the pleading requirements of Federal Rule of Civil Procedure 8. *See* May 2024 Order at 8-10.

### B. Review of the Amended Complaint

Because plaintiff is proceeding in forma pauperis and is an inmate suing one or more government employees, his amended complaint must be reviewed in accordance with 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b). The legal standard governing the review of a pleading pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) was discussed at length in the May 2024 Order and will not be restated herein. *See* May 2024 Order at 4-6.

Aside from the two pages of plaintiff's submission wherein he appears to seek reconsideration of the May 2024 Order, the document consists of over thirty handwritten pages, which are comprised of incoherent statements, confusing references to lawsuits, statutes, and websites, and hand drawn property maps. *See generally*, Dkt. No. 11. By way of example only, plaintiff alleges that "[t]he car that plaintiffs are suing for contract violations and amendment disregard to the coad [sic] conduct of police in the C-20 Bill ... because [the] police[ ] fail[ed] to report overturned vehicle in Tompkins New York of plaintiffs [sic] friend[.]" *Id.* at 12. In the very next sentence, plaintiff alleges, "Both state police and sheriffs are looking into a shooting at that plaintiff has no legal obligation to talk about with the Bills of Fed Civil Practice Law." *Id.* The pleading then references other lawsuits, the legality of being part of "a militia[,]" and two sentences later discusses "[t]he congregational [sic] church ... from Pennsylvania" that plaintiff attended with his former co-plaintiff as a child, which he claims is somehow involved -- with "police" in Broome County, New York and other churches -- in "laundering" "Christmas gifts" and other donations. *Id.* at 13.

**\*3** As with the original complaint, the amended complaint fails to clearly explain the basis for plaintiff's lawsuit, or where and when any alleged violation(s) of plaintiff's federal rights may have occurred. Thus, the Court has no basis to plausibly infer that this action is even timely and properly venued in this District.

Furthermore, Rule 8(a) of the Federal Rules of Civil Procedure expressly requires a pleading to include "a short and plain statement of the claim showing that the pleader is entitled to relief" and "a demand for the relief sought[.]" In this case, the amended complaint does not contain a list of defendants or otherwise identify any state actor who allegedly violated plaintiff's federal rights, and the allegations in the amended complaint fail to provide any indication that plaintiff is entitled to any measure of relief in this action.[3] In addition, as noted above, at least some of the statements in plaintiff's submission are blatantly frivolous.

[3]    Rule 10(a) of the Federal Rules of Civil Procedure requires "the title of the complaint" to "name all the parties." As other courts have noted, it is not the Court's place to add officials referenced in the body of the pleading to an action as defendants based on an assumption that plaintiff intended for such individuals to be parties. *See, e.g., Abbas v. U.S.*, No. 10-CV-0141, 2014 WL 3858398, at *2 (W.D.N.Y. Aug. 1, 2014) (the failure to name a party in the caption makes it "infeasible for the Court to determine which of the individual officers mentioned in the body of the complaint should be deemed to be defendants to which claims").

Finally, insofar as plaintiff has reasserted Section 1983 claims against the State of New York or any state agencies, the Eleventh Amendment has long been construed as barring a citizen from bringing a suit against his or her own state in federal court, under the fundamental principle of "sovereign immunity." U.S. Const. amend. XI ("The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."); *Hans v. Louisiana*, 134 U.S. 1, 10-21 (1890); *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 267 (1997); *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984). Eleventh Amendment immunity is lost only if Congress unequivocally abrogates states' immunity or a state expressly consents to suit. *Gollomp v. Spitzer*, 568 F.3d 355, 365-66 (2d Cir. 2009).

It is well-settled that Congress did not abrogate states' immunity through Section 1983, *see Quern v. Jordan*, 440 U.S. 332, 343-45 (1979), and that New York State has not waived its immunity from suit on the claims asserted in plaintiff's amended complaint. *See generally Trotman v. Palisades Interstate Park Comm'n*, 557 F.2d 35, 38-40 (2d Cir. 1977); *Dawkins v. State of New York*, No. 5:93-CV-1298 (RSP/GJD), 1996 WL 156764 at *2 (N.D.N.Y. 1996). Furthermore, state immunity extends not only to the states, but also to state agencies. *See Puerto Rico Aqueduct & Sewer Auth. v. Metcalf*, 506 U.S. 139, 142-47 (1993);

*McGinty v. New York*, 251 F.3d 84, 95 (2d Cir. 2001) ("The Eleventh Amendment extends immunity not only to a state, but also to entities considered 'arms of the state.' "); *Posr v. Court Officer Shield No. 207*, 180 F.3d 409, 414 (2d Cir. 1999) ("An official arm of the state enjoys the same Eleventh Amendment immunity from suit in federal court as is enjoyed by the state itself."); *Davis v. New York*, 316 F.3d 93, 101 (2d Cir. 2002) (affirming dismissal of Section 1983 claims against DOCCS on Eleventh Amendment grounds). Accordingly, any intended federal claims against the State of New York and/or a state agency are barred by the Eleventh Amendment. [4]

[4]    In *Ex Parte Young*, 209 U.S. 123 (1908), the Supreme Court established an exception to state sovereign immunity in federal actions where an individual brings an action seeking injunctive relief against a state official for an ongoing violation of law or the Constitution. Under the doctrine, a suit may proceed against a state official in his or her official capacity, notwithstanding the Eleventh Amendment, when a plaintiff, "(a) alleges an ongoing violation of federal law, and (b) seeks relief properly characterized as prospective." *See In re Deposit Ins. Agency*, 482 F.3d 612, 618 (2d Cir. 2007) (quotations and citations omitted); *see also Santiago*, 945 F.2d at 32 (holding that such claims, however, cannot be brought directly against the state, or a state agency, but only against state officials in their official capacities). In this case, the amended complaint lacks allegations which plausibly suggest that plaintiff is experiencing an ongoing violation of federal law and does not seek relief that may be characterized as prospective.

**\*4**  In light of the foregoing, the amended complaint is dismissed without pursuant to 28 U.S.C. § 1915(e)(2)(B)(i) and (ii), 28 U.S.C. § 1915A(b)(1), and for failure to comply with the pleading requirements of Rule 8 of the Federal Rules of Civil Procedure. *See Mendes Da Costa v. Marcucilli*, 675 Fed. App'x 15, 17 (2d Cir. 2017) (affirming district court's dismissal of amended complaint "as frivolous and running afoul of Rule 8"); *Grullon v. City of New Haven*, 720 F.3d 133, 138 (2d Cir. 2013) ("It is well settled that, in order to establish a defendant's individual liability in a suit brought under § 1983, a plaintiff must show, inter alia, the defendant's personal involvement in the alleged constitutional deprivation.").

## IV. CONCLUSION

**WHEREFORE**, it is hereby

**ORDERED** that this action alleging federal claims under Section 1983 is **DISMISSED without prejudice** pursuant to 28 U.S.C. § 1915(e)(2)(B)(i) and (ii) and 28 U.S.C. § 1915A(b)(1) as frivolous and for failure to state a claim upon which relief may be granted, and for failure to comply with the pleading requirements of Rule 8 of the Federal Rules of Civil Procedure. The Clerk is directed to terminate the defendants and close this case; and it is further

**ORDERED** that the Clerk serve a copy of this Decision and Order on plaintiff.

**IT IS SO ORDERED**.

**All Citations**

Slip Copy, 2024 WL 3488408

---

**End of Document**                                                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Case 6:24-cv-01009-DNH-TWD     Document 8     Filed 11/08/24     Page 72 of 89

218 N.Y.S.3d 770

Supreme Court, Albany County, New York.

In the Matter of the Application of Caroline CARTWRIGHT, Matthew
Nelson, Joseph R. Rhone, Jr., and Alexander Pease, Petitioners,

v.

Robert F. KENNEDY, Jr., Nicole Shanahan, Donna L Harris, Dawn M. D'Arcangelo, Ross W. Elakman, Alan S.
Gompers, Lisa B. Jacques, Kevin J. Madonna, Victoria E. Madonna, Philip J. Maresco, Jensuh Y. McCormack,
Javier Eduardo Merizalde, Jennifer Meyerson, Kenneth A. Noga, Mary C. O'Donnell, Gina M. Krause, Valentin
Parks Jr., Nancy V. Pierro, Teresa E. Polsky, Varin D. Sawh, Lawrence P. Schnapf, Celeste L. Shear, Jehanzeb
Syed, Eileen S. Tepper, Bruce T. Thorne, Lita L. Thorne, Joshua Vogel, Kristin Ann Marie White, Kelly A.
Zaneto and Susan Peters, Respondents-Candidates, and Henry T. Berger, Peter S. Kosinski, Essma Bagnuola
and Anthony J. Casale, Commissioners constituting the New York State Board of Elections, Respondents.

Index No. 906349-24

|

Decided on August 13, 2024

**Synopsis**

**Background:** Petitioners sought to invalidate independent nominating petition seeking to place candidates for President and
Vice President on ballot for general election, based on alleged defect in petition listing New York as candidate's place of
residence.

**Holdings:** The Supreme Court, Christina L. Ryba, J., held that:

[1] New York address listed on candidate's nominating petition was not candidate's bona fide "residence" within meaning of
Election Law;

[2] fact that candidate may not have intended to mislead or confuse signatories for his nomination petition by listing New York
address as his place of residence based upon advice of legal counsel did not preclude invalidation of nominating petition;

[3] New York's residency requirement for nominating petitions for candidates for President did not unconstitutionally impose
eligibility restrictions beyond those established in Twelfth Amendment of United States Constitution; and

[4] testimony of candidate's counsel regarding constitutionality of residency requirement for candidate's nominating petition
was inadmissible.

Petition granted.

**Procedural Posture(s):** Other.

West Headnotes (17)

**[1]     Election Law**      Requisites and sufficiency

The requirement that each page of a nominating petition set forth the candidate's "place of residence" is a matter of prescribed content, rather than form, and therefore strict compliance with the requirement is necessary. N.Y. Election Law § 6-140(1).

**[2]    Election Law** 👉 Construction and Operation

Mandating strict compliance with the statutory commands of the Election Law is designed to guarantee the integrity of the election process by facilitating the discovery of fraud and reducing the likelihood of unequal enforcement of the law. N.Y. Election Law § 1-100.

**[3]    Election Law** 👉 Construction and operation

The strict compliance standard ensures that the Election Law is neutrally applied regardless of a candidate's history, background, party affiliation, protected class, or any other criterion irrelevant to a determination of whether its requirements have been met; a too-liberal construction of the Election Law has the potential for inviting mischief on the part of candidates, or their supporters or aides, or worse still, manipulations of the entire election process. N.Y. Election Law § 1-100.

**[4]    Election Law** 👉 Requisites and sufficiency

The failure to strictly comply with the Election Law requirements as to matters of content is fatal to a nominating petition. N.Y. Election Law § 1-100.

**[5]    Election Law** 👉 Weight and Sufficiency

Challengers to residence of candidate on nominating petition bear the burden at trial to demonstrate by clear and convincing evidence that address listed on candidate's nominating petition was not his residence within the meaning of the Election Law. N.Y. Election Law § 6-140(1).

**[6]    Evidence** 👉 High probability; reasonable certainty

The clear and convincing evidence standard requires the production of evidence which makes it "highly probable" that petitioners' claims are true.

**[7]    Election Law** 👉 Residence
**Election Law** 👉 Sufficiency in general

As used in the Election Law, the term "residence" is synonymous with "domicile" and requires that a person be physically present with the intent to remain for some time. N.Y. Election Law § 1-104(22).

**[8]    Election Law** 👉 Sufficiency in general

The controlling factor to a court's finding that a party maintains a "residence," within the meaning of the Election Law, at a particular address is that the individual must manifest an intent to reside there, coupled with physical presence without any aura of sham. N.Y. Election Law § 1-104(22).

**[9]    Election Law    ⚷ Sufficiency in general**

A generalized intent to return to a general geographic area at some uncertain point in the future is insufficient to constitute "residence" within the meaning of the Election Law. N.Y. Election Law § 1-104(22).

**[10]    Election Law    ⚷ Sufficiency in general**

Under the Election Law, a person's residence is based largely on his intent to remain at or return to a specific abode, and must be coupled with an actual physical presence at that abode. N.Y. Election Law § 1-104(22).

**[11]    Election Law    ⚷ Questions for jury and instructions**

Residency, within the meaning of the Election Law, is generally a factual question which is dependent upon the particular circumstances presented. N.Y. Election Law § 1-104(22).

**[12]    Election Law    ⚷ Review of questions of fact**

Where the determination of residence under the Election Law requires the resolution of conflicting testimony and credibility issues presented at trial, the resolution of the conflict lies within the province of the trial court, as the finder of fact, and should not be disturbed on appeal unless it is obvious that the court's conclusion could not be reached under any fair interpretation of the evidence. N.Y. Election Law § 1-104(22).

**[13]    Public Employment    ⚷ Residence or domicile**

New York address listed on candidate's nominating petition was not candidate's bona fide "residence" within meaning of Election Law, although candidate argued that he lived as tenant in spare bedroom at address; candidate only slept at address on one occasion in 15 months, that occasion did not occur until after filing of candidate's nominating petition an instant proceeding challenging his nominating petition, there was no written lease for premises, candidate was not named as defendant in foreclosure of premises, he testified that he had no present intent to return to premises, his intention to return to premises with his wife and belongings at unspecified date was speculative and improbable, based on size of room, and he admitted that he did not intend to abandon his California residence. N.Y. Election Law §§ 1-104(22), 6-140(1).

**[14]    Public Employment    ⚷ Residence or domicile**

While the Election Law does not preclude a person from having two residences and choosing one for election purposes, the residence chosen must be one to which the candidate has legitimate, significant, and continuing attachments such that it qualifies as a bona fide "residence" within the meaning of the Election Law. N.Y. Election Law §§ 1-104(22), 6-140(1).

**[15]    Election Law    ⚷ Effect of irregularities or defects**

Fact that independent candidate for President may not have intended to mislead or confuse signatories for his nomination petition by listing New York address as his place of residence based upon advice of legal counsel did not preclude invalidation of nominating petition; testimony demonstrated that counsel's advice was not based upon legal opinion that address was valid residence under Election Law, but rather upon need to use address where candidate was registered to vote. N.Y. Election Law §§ 1-104(22), 6-140(1).

[16]  **Election Law**  ⬤  Requisites and sufficiency

**United States**  ⬤  Presidential eligibility and qualification

New York's residency requirement for nominating petitions for candidates for President did not unconstitutionally impose eligibility restrictions beyond those established in Twelfth Amendment of United States Constitution; candidate's designation of New York address as his place of residence on his nominating petition was false statement requiring invalidation of petition, and United States Constitution could not protect candidates from making false statements on their petitions for public office. U.S. Const. Amend. 12; N.Y. Election Law § 6-140(1).

[17]  **Attorneys and Legal Services**  ⬤  Lawyers not admitted, licensed, or authorized in jurisdiction

**Evidence**  ⬤  As to Particular Subjects

**Pretrial Procedure**  ⬤  Facts taken as established or denial precluded;  preclusion of evidence or witness

**Privileged Communications and Confidentiality**  ⬤  Waiver of privilege

Testimony of candidate's counsel regarding constitutionality of residency requirement for candidate's nominating petition was inadmissible, in proceedings challenging candidate's nominating petition based on candidate's address of residence; counsel was not disclosed or shown to be qualified as expert in either constitutional or New York State law, he was not licensed to practice in New York, and, assuming that testimony was legal advice rather than expert testimony, it was outside scope of candidate's limited waiver of attorney-client privilege. N.Y. Election Law § 6-140(1).

More cases on this issue

**Attorneys and Law Firms**

**\*773**  Howard E. Colton, Esq., Law Office of Howard E. Colton, Esq., For Petitioners, 53 East Merrick Road, Suite 237, Freeport, New York 11520

Keith Corbet, Esq., Harris Beach, PLLC, For Petitioners, 333 Earle Ovington Blvd, Suite 901 Uniondale, New York 11553

John C. Quinn, Esq., Kaplan, Hecker & Fink LLP, For Petitioners-Objectors, 350 Fifth Avenue, 63rd Floor, New York, New York 10118

New York State Board of Elections, For Respondents, 40 North Peal Street, Suite 5, Albany, New York 12207

Gary L. Donoyon, Esq., The Law Office of Gary L. Donoyon, For Respondents-Candidates, 565 Plandome Road, #209, Manhasset, New York 11030

**Opinion**

Christina L. Ryba, J.

**\*\*1**  The underlying facts and procedural history relevant to this Election Law § 16-102 proceeding are fully detailed in the Court's prior decision dated July 23, 2024 and will not be repeated herein except as necessary for clarification. Briefly, petitioners commenced this proceeding to invalidate an independent nominating petition filed with the New York State Board of Elections seeking to place respondents Robert F. Kennedy, Jr. and Nicole Shanahan on the official statewide ballot as candidates of the "We The People" independent body for  **\*774**  the respective public offices of President and Vice President of the United States in the November 5, 2024 general election. While the verified petition asserts challenges to a wide array of alleged defects in

the nominating petition, petitioners have since narrowed the original issues presented for the Court's determination to the sole and limited question of whether the address that Kennedy listed on the nominating petition as his "place of residence", i.e., 84 Croton Lake Road, Katonah, New York, is his true place of residence within the meaning of Election Law § 1-104 (22). Upon denying respondents' pre-answer motion to dismiss this proceeding and petitioners' cross motion for a summary determination in their favor, the Court scheduled a bench trial on the limited issue of Kennedy's residence to commence on August 5, 2024. [1]

[1]    The trial was initially scheduled to commence on July 29, 2024 but was adjourned to August 5, 2024 at the request of Kennedy's counsel.

Kennedy thereafter served an answer to the verified petition in which he raised various defenses, including but not limited to the claim that he designated the 84 Croton Lake Road address as his place of residence on the nominating petition pursuant to the legal advice of Paul Rossi, Esq., senior counsel for ballot access on Kennedy's campaign, and the claim that the New York State Election Law is unconstitutional to the extent that it imposes residency requirements for candidates running for the offices of President and Vice-President of the United States beyond those set forth in the United States Constitution. Various pre-trial motions ensued, with Kennedy filing a motion in limine seeking an order 1) precluding petitioners from offering any evidence at trial relating the fact that he owns a residence in California and that his wife and other family members reside in that home; 2) limiting his waiver of the attorney-client privilege resulting from his advice-of-counsel defense to the narrow issue of legal advice given by Rossi with regard to using the 84 Croton Lake Road address as his place of residence on the nominating petition; and 3) precluding petitioners from introducing any evidence at trial in the form of news and media articles. Petitioners filed a cross motion in limine in which they opposed Kennedy's motion and sought an order precluding Kennedy from introducing any evidence regarding legal advice he received regarding the use of the 84 Croton Lake Road address as his place of residence on the nominating petition. Petitioners also filed a separate motion requesting that the Court issue subpoenas duces tecum directing Kennedy and Rossi to produce certain documents at trial relating to legal advice given as to the nominating petition and the place of residence listed therein. Finally, petitioners filed an Order to Show Cause seeking an adverse inference by virtue of Kennedy's failure to respond to their various discovery demands. The motions and cross-motions were made returnable on August 5, 2024, the first day of trial.

## TRIAL

### I. Motions in Limine

**\*\*2**  The morning of trial commenced with counsel offering oral argument on their respective motions. With regard to Kennedy's motion to limit his waiver of the attorney-client privilege, Kennedy's trial counsel argued that the waiver of the attorney-client privilege should be "limited specifically to the advice he received regarding the use of the [84 Croton Lake Road] address on his nominating petition", which trial counsel described as "the only subject matter [Kennedy] has put at issue with **\*775** regards to the advice of counsel". Trial counsel further cautioned against any attempts by opposing counsel to elicit testimony from Rossi that might "invade the attorney-client privilege beyond the scope of what's been put at issue". At the conclusion of oral argument, petitioners' counsel withdrew the Order to Show Cause for an adverse inference and the Court issued decisions from the bench as to the remaining motions. Prior to issuing its rulings, the Court set forth the applicable standard of residency under New York law as follows:

According to Election Law § 1—104 (22) and New York State case law, a residence is that place where a person maintains a fixed, permanent, and principal home and to which he or she, wherever temporarily located, always intends to return. As used in the Election Law, the term 'residence' is synonymous with 'domicile'. Case law has also established that an individual having two residences may choose one to which she or he has legitimate, significant and continuing attachments as her or his residence for purposes of the Election Law. The crucial factor in determining whether a particular residence complies with the

requirements of the Election Law is that the individual must manifest an intent to reside there, coupled with physical presence, without any aura of sham.

Given the residency standard to be applied under New York law, the Court denied Kennedy's motion to preclude evidence related to his California residence. With regard to the request for a blanket preclusion of evidence related to news and media articles, the Court reserved decision pending a case-by-case determination of admissibility when such evidence was introduced at trial. With regard to the motion to limit Kennedy's waiver of the attorney-client privilege to legal advice received regarding use of the 84 Croton Lake Road address as his place of residence on the nominating petition, the Court granted the motion and further directed that "[a]ny other legal advice of counsel outside the scope of this limitation will not be admitted into evidence as I find it to be prejudicial and the prejudice of such testimony outweighs any probative value it may have". Finally, given the limitation imposed on Kennedy's waiver of the attorney-client privilege, the Court denied petitioners' motion for trial subpoenas duces tecum as overly broad and seeking production of documents outside the narrow scope of the residency issue to be tried. When the Court inquired as to whether counsel for either party wished to be heard on the Court's rulings, they expressly declined the opportunity.

**3  *II. Stipulations, Witness Lists and Cheryl Hines*:

In compliance with the Court's pre-trial letter order, the parties filed witness lists, motions in limine and exhibit lists prior to trial. Petitioners' witness list identified 11 people including Cheryl Hines (virtual). Respondent's list identified five witnesses. Notably, neither side filed disclosures regarding expert testimony. To accommodate certain witnesses' schedules, the parties stipulated and the Court agreed that witnesses could be called out of order. This resulted in some of Kennedy's witnesses being called before petitioners rested their case. Before the trial began, various exhibits were stipulated into evidence by counsel.

Prior to the trial, the Court determined that the format would be hybrid allowing some witnesses to testify virtually. Before petitioners began their case, various arguments were placed on the record regarding the testimony of Cheryl Hines, Kennedy's wife. To that end, Scott James Street, Esq. appeared virtually on behalf of Hines and argued that the Court lacked jurisdiction to require her testimony. Street argued, "Ms. Hines is not physically present in  *776  New York right now, so under the law, civil law, she cannot be compelled to appear for a trial based on a New York trial subpoena." He further asserted that the proper approach would be to serve Hines with a subpoena in California for a deposition to occur in California, "[t]hat way [Hines'] deposition could be used if she was unavailable to testify in New York State." Petitioners countered by claiming that under "Election Law this is a special proceeding, the time frames are truncated, discovery is truncated, and there's an important issue." They further argued that "in residence challenged cases, quite often the spouse of the candidate being challenged appears and presents testimony." Petitioners further argued that "in most of the cases when a spouse appears, residency has been determined in the candidate's favor." The parties then indicated they were close to placing a stipulation on the record with regard to Hines but that the agreement broke down as to whether California was "*a*" residence or "*the*" residence of Hines. The Court then asked Street if his position related to his client's testimony would change if Hines were allowed to testify virtually, and he stated, "he would have to ask her about it." Street then reiterated that California Law needed to be complied with to compel Hines to testify. The Court reserved on petitioners' request to subpoena Hines' testimony. Notably, both sides ultimately rested without calling Hines to testify or requesting the Court to revisit the issue. Therefore, the Court makes no inferences regarding Hines in this matter. The testimony and evidence presented at trial and relied upon by the Court is summarized but not limited to the proof set forth below.

*III. Petitioner's Case:*

*1. David Michaelis*

Michaelis testified that he received a subpoena requiring his testimony. His testimony established that he has lived at 1 Twin Lakes Drive, in Bedford, NY since 2009 with his wife Nancy Ellen Steiner. Per his testimony, the home sits on five acres and is a "farmhouse with four bedrooms and a patio." According to Michaelis, he pays the regular expenses at the home. Michaelis

testified he has known Kennedy since 1978 and they were "always good friends." With regard to Kennedy staying at the 1 Twin Lakes Drive home, he testified that at a certain point there was a pattern where Kennedy would "stay over as [a] house guest when he was continuing work at Pace and at Riverkeepers." He testified that after Kennedy married Hines in 2014, he was "essentially in California, although obviously his travels take him all over the place." After 2014, Michaelis testified that as early as 2015 and "certainly in 2016" Kennedy would "come on Sunday nights and leave on Tuesday and go to work and then back to California." Michaelis testified that when Kennedy stayed he would "bring a briefcase, an overnight bag and very little." In between the visits, Michaelis testified that Kennedy did not leave anything behind, although once a rosary was left behind and was mailed to Kennedy at his California address. Michaelis testified that Kennedy never moved into his home nor did he ever pay rent or contribute to expenses.

 **4  According to Michaelis, in January 2017 the visits from Kennedy stopped and he could no longer recall Kennedy being a regular guest anymore. When directed to the statement in Kennedy's Affirmation that "upon [his] decision to contest the Democratic Party's 2024 nomination for the office of President of the United States, in March 2023, [his] friend and landlord David Michaelis requested that [he] move out of [his] residence at *Two* Twin Lakes *Road*, as he remains a supporter  **777**  of President Biden", Michaelis testified that the statement wasn't truthful. He elaborated that he didn't speak to Kennedy in March 2023 and that the Twin Lakes address was not Kennedy's residence as he had not "lived there for six years." Furthermore he pointed out that the address or the house is *One* Twin Lakes *Drive*, not *Two* Twin Lakes *Road* which was stated in Kennedy's affirmation. With regard to possessions of Kennedy's moved from the Twin Lakes home to the 84 Croton Lake Road address, Michaelis testified that he "never saw any possessions of [Kennedy's] that would've had to be moved in the time frame that's being described, or frankly, ever." He further testified that "[Kennedy] never moved into our house as a tenant; therefore, there were no amount of possessions other than that which he would bring with him to visit us as our guest and friend." He testified that the last time he saw Kennedy was in approximately 2019 when he was in California, which is 4 years prior to his candidacy for president. Nonetheless, Michaelis testified that he recently months he returned home from the gym to find a reporter in his driveway asking him questions about whether Kennedy lived in his Twin Lakes home.

On cross-examination by respondent's attorney, Michaelis admitted that Kennedy kept a van at his home during the time he would periodically stay there as a guest from 2014 to 2017. He also testified that Kennedy held Alcoholics Anonymous meetings at his home during the years he was a guest at the home. He also testified that Kennedy used the Twin Lakes address for his car registration and for his voter registration, even during years when he never stayed or returned to the home.

### *2. Nancy Steiner*

Steiner's testimony established that she has lived at 1 Twin Lakes Drive since 2007 which was corroborated by the deed to the home. She further testified that she has resided at 1 Twin Lakes Drive with her husband David Michaelis since 2009. Other than time spent in Maine, Steiner spends her time at 1 Twin Lakes Drive. She testified that she has known Kennedy for at least 33 years. She stated that recently her relationship with Kennedy had changed and she was unhappy about Kennedy representing to the press that her husband was his landlord, because "that's not accurate." She testified that Kennedy stayed at her 1 Twin Lakes Drive home over the years until 2017 and that he has never spent a night at the home since then. Steiner's testimony was consistent with Michaelis' testimony, namely that Kennedy never paid rent nor contributed to any expenses at the Twin Lakes home. Similar to Michaelis' testimony, Steiner testified that the last time she saw Kennedy (before the present day) was in California in 2019.

With regard to Kennedy using her address recently, Steiner testified that she was upset when her house was referred to in the press because he was a "*guest*" in their home and she was never his "*landlord.*" On cross-examination, Steiner admitted that she had met with petitioner's counsel to prepare for the hearing. In addition, certain text messages related to conversations between Steiner and Kennedy were stipulated into evidence. In these text messages, Kennedy apologized for referring to Michaelis as his landlord. Kennedy also stated in the text "your house was my official residence for my drivers license, voting etc until you asked me to leave."

### 3. Stephen Smith

Smith's testimony established that he lives in Cambridge, Massachusetts and has a home in Los Angeles, California. He testified that he is Kennedy's cousin and **\*778** that they attended Harvard University together. He testified that he sees Kennedy once or twice a year in Los Angeles. He also testified that he saw Kennedy in Boston this year. He set forth that he wouldn't let his political differences with Kennedy impact his testimony and that he once visited Kennedy's home in California for dinner. Smith testified that he has not seen Kennedy in New York in five years. However on cross-examination, Smith testified that he doesn't spend time in Westchester County when visiting New York

### 4. Andrew Karsch

According to his testimony, Karsch has known Kennedy since 1971 or 1972 when they met in Cambridge where Karsch currently resides. Karsch testified that he moved back to Cambridge two and half years ago. Prior to that, he lived in Brooklyn Heights and Shelter Island in New York. Most of Karsch's testimony referenced time spent with Kennedy and his family prior to 2014. When asked questions about his political views, he testified that despite having differing political views from Kennedy, that would not impact his ability to testify truthfully. He testified that the last time he saw Kennedy was at his home in California in 2022. He testified that the California home was "well lived in."

### **\*\*5** 5. Charles Rohrer

Rohrer was subpoenaed by petitioners to testify. His testimony was limited to the fact that he has lived in Katonah, New York for 35 years and that while he often walks his dog past 84 Croton Lake Road, he has never seen Kennedy at the subject address. He testified that recently he noticed that the house was painted and the fence has been taken care of. He testified that there is rarely a car parked at the house, and that he lately "noticed that no one's been there a lot."

### 6. Robert F. Kennedy, Jr.

When questioned by petitioners, Kennedy admitted that he is currently a candidate for the public office of President of the United States. He also testified that he is running as a cadidate for the independent body named "We the People." He testified that Susan Peters signed the bottom of the Independent Nominating Petition. He also testified that the address on the petition is 84 Croton Lake Road. His testimony established that he married Cheryl Hines in 2014 and that she resides in California at 2975 Mandeville Canyon Road. He testified further that when he filed paperwork with the Federal Election Commission, he listed his address as 2975 Mandeville Canyon Road and electronically signed his signature.

With regard to his current ties to New York State, Kennedy testified that he has a Jeep registered in New York at his accountant's address, located at 217 West 18th Street, 1851, (not 84 Croton Lake Road). Kennedy also testified that he is licenced to practice law in the State of New York. Per Kennedy's testimony he owns real property in California and Massachusetts but not in New York. His testimony and a deed confirmed that he sold his property located in Bedford, NY in November 2012 and ultimately moved to California in 2014. He testified that it was after his marriage to Hines and that "one of us had to move." Kennedy then testified about various properties that the couple purchased and sold in California while living in that State. The testimony then turned to various pets Kennedy has had over the years, including a pet emu, turtles, 20 falcons and hawks, and three dogs. With the exception of the falcons and hawks, Kennedy testified that his pets **\*779** moved with him to California in 2014. Kennedy also testified that the children who were younger than college age, moved to California with him. Kennedy then testified that his employee of more than 40 years, Wilbur Menendez, also moved with him to California along with some of Menendez's various family members. Per Kennedy's testimony Menendez travels with him to his Massachusetts property, but not to the 84 Croton Lake Road address.

With regard to work in California, Kennedy testified that he is of-counsel to the firm Howard & Street located in California. He then testified about various properties he purchased over the years while residing in California. Finally he testified that he purchased 2975 Mandeville Canyon Road in 2021 with Hines in California. Notably, Kennedy testified that some of his books

are located at a storage facility in California. Kennedy testified that he pays the utility bills, tax bills and the mortgage expenses related to the Mandeville Canyon Road home along with Hines. Likewise, his testimony related to other homes purchased with Hines established they shared in paying those expenses.

 **6  With regard to Kennedy's home in Hyannis Port, Massachusetts, he testified that while he lived at the property since 2008 under a lease arrangement, he exercised his purchase option on February 9, 2022. On the document transferring title, he listed his address at 2975 Mandeville Canyon Road, California. Kennedy also signed a power of attorney on January 29, 2022 and listed his address as 2975 Mandeville Canyon Road, California.

Next Kennedy was directed to testimony about his sister's residence located at 228 Chestnut Ridge Road in New York, where he testified that he lived for a period of six months or less before she sold the property on November 17, 2015. Kennedy's testimony and the admissible evidence revealed that Kennedy continued to utilize his sister's address for voting registration purposes even though she no longer owned the home and he no longer resided with her. Kennedy admitted that he continued to register his vote using the 228 Chestnut Ridge Road address in the 2016 primary and general elections. He explained that "I don't think it's illegal to vote -- I vote in the same town and I lived in the same town at the same voting place for 40 years."

Subsequent testimony by Kennedy establishes that for many years he utilized *2* Twin Lakes Drive as his address for purposes of his New York State voter registration. Notably Kennedy later testified that he never lived or spent time at *2* Twin Lakes Drive. Instead, Kennedy testified that he stayed at *1* Twin Lakes Drive. Nonetheless, Kennedy testified that he has not spent anytime at *1* Twin Lakes Drive since 2017 - the year he resigned from his positions at Pace University and Riverkeeper located in New York.

Next, Kennedy's testimony was directed to his March 10, 2017 resignation letter from certain positions at the New York organization known as Riverkeeper. In relevant part, the letter sets forth the following: "As you know, I now live on the west coast and the weekly commute has been hard on my family to say nothing of my carbon footprint." Next, Kennedy testified about his falconry licenses in New York and California. Furthermore there was testimony regarding the date Kennedy registered his automobile to the 84 Croton Lake Road address. There was then testimony related to Kennedy's fishing licenses in the State of New York. Finally testimony returned to Mr. Kennedy's claims of residency at the 84 Croton Lake Road address which, according to Kennedy, began "sometime around May of 2023." Kennedy than confirmed that his pets do not  **780**  reside at 84 Croton Lake Road nor do any of his family members.

Kennedy also testified that he left Pace in 2017 at the same time he resigned from New York based Riverkeeper and the NRDC. Kennedy's testimony then turned to registering his vehicle using a Twin Lakes "*Drive*" address instead of Twin Lakes "*Road.*" Kennedy then testified to a recent social media post where he discussed training ravens at his California residence. Kennedy was then directed to account for the number of times he slept at the 84 Croton Lake Road address and he responded "I only slept there once." When asked for details he stated, "About, I don't know, a month ago, three weeks ago." Then Kennedy was directed to a photo of the spare bedroom he claimed to be renting at the 84 Croton Lake Road address, he testified that none of the furniture or bedding was his. When directed to tell the Court regarding his intention to return to 84 Croton Lake Road, the following was stated on the record:

 **7  Q.  You testified before this Court, as you've sworn in affidavits, that it's your intent to return your family, your pets, maybe raven, to that spare bedroom in Mrs. Moss's house when you and Ms. Hines leave the State of California?

A. I'm going to return to Bedford. And if that is convenient at the time, I would live there. It depends how many people come. I've lived with Tim before. It isn't a move the same way I did 13 other times in Bedford.

Q. Understood Mr. Kennedy. So it's your testimony here today that you, your family, the pets, and all those wonderful things that establish some of the great things you've done in your life, may return actually to that spare bedroom in Ms. Moss' house?

A. It's possible. If not, I'll find a house nearby.

Later on Kennedy testified that "it was a hardship" for him to move to California which he did. He testified further that "I did gratefully out of love."

Next, Kennedy's testimony was directed to answering why he has been registering to vote at various places in New York State. In particular when Kennedy was asked why he went to great lengths to obtain an New York State absentee ballot, he responded "because I did not want to change my voter registration to California because I'm a New Yorker." Next Kennedy testified regarding moving 13 times in Bedford over the years. In addition Kennedy was asked about the various places he receives mail other than the Croton Lake Road address, Kennedy testified that he receives mail at his two accountants - "some at Foxborough, Massachusetts; some mail in [his] home in Hyannis Port; some at [his] accountant in New York; some in Mandeville Canyon California." Next Kennedy testified that he pays income taxes in both New York State and California because he pays where he "receive[s] income."

When asked about the rent arrangement with Ms. Moss for the spare bedroom at the 84 Croton Lake Road address, Kennedy testified that at first he agreed to pay her $300 a month. He then testified that "after the New York Post story broke I asked my assistant at that point to send her $500 a month because of the foreclosure." Kennedy then testified about how he selected his Vice President candidate who resides in California. Kennedy's testimony then was directed back to his time at 1 Twin Lakes Drive. While he testified that he stopped residing there in 2023, he admitted that he had not spent any time there after calendar year 2017. In addition when asked "you don't really have a lot of physical attachment to 84 Croton Lake Road?," Kennedy responded "correct."  **781**  When asked if he has a physical presence there, he responded, "no." Then when asked if he lives in California, Kennedy responded, "yes." When asked to use the dictionary definition of the word "fixed" to state whether he has a fixed presence in California, Kennedy responded, "to the extent that I am there a lot of my time, yes." Kennedy also testified that he became aware of the foreclosure proceeding at 84 Croton Lake Road from the New York Post. Petitioners rested.[2]

[2]    Kennedy's counsel made an oral motion to dismiss the case at the close of petitioners' proof, which was denied by the Court.

### IV. Respondent's Case:

### 1. Barbara Moss

Moss testified that she purchased her residence located at 84 Croton Lake Road in Katonah, New York on August 1, 1991. The deed supporting her testimony was received into evidence. Moss testified that the structure located at 84 Croton Lake Road is a four-bedroom home approximately between 2200 and 2400 square feet on 4 and ½ acres. Moss also testified that she spends time in Dartmouth, Massachusetts where her husband owns a home. She testified that until recently her mother lived in Bedford and she was there to take care of her. Moss stated that her husband, D.Timothy Haydock, owns a home in Massachusetts. Her additional testimony was that she splits the time "pretty much half and half" between Massachusetts and New York.

**8**  With regard to her husband, D. Timothy Haydock, Moss testified that he has cognitive issues as a result of a medical problem beginning during COVID. She indicated that Haydock has "problems with language, aphasia and dementia and would be unable to give cogent testimony at the hearing." Moss testified that while she has been partners with Haydock for 29 years, they "only got married two years ago." When asked by Kennedy's attorney who was living at 84 Croton Lake Road in 2022, Moss responded "Tim and myself." With regard to interactions with Kennedy, Moss testified that she and her husband attended his wedding to Hines in 2014. Her testimony corroborated the testimony that Kennedy would spend time at the Twin Lakes home between 2014 and 2017.

With regard to Kennedy, Moss testified that she has known him since 1989 or 1990. She testified further that Haydock has known Kennedy since he was 17 or 18 years old. She testified that years ago when Kennedy and her husband were each separated from prior marriages, they rented a home together in 1993 or 1994. With regard to recent interactions in 2024, Moss testified that at some point two boxes of Kennedy's personal effects arrived at her Croton Lake residence. She then testified that she

received a wire transfer to her checking account from Kennedy recently. She also testified that there was to be a written lease with Kennedy but that it was never executed. Moss then discussed photos that were taken in her home a few days before the trial that showed the spare bedroom that was set up for Kennedy to stay in. Additional photos were received into evidence which were photos of Kennedy's clothes in a closet and in a drawer. Moss' additional testimony established that there were pieces of unopened mail that had been sent to the residence along with mail received that Moss discusses with Kennedy's assistant. Notably, one piece of mail stipulated and received into evidence was from the Illinois Board of Election post marked July 11, 2024. Moss also testified that Kennedy has spent just one night  **782**  in total at the 84 Croton Lake Road address, which was in the last week of June 2024.

On cross-examination, Moss testified she is the sole owner and mortgage holder at 84 Croton Lake Road. She testified that she pays the property taxes and the bills at the property along with her husband. She testified that her husband has been friends with Kennedy for almost 50 years with her husband serving as best man at two of his weddings. Kennedy is the godfather to one of Haydock's daughters. Moss testified that members of the Kennedy family have come to the aid of her family in difficult situations including testifying during Kennedy's brother's trial in 2012. Moss also testified that her 84 Croton Lake Road property is subject to a foreclosure proceeding. She testified that while she has been provided with an attorney in this matter, she has no attorney representing her in the foreclosure action.

With regard to Kennedy making payments to Moss for use of the spare bedroom at the Croton Lake Road address, Moss testified that she received the first payment on May 20, 2024. The witness then testified on cross examination that the payment was received the very next day after a New York Post article about Kennedy. Notably, the New York Post article was stipulated and received into evidence by the Court but the Court ruled that its contents were inadmissible hearsay and would not be admitted for the truth of the matter. Moss then testified that two weeks later she received an additional $500.00. When asked "so it was Kennedy's idea on May 20th to send you $6,000," Moss answered, "somebody sent me $6,000, I don't know whose idea it was." Moss also testified that she worked with a lawyer for Kennedy in this proceeding. On cross-examination she also indicated that while Kennedy arranged to use a spare bedroom in her home in 2023, that the first payment she received was over a year later on the morning after the New York Post article was published. She also testified that she did not know where the two boxes that arrived at her home for Kennedy came from. Moss also testified that she "put things in the room when they arrived so they weren't in a box." She testified further that at some point she sent a key to her house to Kennedy's assistant but she is unsure if he received it. She testified that any mail that comes to her house, she mails to Kennedy's attorney or to his personal assistant in California. She testified that Hines has never stayed at her home nor have any of Kennedy's various pets.

**\*\*9**  *2. Robert F. Kennedy, Jr.*

Respondent's direct questioning of Kennedy began with a video showing Kennedy's "younger self" and his ties to New York State. When asked if he considered himself a New Yorker, Kennedy responded in part:

"I have every kind of affiliation with this state. My political gravities were in New York. I've been involved in politics for most of my adult life. I'm deeply involved in politics ... But in the back of my head, at some point I may run for political office or my kids may run for political office and I want to keep my affiliations with New York State."

Then when asked by his counsel why he didn't rent an entire house or buy a house in Bedford NY, Kennedy responded:

"Well home ownership is not just expensive, it's time consuming. And particularly in New York, you know, where — I was going to leave my car in New York and it snows a lot here and pipes break, the driveway needs to be plowed and, you know, all these other burdens that are associated with home ownership.  **783**  And so for me it was much better to live with a friend."

Next Kennedy's attorney asked him questions related to his time at 1 Twin Lakes Drive and texts between he and Steiner in 2024 after the New York Post article was pusblished.

Next the testimony turned to questions about attorney Paul Rossi and certain advice he gave Kennedy regarding ballot access in his presidential campaign. Kennedy then proceeded to testify that he used New York as his residency in his nominating petitions

"on advice of counsel." He further stated, "On advice of counsel..I believe that to be my only option at that time." He further testified that he did not use the 84 Croton Lake Road address in his nominating petition with the intent to mislead voters in the State of New York. He then testified about his various ties to New York including work he has done for the environment during the Pataki administration. After that, Kennedy testified to the various places he lived after his father was assassinated in 1968. Next the testimony discussed Kennedy's falconry license in New York State. Kennedy then testified regarding the various jobs he had in New York State since graduating from the University of Virginia Law School. He testified about how he co-founded Hudson Riverkeeper and Waterkeeper Alliance, which he claims is the biggest water protection group in the world, and is based in New York. He then testified about his time working at Pace Law School and running an environmental litigation clinic. While he testified that he resigned from Hudson Riverkeeper and Pace in 2017, he testified that he remained involved with Waterkeeper "until the pandemic."

Turning to his Presidential campaign in the 50 states, Kennedy was asked if certain states required that he disclose the residence "where he was registered to vote," Kennedy answered "yes." Kennedy then stated that some states required that he list his domicile as "a state where [he] voted. And if [he] had any inconsistency across the 50 states [he] would have been sued and probably would have lost everything." Then when Kennedy was asked on re-direct if by signing a Statement of Candidacy and using his California address, whether he was making a statement on legal residency, Kennedy answered "No." Then Kennedy testified about having falconry licenses in NY State. He further testified that his falconry licensed had expired in California. He also testified how he sometimes mixes up the Twin Lakes Road address and refers to it as "*2*" instead of "*1*" and at times "*Drive*" instead of "*Road.*" Then Kennedy testified that someone on his staff was supposed to change his driver's license. Later, certain emails were received into evidence to support this testimony. Kennedy then testified that his friends who had testified days earlier on behalf of petitioners may have done so "because many of the positions that [he's] taken ... running against [his] own Party have alienated [him] from many important and life-long relationships." At the close of his re-direct, Kennedy was asked by his attorney: "Have you intentionally maintained a continuous physical address in New York?," Kennedy answered, "yes."

**\*\*10** *3. Paul Rossi*

Rossi testified that he graduated from Temple Law School in 1998. He testified about his employment following law school. He indicates that he is currently a solo practitioner. He also described a case where he represented the League of Women Voters and Common Cause in a constitutionality challenge. He also testified that his practice has been focused on "a lot of ballot access law challenges." Rossi then discussed various residency rules in other **\*784** states that have been deemed unconstitutional for various reasons. Rossi then testified that he is an independent contractor for Team Kennedy. More specifically he testified, "I'm ballot access legal counsel. And they gave me the upgrade of Senior Ballot Access Legal Counsel." When asked if he has been paid, Rossi responded, "I have not asked to be paid yet" but indicated he would probably ask to be paid. He testified that he was engaged by Team Kennedy at the end of October 2023 "to put together a 50-state ballot access program so that the name Robert F. Kennedy, Jr. and whomever his Vice Presidential candidate would be would appear on the ballot in 2024." When asked if he needed to discuss legal residency with Kennedy, Rossi responded, "Absolutely. I mean one of the very first things you have to put on the very first documents are name and address. So, yes, I did." When Kennedy asked Rossi what constitutes residency and address, Rossi testified that the 12th Amendment establishes the standard of "inhabitancy", and that everybody can have just one domicile. Then when asked, to tell us the full extent of what he said to Kennedy regarding his legal residency, Rossi responded in part as follows:

> I told him that the address that we needed was the address to which he intended to return after any kind of temporary or prolonged absence. And then the further conversation I had with him. What I told him is that it had to be the address to which he was registered to vote because certain states require you to swear that the address that you attested to is where you are registered to vote.

The witness later testified that he was relying on a case from the Northern District of Texas for his advice. Then when asked "after your interaction with Mr. Kennedy, did you conclude that his proper residency for his nominating petitions in the State of New York was his address in Katonah, New York?," Rossi responded as follows:

> Absolutely, because — look it was my understanding he has essentially three addresses: One in Massachusetts, which everyone is aware of, Hyannis Port, okay? His current domicile in New York. And the California address that his wife has and is maintaining until she retires. My analysis was based on the following. And I was the one who gave — I essentially was the one that said it's the 84 Croton Lake Road address which is your domicile under New York Law and under every other law. New York is the most restrictive domicile law in the country, so that's the rule I went with. It also comported with the 12th Amendment, which does apply here. It was my analysis based on he's a life-long New York resident, has maintained a domicile here his entire life, registered to vote here his entire life, he's always voted here his entire life, he is licensed to vote here, he is licensed to drive in New York, his professional licenses are in New York, his recreational licenses are in New York, he also pays taxes in New York. With all due respect, if I have advised him that either the Massachusetts or California address was the proper address to use, we would be in the same courtroom, the challenges would be made, and we would have a horrible case to defend. The only address that we could use on a 50-state basis is 84 Croton Lake Road, New York, in Katonah. And I told him that.

**\*\*11** He then testified that he gave Kennedy this advice in November of 2023. This witness was then asked to testify about the constitutionality of New York State Election Law. At that time, the Court sustained petitioner's objection and limited **\*785** Rossi to testimony to the scope of the Court's previous ruling.

On cross-examination, Rossi testified that he is not admitted to practice law in the State of New York. When asked "is it possible that there's evidence and testimony and documents that maybe Mr. Kennedy did not share with you when you gave him advice [about residency]," Rossi answered at first, "that's a hypothetical." Then when asked "it's a possibility thought?", Rossi responded "I guess so."

### 4. John Dignan

John Dignan testified that he was appearing voluntarily and was not being paid for his testimony. He testified that he has known Kennedy for 40 years. He currently lives in Bedford, New York and owns a car service. He testified that he has been Kennedy's driver since 2003 or 2004. Dignan testified that in 2014 when Kennedy got married to Hines, he "used to come back weekly to be a professor at Pace Law School. I used to pick him up weekly." His testimony related to Kennedy's schedule in 2014 was similar to all the witnesses set forth above. He testified that in the last year he has seen Kennedy probably "four or five times." When asked, when did he last drive Kennedy, Dignan responded, "about a month ago ... I picked him up at the [Hudson Yards Hotel] ... in Manhattan." On cross-examination, Dignan testified that he had a very strong friendship with Kennedy and feels "loyalty" to him. Then when asked the questions "so you haven't driven him to 84 Croton Law Road in Katonah in the last few month at all?", Dignan responded "no." Respondents rested.

### V. The Court's Ruling

[1]  [2]  [3]  [4]  Election Law§ 6-140 (1) requires that each page of an independent nominating petition set forth the address of the candidate's "place of residence" (Election Law§ 6-140 [1]). The Court of Appeals has repeatedly emphasized that although substantial compliance with Election Law requirements is acceptable as to details of form, "there must be strict compliance with statutory commands as to matters of prescribed content" (*Matter of Hutson v. Bass*, 54 N.Y.2d 772, 774, 443 N.Y.S.2d 57, 426 N.E.2d 749 [1981]; *see*, *Matter of Stoppenbach v. Sweeney*, 98 N.Y.2d 431, 433, 749 N.Y.S.2d 210, 778 N.E.2d 1040 [2002]).

The requirement that each page of a nominating petition set forth the candidate's "place of residence" is a matter of prescribed content, rather than form, and therefore strict compliance with the requirement is necessary (see, *Matter of Stoppenbach v. Sweeney*, 98 N.Y.2d at 433, 749 N.Y.S.2d 210, 778 N.E.2d 1040 [2002]; *Matter of Hutson v. Bass*, 54 N.Y.2d at 774, 443 N.Y.S.2d 57, 426 N.E.2d 749 [1981]; *Matter of Sheehan v. Scaringe*, 154 A.D.2d 832, 546 N.Y.S.2d 698 [1989], *appeal denied* 74 N.Y.2d 615, 549 N.Y.S.2d 960, 549 N.E.2d 151 [1989]). Mandating strict compliance with the Election Law in this regard is designed to guarantee the integrity of the election process by facilitating the discovery of fraud and reducing the likelihood of unequal enforcement of the law (see, *Seawright v. Bd. of Elections in City of New York*, 35 N.Y.3d 227, 233, 127 N.Y.S.3d 45, 150 N.E.3d 848 [2020]; *Matter of Gross v. Albany County Bd. of Elections*, 3 N.Y.3d 251, 258, 785 N.Y.S.2d 729, 819 N.E.2d 197 [2004]). The strict compliance standard ensures that the Election Law is neutrally applied regardless of a candidate's history, background, party affiliation, protected class, "or any other criterion irrelevant to a determination of whether its requirements have been met" (*Matter of Staber v. Fidler*, 65 N.Y.2d 529, 534, 493 N.Y.S.2d 288, 482 N.E.2d 1204 [1985]). As cautioned by the Court of Appeals, "a too-liberal construction **\*786** of the Election Law has the potential for inviting mischief on the part of candidates, or their supporters or aides, or worse still, manipulations of the entire election process" (*Matter of Staber v. Fidler*, 65 N.Y.2d at 534, 493 N.Y.S.2d 288, 482 N.E.2d 1204 [1985]; *see*, *Matter of Gross v. Albany County Bd. of Elections*, 3 N.Y.3d 251, 258, 785 N.Y.S.2d 729, 819 N.E.2d 197 [2004]). Thus, the failure to strictly comply with the Election Law requirements as to matters of content is fatal to a nominating petition (see, *Matter of Gross v. Albany County Bd. of Elections*, 3 N.Y.3d at 258, 785 N.Y.S.2d 729, 819 N.E.2d 197 [2004]).

 **\*\*12** In view of the strict compliance standard, the Court's inquiry in this proceeding is not whether Kennedy substantially complied with the Election Law by listing the 84 Croton Lake Road address as his "place of residence" in the nominating petition. Nor does the Court's inquiry involve consideration of whether Kennedy's use of that address was intended to, or did in fact, mislead or confuse signatories to the petition. Rather, the strict compliance standard simply requires the Court to determine whether the 84 Croton Lake Road address was in fact Kennedy's legitimate "place of residence" under the Election Law at the time the nominating petition was circulated and filed with the Board of Elections (see, *Matter of Pilla v. Karnsomtob*, 142 A.D.3d 1116, 1119, 39 N.Y.S.3d 174 [2016], *lv denied* 28 N.Y.3d 904, 2016 WL 5822534; *Zobel v. New York State Bd. of Elections*, 254 A.D.2d 520, 521, 678 N.Y.S.2d 794 [1998]; *Sheehan v. Scaringe*, 154 A.D.2d at 833, 546 N.Y.S.2d 698 [1989], *appeal denied* 74 N.Y.2d 615, 549 N.Y.S.2d 960, 549 N.E.2d 151 [1989]). Here, petitioners contend that the nominating petition must be invalidated because the 84 Croton Lake Road address was not, and has never been, Kennedy's legitimate and bona fide "place of residence". Instead, petitioners argue, Kennedy falsely listed the 84 Croton Lake Road address as his residence on the nominating petition in order to perpetuate a decade-long "sham" that enabled him to retain his voting eligibility and political clout in the State of New York, while actually residing in the State of California.

 [5]  [6]  [7]  [8]  [9]  [10]  [11]  [12]  Here, petitioners bore the burden at trial to demonstrate by clear and convincing evidence that the 84 Croton Lake Road address listed on Kennedy's nominating petition was not his residence within the meaning of the Election Law (see, *Matter of Glickman v. Laffin*, 27 N.Y.3d 810, 815, 37 N.Y.S.3d 792, 59 N.E.3d 527 [2016]; *Matter of Willis v. Suffolk County Bd.of Elections*, 54 A.D.3d 436, 862 N.Y.S.2d 608 [2008], *lv denied* 11 N.Y.3d 701, 864 N.Y.S.2d 388, 894 N.E.2d 652 [2008]). The clear and convincing evidence standard requires the production of evidence which makes it "highly probable" that petitioners' claims are true, i.e., that Kennedy did not reside at the 84 Croton Lake Road address listed on the nominating petition (see, *Matter of Ferreyra v. Arroyo*, 35 N.Y.3d 127, 128, 125 N.Y.S.3d 354, 149 N.E.3d 47 [2020]; *Matter of Stavisky v. Koo*, 54 A.D.3d 432, 434, 863 N.Y.S.2d 87 [2008]; *Matter of Poldrugovaz*, 50 A.D.3d 117, 127, 851 N.Y.S.2d 254 [2008]). Election Law § 1—104 (22) defines "residence" as "that place where a person maintains a fixed, permanent, and principal home and to which he [or she], wherever temporarily located, always intends to return". As used in the Election Law, the term "residence" is synonymous with "domicile" and requires that a person be "physically present with the intent to remain for some time" (*People v. O'Hara*, 96 N.Y.2d 378, 384, 729 N.Y.S.2d 396, 754 N.E.2d 155 [2001]; *see*, *Matter of Palla v. Suffolk County Bd. of Elections*, 31 N.Y.2d 36, 334 N.Y.S.2d 860, 286 N.E.2d 247 [1972]; **\*787** *Matter of Fernandez v. Monegro*, 10 A.D.3d 429, 780 N.Y.S.2d 741 [2004]). The controlling factor to a Court's finding that a party maintains a "residence" at a particular address "is that the individual must manifest an intent [to reside there], coupled with physical presence 'without any aura of sham' " (*People v. O'Hara*, 96 N.Y.2d 378, 385, 729 N.Y.S.2d 396, 754 N.E.2d 155 [2001], quoting *Matter of Gallagher v. Dinkins*, 41 A.D.2d 946, 947, 343 N.Y.S.2d 960 [1973]). Notably, a generalized intent

Case 6:24-cv-01009-DNH-TWD    Document 8    Filed 11/08/24    Page 86 of 89

to return to a general geographic area at some uncertain point in the future is insufficient to constitute "residence" within the meaning of the Election Law (*see, Matter of Stewart v. Chautauqua Cnty. Bd. of Elections,* 69 A.D.3d 1298, 1301, 894 N.Y.S.2d 249 [2010], *aff'd* 14 N.Y.3d 139, 897 N.Y.S.2d 704, 924 N.E.2d 812 [2010]). Under the Election Law, "[a] person's residence is based largely on his intent to remain at or return to a specific abode", and must be coupled with an actual physical presence at that abode (*Matter of Markowitz v. Gumbs,* 122 A.D.2d 906, 907, 505 N.Y.S.2d 948 [1986], *lv denied* 68 N.Y.2d 605, 506 N.Y.S.2d 1029, 497 N.E.2d 967 [1986]; *see, Matter of Davis v. Clennon,* 227 A.D.3d 638, 639, 212 N.Y.S.3d 603 [2024]). Residency is generally a factual question which is dependent upon the particular circumstances presented (*see, Matter of Glickman v. Laffin,* 27 N.Y.3d at 815, 37 N.Y.S.3d 792, 59 N.E.3d 527 [2016]). Where the determination of residence requires the resolution of conflicting testimony and credibility issues presented at trial, "the resolution of the conflict lies within the province of the trial court, as the finder of fact, and should not be disturbed on appeal unless 'it is obvious that the court's conclusion could not be reached under any fair interpretation of the evidence' " (*Matter of Fernandez v. Monegro,* 10 A.D.3d at 430, 780 N.Y.S.2d 741 [2004], quoting *Matter of Markowitz v. Gumbs,* 122 A.D.2d at 907, 505 N.Y.S.2d 948 [1986], *lv denied* 68 N.Y.2d 605, 506 N.Y.S.2d 1029, 497 N.E.2d 967 [1986]).

**\*\*13**  **[13]**  Here, petitioners demonstrated by clear and convincing evidence that the 84 Croton Lake Road address listed on the nominating petition was not Kennedy's bona fide residence within the meaning of the Election Law. Despite Kennedy's claim that he resided in the spare bedroom of the home as Barbara Moss' tenant beginning in approximately the Spring of 2023, the overwhelming credible evidence introduced at trial established that Kennedy's connections with the 84 Croton Lake Road address existed only on paper and were maintained for the sole purpose of maintaining his voter registration and political standing in the State of New York. Kennedy's own testimony, as well as Moss' testimony, established that during the approximately 15 months that Kennedy claimed to be a tenant at the 84 Croton Lake Road address, he only slept there on one occasion. Moreover, that lone overnight stay at 84 Croton Lake Road did not occur until June 25, 2024, one month *after* Kennedy filed the nominating petition naming that address as his place of residence and two weeks after this proceeding challenging the nominating petition was commenced. Thus, during the period of May 3, 2024 through May 28, 2024 when the nominating petition was being circulated for signatures, Kennedy had not yet slept at the 84 Croton Lake Road address even once. While Kennedy attempted to blame his failure to sleep at the address on his busy campaign travel schedule and the lack of space for his security detail, this excuse is just further proof that Kennedy did not intend to reside at the address. Furthermore, the Court deems it noteworthy that Kennedy was not campaigning for President during the period of 2018 and 2023 when he was using 1 Twin Lakes Road as  **\*788**  his address and failed to even step foot in that residence.

Furthermore, the undisputed testimony provided by Moss and Kennedy established that there was no written lease for the premises and that, although they allegedly discussed a potential rental payment of $300 per month during their initial conversation in the Spring of 2023, Kennedy made no payments to Moss whatsoever until approximately one year later on May 20, 2024. Although Kennedy attempted to characterized that $6,000 payment to Moss as a "back payment" for one-year of rent, the credibility of this characterization is undermined by the testimony that Moss was not pressing Kennedy to make rental payments, that Kennedy made the payment one day after reading the May 19, 2024 New York Post article, that he told his assistant to send Moss $6,000 "because of the foreclosure", and that he was completely unaware that the home where he had supposedly been residing for an entire year was under foreclosure until he read about it in the New York Post. Indeed, Kennedy's admission that he was not named as a defendant in that foreclosure action, had never been contacted about the foreclosure or served with foreclosure papers, and was personally unaffected by the foreclosure action, supports the conclusion that he was not a legitimate tenant of the property. This credible evidence clearly established that Kennedy lacked the necessary intent to make the spare bedroom of the 84 Croton Lake Road address his legitimate and bona fide residence. The undisputed testimony and evidence also established that Kennedy's physical presence at the 84 Croton Lake Road address was virtually nonexistent. Kennedy himself admitted that he does not have a physical presence at 84 Croton Lake Road, that he doesn't have much physical attachment to the property, that he lives in California and spends a lot of time at his residence there, and that he has no current intention to abandon his California residence. Evidence regarding the scant number of his personal items kept in the spare bedroom at 84 Croton Lake Road further reinforces that Kennedy's physical presence at that address is nominal. The existence of minimal personal items consisting of some articles of clothing, a few books, and three photographs can hardly be considered a legitimate physical presence. Indeed, the Court finds it significant that Kennedy did not personally unpack

the two boxes of his belongings that were sent to the address, was unable to provide an independent description of the three photographs, could not recall placing the photographs on the nightstand, and denied hanging the clothes that were in the closet. Kennedy's testimony that none of the furniture, bedding and other decorative items in the spare bedroom belonged to him, as well as his testimony that his wife and family, his extensive book collection, and his wide assortment of domestic and exotic pets all remained in California, was further compelling evidence that Kennedy lacks the necessary physical presence and intent to remain at the 84 Croton Lake Drive address to establish that address as his residence.

**\*\*14** Kennedy's reliance upon evidence that he received certain items of mail at the 84 Croton Lake Road address is likewise insufficient to establish his physical presence and intent to return to that location. Moss' testimony that she did not retain the items of mail in anticipation of Kennedy's return to 84 Croton Lake Road, but that instead forwarded the mail to California and several other addresses at Kennedy's directive, only serves to strengthen the conclusion that Kennedy had no intention to return to that address to retrieve his mail. In addition, inasmuch as the items of mail **\*789** entered into evidence were either related to Kennedy's Presidential campaign or appeared to be personal communications that had never been opened, the Court does not afford them great weight on the issue of residence. Moreover, as the testimony established that Kennedy receives mail at five different addresses located in California, New York and Massachusetts, the fact that he receives campaign mail and seemingly unimportant personal mail at the 84 Croton Lake Road address holds little probative value.

To the extent that Kennedy attempted to demonstrate residence through proof that he maintains New York State fishing and falconry licenses, a New York State driver's license and vehicle registration, a New York State Voter registration, a law practice, and a license to practice law in New York State, none of this evidence is relevant to establishing that the 84 Croton Lake Road address that Kennedy listed on his nominating petition was his actual place of residence within the meaning of the Election Law. Kennedy's ability to drive, work and vote in this State, without proof of the requisite physical presence at a specific address where he intends to reside on a permanent basis, is immaterial. The Court reaches the same conclusion with respect to evidence relating to Kennedy's family history and past contributions to environmental and other worthy causes in this State. While no doubt admirable, Kennedy's accomplishments and family history from decades past have absolutely no bearing on the sole issue to be determined by this Court, i.e., whether the 84 Croton Lake Road address listed on the nominating petition was Kennedy's bona fide residence within the meaning of the Election Law.

The clear and convincing evidence at trial also established that Kennedy lacked the requisite intent to return to 84 Croton Lake Road. Indeed, Kennedy himself testified that he lacked any present intent to return to the 84 Croton Lake Road address. While Kennedy testified that he intends to return to the State of New York when his wife retires from acting at some undefined date in the future, this testimony is speculative and wholly inadequate to establish a present intent to return to the spare bedroom of the 84 Croton Lake Road address. Given the size and appearance of the spare bedroom as shown in the photographs admitted into evidence, the Court finds Kennedy's testimony that he may return to that bedroom to reside with his wife, family members, multiple pets, and all of his personal belongings to be highly improbable, if not preposterous. In addition, Kennedy's testimony that he would buy another house in the Town of Bedford if it is not "convenient" to move his family, pets, belongings into the spare bedroom at 84 Croton Lake Road is both speculative and immaterial to the issue of residence. The fact that Kennedy considers himself to be a "New Yorker," has fond memories of the years he lived in the Town of Bedford and longs to return there some day is utterly irrelevant to the issue of whether he resided in the spare bedroom of the 84 Croton Lake Road address during May of 2024 when he circulated and filed the nominating petition.

Based upon the clear and convincing credible evidence presented in this case, the Court finds that the 84 Croton Lake Road address listed on the nominating petition was not Kennedy's bona fide and legitimate residence, but merely a "sham" address that he assumed for the purpose of maintaining his voter registration and furthering his own political aspirations in this State. This conclusion is consistent with other evidence in the record demonstrating Kennedy's long-standing pattern of borrowing addresses from friends and relatives to use as placeholder addresses **\*790** so he could maintain his voter registration in New York State while actually residing in California. Using a friend's address for political and voting purposes, while barely stepping foot on the premises, does not equate to residency under the Election Law. To hold otherwise would establish a dangerous precedent and open the door to the fraud and political mischief that the Election Law residency rules were designed to prevent.

**\*\*15  [14]**  The defenses and contrary arguments offered by Kennedy do not warrant a contrary result. First, to the extent that Kennedy claims a "dual residence" in California and New York and is therefore entitled to list the New York address as his residence, this argument is without merit. While the Election Law does not preclude a person from having two residences and choosing one for election purposes, the residence chosen must be one to which the candidate has legitimate, significant, and continuing attachments such that it qualifies as a bona fide "residence" within the meaning of the Election Law (*see*, *Maas v. Gaebel*, 129 A.D.3d 178, 180, 9 N.Y.S.3d 701 [2015]; *Matter of Willkie v. Delaware County Bd. of Elections*, 55 A.D.3d 1088, 1089, 865 N.Y.S.2d 739 [2008]). Inasmuch as the clear and convincing evidence demonstrates that the 84 Croton Lake Road address was not Kennedy's true residence, the dual residency argument must fail.

 **[15]**  Kennedy's attempt to establish that he lacked the intent to mislead or confuse signatories because he listed the 84 Croton Lake Road address as his place of residence based upon the advice of legal counsel is also of no avail. According to this argument, because Kennedy lacked the intent to mislead or confuse signatories by using the 84 Croton Lake Road address, and because petitioners presented no evidence that any signatories were actually mislead or confused by his use of that address, invalidation of the petition is not required. However, the cases relied upon by Kennedy for the proposition that such a showing of intent or actual confusion is required, namely (*Ferris v. Sadowski*, 45 N.Y.2d 815, 409 N.Y.S.2d 133, 381 N.E.2d 339 [1978]) and (*Maloney v. Ulster County Bd. of Elections*, 21 A.D.3d 692, 800 N.Y.S.2d 249 [2005]), are distinguishable. Both *Ferris* and *Maloney* concerned an inadvertent mistake that resulted in the use of the candidate's previous address on the petition. In each case, there was no dispute that the incorrect address had recently been the candidate's genuine and bona fide residence within the meaning of the Election Law. Notably, in excusing the mistake in *Ferris*, the Court of Appeals cautioned that its finding should not be interpreted as blanket rule permitting validation of a petition containing an incorrect address, as strict compliance with the Election Law would be required in any case "where opportunities for deception or the likelihood of confusion would be present".

Here, unlike the candidates in *Ferris* and *Maloney*, Kennedy made the deliberate choice to use the 84 Croton Lake Road address as his "place of residence" on the nominating petition despite that fact that he never resided there. In this regard, this matter is identical to (*Eisenberg v. Strasser,* 100 N.Y.2d 590, 769 N.Y.S.2d 150, 801 N.E.2d 370 [2003]), wherein the Court of Appeals invalidated a petition "because the candidate did not actually reside at the address he listed as his residence on the designating petition and which he had used for voter registration" (*Eisenberg v. Strasser*, 100 N.Y.2d at 591, 769 N.Y.S.2d 150, 801 N.E.2d 370 [2003]). Distinguishing the case from *Ferris,* wherein the candidate's former address was listed by mistake, the Court of Appeals found that invalidation of the petition was necessary because "in this  **\*791**  case, the candidate decided to use an address that was not a true residence" (*id.*). While Kennedy attempts to deflect blame for his decision to use the 84 Croton Lake Road address upon Rossi's legal advice, the testimony demonstrated that the advice was not based upon Rossi's legal opinion that the 84 Croton Lake Road address was a valid residence under the New York State Election Law, but rather upon the need to use the address where Kennedy was registered to vote.

 **[16]    [17]**  The Court will finally address Kennedy's contention that the Election Law residence requirement is unconstitutional under the 12th Amendment of the United States Constitution, as well as Kennedy's attempt to establish this contention through Rossi's trial testimony. Kennedy argues that the Election Law's residence requirement unconstitutionally imposes eligibility restrictions beyond those established by the 12th Amendment of the United States Constitution, which sets for the standard of "inhabitancy" rather than "residency". This argument is a red herring. Kennedy's designation of the 84 Croton Lake Road address as his "place of residence" was a false statement requiring invalidation of the petition. The United States Constitution cannot be construed to protect candidates from making false statements on their petitions for public office. Moreover, to the extent that Kennedy attempted to establish his claim of unconstitutionality through Rossi's testimony, such testimony was properly excluded because Rossi was not disclosed or shown to be qualified as an expert in either Constitutional or New York State law, and admittedly was not licensed to practice law in the State of New York. In any event, even assuming that the testimony could be characterized as legal advice rather than expert testimony, any legal advice regarding the constitutionality of the New York State Election Law was nonetheless properly excluded as outside the scope of Kennedy's limited waiver of the attorney client privilege.

**\*\*16**  In view of the above testimony, evidence and findings, the nominating petition must be invalidated.

Therefore, it is

ORDERED AND ADJUDGED, that the petition is granted in its entirety, and it is further

ORDERED, ADJUDGED AND DECLARED that the nominating petition filed with Respondent New York State Board of Elections purporting to designate Respondent-Candidate, Robert F. Kennedy, Jr., as a candidate of the We The People Independent Body for Public Office of President of the United States, Respondent-Candidate Nicole Shanahan, as a candidate of the We The People Independent Body for Public Office of Vice President of the United States and Respondents Candidates individuals captioned therein as Electors for the General Election to be held on the 5th day of November, 2024 is invalidated, and it is further

ORDERED AND ADJUDGED that Respondent New York State Board of Elections is hereby directed not to place and/or print the name of the Respondents-Candidates aforesaid as candidates of the We The People Independent Body on the official ballots to be used at the General Election to be held on the 5th day of November, 2024.

This constitutes the Decision and Judgment of the Court, the original which is being transmitted to the Albany County Clerk for electronic filing and entry. Upon such entry, counsel for petitioners shall promptly serve notice of entry on all other  **\*792** parties (*see* Uniform Rules for Trial Courts [22 NYCRR § 202.5-b [h][1], [2]).

**All Citations**

218 N.Y.S.3d 770, 2024 WL 3894605, 2024 N.Y. Slip Op. 24221

---

**End of Document**  © 2024 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW  © 2024 Thomson Reuters. No claim to original U.S. Government Works.  18